**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| **DANIEL MCCABE, DANIEL WRIGHT,** | ) | |
| **and JEFFREY POLLACK, individually** | ) | |
| **and on behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **23-10829-FDS** |
| | ) | |
| **FORD MOTOR COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

SAYLOR, C.J.

This is a putative class action alleging defects in the transmissions of certain Ford vehicles. Jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).

Plaintiffs Daniel McCabe, Daniel Wright, and Jeffrey Pollack have brought suit against defendant Ford Motor Company. They represent a putative class of purchasers and lessees of Ford vehicles equipped with a 10R80 10-speed automatic transmission. According to the complaint, the transmission "can shift harshly and erratically, causing the vehicle to jerk, lunge, clunk, and hesitate between gears." (First Am. Compl. ¶ 4).

The complaint asserts claims for breach of express warranty; breach of implied warranty; violation of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; negligence; fraud and fraudulent concealment; unjust enrichment; and violation of the Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A.

Ford has moved to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the motion will be granted in part and denied in part.

## I.   Background

### A.   Factual Background

The facts are set forth as alleged in the First Amended Class Action Complaint ("FAC").

According to the complaint, Daniel McCabe, Daniel Wright, and Jeffrey Pollack purchased or leased vehicles designed and manufactured by defendant Ford Motor Company equipped with a 10R80 10-speed transmission.  (FAC ¶¶ 17-19).

The complaint alleges that when Ford first introduced 10R80 transmission in the 2017 F-150, it "bragged about the 'improved acceleration and performance' and 'enhanced shifting performance' offered by the Transmission."  (*Id.* at ¶ 26).  Ford also described the transmission as "innovative" and "class-exclusive," advertising its "responsiveness and all-around performance."  (*Id.* at ¶¶ 34, 37).

According to the complaint, however, the transmission did not live up to Ford's representations.  It alleges that vehicles equipped with the transmission "slip gears, hesitate, jerk, lunge, clunk, and/or shift roughly."  (*Id.* at ¶ 40).  It further alleges that "[s]ome consumers have reported that their Vehicle loses power while accelerating, including onto a freeway or through an intersection, when the Transmission failed to shift up or down."  (*Id.*).  As a result, drivers have "reported whiplash and discomfort due to harsh shifting," "distraction from driving due to loud and unusual sounds," "concerns about reliability," and "that they do not feel safe driving [their vehicles] in normal traffic conditions."  (*Id.* at ¶¶ 41-42).

According to the complaint, "[s]ince the 10R80 transmission was introduced . . . drivers have repeatedly complained to Ford about problematic shifting, including Vehicles lunging,

jerking, hesitating, clunking, and otherwise shifting erratically." (*Id.* at ¶ 66).  It alleges that numerous complaints filed with the National Highway Transportation Safety Administration demonstrate that the defects with the 10R80 are "widespread." (*Id.* at ¶ 65).

McCabe leased a 2019 Ford Ranger equipped with a 10R80 transmission in September 2019.  (*Id.* at ¶ 46).  The complaint alleges that "[a]pproximately seven months after leasing the Vehicle, Mr. McCabe started to notice the Transmission held gears much longer than it should." (*Id.* at ¶ 48).  According to the complaint, McCabe felt that the car was "lethargic" and would "skip[] gears while driving."  It alleges that he would sometimes "hear a loud 'clunk' once the gear was finally in place." (*Id.*).

Wright purchased a 2022 Ford Ranger equipped with a 10R80 transmission in June 2022. (*Id.* at ¶ 52).  According to the complaint, Wright soon noticed that the car's transmission "was 'bogging down,' shuddering while driving, 'bucking,' and generally shifting harshly and erratically." (*Id.* at ¶ 54).

Pollack purchased a 2023 Ford F-150 equipped with a 10R80 transmission in April 2023 and a 2022 Ford Mustang equipped with a 10R80 transmission in May 2023.  (*Id.* at ¶ 58).  The complaint alleges that Pollack soon noticed the vehicles "shifting very hard, erratically shifting between gears, 'slamming' between gears, lunging, hesitation, and being 'constantly confused about what gear it should be in.'" (*Id.* at ¶ 60).  According to the complaint, Pollack also "experienced complete loss of power while trying to accelerate at highway speeds." (*Id.*).

The vehicles in question are covered by Ford's "New Vehicle Limited Warranty," which provides that (subject to certain limitations, such as time and mileage) Ford will repair or replace any defective parts.  (*Id.* at ¶ 130).  The complaint does not allege that any of the three named plaintiffs ever took their vehicles to a Ford dealer for repairs, or that they even contacted a dealer

about the problems they had experienced.

In March 2018, Ford issued its first of several "Technical Service Bulletins," instructing technicians on how to address "harsh or delayed shifts" in vehicles equipped with 10R80 transmissions.  (*Id.* at ¶ 69).  The complaint alleges that these Technical Service Bulletins "reflected knowledge of the Defect that Ford had maintained throughout the design and testing of the 10-speed Transmission, prior to its first sale to consumers."  (*Id.* at ¶ 70).  Ford released further Technical Support Bulletins and "Special Service Messages" between 2018 and 2023 addressing issues with the 10R80.  (*Id.* at ¶¶ 72-87).  The complaint alleges that these "recommendations fail to remedy the [10R80]'s shifting problems reported in Class Vehicles."  (*Id.* at ¶ 88).

The complaint alleges that from 2017 to the present, Ford "has misrepresented the safety, performance and reliability of the 10R80 through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians."  (*Id.* at ¶ 93).  According to the complaint, Ford has characterized the purported defect with the 10R80 as "'normal,' or simply a limited period of adjustment and adaptation."  (*Id.* at ¶ 94).  Although Ford allegedly knew about the defect with the 10R80, it "has allowed Plaintiffs and Class Members to continue to drive the Class Vehicles," "has not recalled the Class Vehicles," and "has not offered to reimburse Class Vehicle owners and lessees who incurred costs relating to the transmission problems."  (*Id.* at ¶¶ 95-96).

The complaint alleges that the plaintiffs "have not received the benefit for which they bargained when they purchased or leased the Class Vehicles," and "the value of the Class Vehicles has diminished."  (*Id.* at ¶¶ 99-100).

### B.    Procedural Background

Plaintiffs have filed suit individually and on behalf of "[a]ll persons in the United States and its territories who formerly or currently own or leased one or more vehicles with a 10R80 10-speed automatic transmission." (*Id.* at ¶ 115). As noted, the complaint asserts claims for breach of express warranty (Count 1); breach of implied warranty of merchantability and fitness for particular purpose (Counts 2 and 3); violation of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (Count 4); negligence (Count 5); fraud and fraudulent concealment (Count 6); unjust enrichment (Count 7); and violation of the Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A (Count 8).

Ford has moved to dismiss the first amended complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.    Standard of Review

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301,

305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

III.   <u>**Analysis**</u>

A.   <u>**Claim for Breach of Express Warranty (Count 1)**</u>

Count 1 alleges that Ford breached its express warranty to plaintiffs by failing to repair the defects in the 10R80 transmission.  (FAC ¶ 133).  That claim is based on Ford's "New Vehicle Limited Warranty," which provides:  "[A]uthorized Ford Motor Company dealers will, without charge, repair, replace, or, adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in the factory-supplied materials or factory workmanship."  (*Id.* at ¶ 130).  Among other things, the warranty requires that the vehicle must be "taken to a Ford dealership for a warranted repair during the warranty period." (Exs. 1-3, at 8-9).

To state a claim for breach of express warranty under Massachusetts law, the plaintiff must prove, among other things, that "the defendant promised a specific result and the defendant failed to deliver on his promise and, therefore, breached the express warranty." *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 438 (D. Mass. 2020) (internal quotations omitted).  The complaint must therefore allege a plausible factual basis to conclude that Ford "failed to deliver on [its] promise" to "repair . . . all parts on your vehicle that malfunction or fail during normal use . . . due to a manufacturing defect."  *See id*.

As noted, the complaint does not allege that any of the three plaintiffs actually presented their vehicles to any authorized Ford dealer for repair or replacement of the alleged defects, or otherwise provided Ford with an opportunity to address the issue.[1]  Ford has moved to dismiss

---

[1] The complaint alleges that plaintiffs gave notice to Ford of their claims, and that Ford "suggested . . . a possibility of individual resolution" of those claims (although not "Class-wide relief").  (FAC ¶ 137).  It thus

the express warranty claim on that basis.

Plaintiffs make three arguments in response.  First, they contend that "the facts will demonstrate" that plaintiffs Pollack and White "each brought their Vehicle to a Ford dealership for a warranty repair citing Transmission issues during the warranty period."  (ECF No. 58, 10). But that factual claim is not set forth anywhere in the complaint.  On a motion to dismiss under Rule 12(b)(6), this court's review is limited to "well-pleaded facts" and "reasonable inferences" that can be drawn from those facts.  *Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc.*, 920 F.3d 111, 114 (1st Cir. 2019) (internal quotations omitted).  Having neglected to make those allegations in the complaint, plaintiffs cannot now cure the problem by making them in their memorandum in opposition.  The possibility that later-disclosed information may show a basis for liability is not a substitute for sufficiently pleaded factual allegations.  *See DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome.") (emphasis in original).

Next, plaintiffs contend that Ford was "on notice" of the alleged defects because of various consumer complaints.  (FAC ¶ 138).  But that is not the issue; whether Ford was on notice of the problems or not, the express warranty nonetheless required that it be provided an opportunity to repair or replace the allegedly defective part.

Finally, plaintiffs contend that they were not required to present their vehicles to a dealer for repairs, because to have done so would have been "futile."  As to that issue, the complaint simply alleges, in conclusory terms:

> Plaintiffs were not required to notify Ford of its breach [of express warranty] and/or were not required to do so because affording Ford a reasonable opportunity to cure any breach of written warranty would have been futile.

appears to allege that Ford *offered* to resolve the problems, and that plaintiffs refused to permit it to do so.

(FAC ¶ 138).

Most courts that have addressed the issue have concluded that a plaintiff's failure to present a product to the manufacturer for repair or replacement precludes a claim for breach of express warranty. *See*, *e.g.*, *Costa v. FCA US LLC*, 542 F. Supp. 3d 83 (D. Mass. 2021); *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 937 (N.D. Ill. 2021) (dismissing claim for breach of express warranty against Ford for alleged defects in 10R80 transmission where "the [c]omplaint does not allege that [the plaintiff] ever took his Vehicle to a Ford dealership for repair"); *Raynaldo v. American Honda Motor Co.*, 2022 WL 4358096 at *13-14 (N.D. Calif. Sept. 20, 2022); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288-89 (E.D. Mich. 2021); *In re MyFord Touch Consumer Litigation*, 2015 WL 5118308 at *4-5 (N.D. Cal. Aug. 31, 2015); *Aprigliano v. American Honda Motor Co.*, 979 F. Supp. 2d 1331, 1339-40 (S.D. Fla. 2013); *Wozniak v. Ford Motor Co.*, 2019 WL 108845 at *2 (E.D. Mich. Jan 4, 2019); *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1359 (N.D. Ga. 2013). Both *MyFord Touch* and *Gregorio* acknowledged the theoretical possibility of a futility excuse, but concluded that the relevant factual allegations were not sufficient to make a plausible claim of futility. *See MyFord Touch*, 46 F. Supp. 3d at 971 (holding that "[e]ven assuming a futility argument is theoretically possible . . . there are insufficient allegations in the complaint to make futility possible) (internal quotations omitted); *Gregorio*, 522 F. Supp. 3d at 289 (same).

In *Costa*, the court dismissed a claim for breach of express warranty against FCA, an automobile manufacturer, based on alleged defects because the plaintiff had never brought the vehicle to a dealer for repair. 542 F. Supp. 3d at 102-103. "[The complaint] avers only that [the plaintiff] conducted research to determine if FCA would honor the warranty and concluded that it would not. [The plaintiff] cannot sustain a breach of express warranty claim based solely on

an expectation or assumption, even one founded on research, that FCA would have breached had it been given the opportunity." *Id*. at 103 (footnotes and internal quotations omitted). In a footnote, the court added: [The plaintiff] attempts to avoid dismissal by arguing that seeking a repair would have been futile and the remedy of repair would have failed for its essential purpose. This argument is unavailing. . . . FCA was not given the opportunity to remedy the alleged issue because the plaintiff did not try to enforce the warranty." *Id* at n. 17.

Some courts, however, have excused a failure to present a product to a dealer for repair or replacement under an express warranty on the ground of futility. *See In re Chevrolet Bolt EV Battery Litigation*, 633 F. Supp. 3d 921, 975-77 (E.D. Mich. 2022) (concluding that the complaint plausibly alleged futility where the manufacturer "has acknowledged . . . that it is unable to fix the allegedly defective cars"; "issued . . . software updates as explicitly temporary remedies"; and "issued notices to each customer . . . stating that 'parts to repair your vehicle are not currently available'"); *James v. Yamaha Motor Corp.*, 2016 WL 3083378 at *9-10 (S.D. Fla. May 31, 2016) (concluding that the complaint plausibly alleged futility in claim involving detective outboard motors, where plaintiffs alleged they would "repeatedly need to return the engines for repair and servicing"); *Benkle v. Ford Motor Co.*, 2017 WL 9486154 at *12 (C.D. Cal. Dec. 22, 2017) (concluding that the complaint plausibly alleged futility where it alleged that replacement of the parts "is inadequate because the replacement [parts] are substantially certain to fail again"); *see also Gertz v. Toyota Motor Corp.*, 2011 WL 3681647 at *3 (C.D. Cal. Aug. 22, 2011) (stating that presentation to the dealer for repair was excused on the ground of futility where the plaintiffs alleged that they called the dealer, who advised them that there was "no fix" for the problem and that the complained-of defect was "normal").

A failure to present a vehicle to the dealer for repair or replacement is not a mere

technicality; such a failure eviscerates the express warranty.  For present purposes, the Court will assume that there may be some fairly narrow set of circumstances where that failure may be excused.  If a futility excuse exists, however, surely it must be based on an objectively reasonable belief arising out of the manufacturer's own conduct or statements.  It cannot be the case that futility can be based on the purely subjective belief of the owner—for example, a mere suspicion or belief that the dealer would not likely to be able to fix the problem.  Nor is it sufficient simply to allege that some other owners had similar problems, or that the manufacturer sometimes struggled to fix them; it does not follow that attempting repairs would necessarily be futile.

Furthermore, and at a minimum, merely conclusory allegations of futility are not sufficient.  A complaint seeking to excuse compliance with the terms of an express warranty on the ground of futility must set out plausible factual allegations from which futility could be reasonably inferred.

The facts alleged in the complaint here fall woefully short of any reasonable standard of futility.  The complaint does not allege that plaintiffs took their vehicles to a dealer.  Nor does it allege that they contacted a dealer by telephone, met with a dealer, or otherwise sought in any way to have their vehicles repaired.  It does not even allege that plaintiffs conducted their own research about the problem, and formed their own conclusions.  *See Costa*, 542 F. Supp. at 103. And it does not allege that Ford or any dealer announced or otherwise advised them that the problems could not be fixed.

It is true that the complaint, fairly read, alleges that multiple Ford owners reported similar problems (FAC ¶ 16); that some subset of those owners took their vehicles to Ford dealers, who could not repair the vehicles to their satisfaction (*Id.*); and that Ford issued multiple

10

service bulletins and messages to its dealers, suggesting that it struggled to rectify the problems in at least "some" vehicles.  (*Id.* ¶¶ 17-21).  But the complaint does not allege that the three named plaintiffs were aware of any of that.  Instead, and as noted, it simply alleges in conclusory terms that Ford "refuses to replace or repair" the transmissions, and that "affording Ford a reasonable opportunity" to fix the problems "would have been futile."  (*Id.* ¶¶ 8, 138).

That is not enough.  A plaintiff cannot sidestep the requirements of an express warranty with conclusory allegations of futility.  Because Ford did not have an opportunity to repair or replace the allegedly defective parts, it did not breach the express warranty.

Accordingly, Count 1 will be dismissed for failure to state a claim.

### 1.   Implied Warranty of Merchantability (Count 2)

Count 2 alleges that Ford breached the implied warranty of merchantability because the 10R80 transmissions were "defective," "posed a serious safety risk at the time of sale," and "are not fit for the ordinary purposes for which such goods are used."  (FAC ¶ 147).  Ford contends that that claim should be dismissed because "[p]laintiffs do not allege that they cannot drive or have ever stopped driving" their vehicles, nor that "the purported defect has caused any safety problems or accidents despite their continuous usage of the Vehicles."  (ECF No. 31, 18-19).

"To recover on a claim of breach of the implied warranty of merchantability in the sale of a vehicle under Massachusetts law, a plaintiff must show that the vehicle was not fit for the ordinary purposes for which an automobile is generally used and that the defect existed at the time the vehicle was sold or leased.  The ordinary purpose of a vehicle is to provide safe, reliable transportation."  *Awalt v. Gen. Motors, LLC*, 2023 WL 2743294, at *3 (D. Mass. Mar. 31, 2023).  The parties primarily contest whether the 10R80 defect was such that the vehicles plaintiffs purchased were not "fit for the ordinary purposes for which such [vehicles] are used."  Mass. Gen. Laws ch. 106, § 2-314.

"As to automobiles, it has generally been held that a breach of the implied warranty of merchantability occurs only where a defect is so basic as to render the vehicle unfit for its ordinary purpose of providing safe, reliable transportation." *Finigan-Mirisola v. DaimlerChrysler Corp.*, 2007 WL 1977505, at *1 (Mass. App. Ct. July 9, 2007).  Here, plaintiff Pollack alleges that his vehicle "experienced complete loss of power while trying to accelerate at highway speeds."  (FAC ¶ 60).  A car that "experience[s] complete loss of power" while trying to accelerate onto a highway may not be capable of providing safe and reliable transportation. *See Stockley v. Nissan of N. Am., Inc.*, 2023 WL 7308071 (M.D. Tenn. Nov. 6, 2023) ("Reliable, predictable acceleration is necessary to avoid potentially catastrophic accidents in a number of everyday driving situations . . .").  For present purposes, at least, the complaint alleges sufficient facts to state a claim for breach of implied warranty, and the motion to dismiss will be denied as to Count 2 of the complaint.

### 2.  Implied Warranty of Fitness for a Particular Purpose (Count 3)

In their opposition to the motion to dismiss, plaintiffs state that they "withdraw their claim for Breach of Implied Warranty of Fitness for a Particular Purpose under Massachusetts law."  (ECF No. 58, 15).  Accordingly, Count 3 will be dismissed.

### B.  Claim for Violation of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (Count 4)

Count 4 alleges that Ford violated the provisions of the Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, by breaching its express warranties.  (FAC ¶¶ 171-173). Ford contends that this claim should be dismissed because (1) plaintiffs fail to satisfy MMWA's jurisdictional requirement of 100 named plaintiffs; (2) Ford did not promise defect-free performance of its vehicles; (3) plaintiffs did not comply with the warranty's alternative-dispute resolution procedure; and (4) the MMWA claims are premised on plaintiffs' legally insufficient

state-law express-warranty claims.  (ECF No. 31, 21).

The MMWA claim will be dismissed, among other reasons, because this court lacks subject-matter jurisdiction to hear it.  The MMWA provides that "[n]o claim shall be cognizable in a suit brought under . . . this subsection . . . if the action is brought as a class action, and the number of named plaintiffs is less than one hundred."  15 U.S.C. § 2310(d)(3).  There are only three named plaintiffs in this action.  (*See generally* FAC).

Plaintiffs contend that the MMWA's specific jurisdictional threshold has been superseded by the general class-action requirements of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  When resolving a dispute regarding the meaning of a statute, the court must "begin with the language of the statute itself."  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 128 (1st Cir. 2019).  Again, the plain text of the MMWA expressly states that "*[n]o claim* shall be cognizable" if "the number of named plaintiffs is less than one hundred."  15 U.S.C. § 2310(d)(3) (emphasis added).

The only way that plaintiffs could overcome that plain statutory text is by demonstrating that Congress implicitly repealed the MMWA when it passed CAFA.  However, "repeals by implication are disfavored," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984), and "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).  Plaintiffs have not made such a showing here.  There is no evidence that Congress intended to render § 2310(d)(3) of the MMWA a nullity.  Furthermore, the statutes may be readily harmonized; the specific requirements of the MMWA apply to claims brought under MMWA, and the general requirements of CAFA apply to other types of claims.

13

For similar reasons, the two circuit courts to have considered this issue have concluded that CAFA does not override the specific text of the MMWA.  *See Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023); *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027, 1032-35 (9th Cir. 2020).  A number of courts in this district have followed suit.  *See Rezendes v. Mitsubishi Motors N. Am., Inc.*, 2023 WL 1864405, at *7-8 (D. Mass. Feb. 9, 2023); *Awalt*, 2023 WL 2743294, at *4-5.

The claim under the MMWA will therefore be dismissed.

**C.**      **Claim for Negligence (Count 5)**

In their opposition to the motion to dismiss, plaintiffs state that they agree to dismiss their claim for negligence.  (ECF No. 58, 7).  Accordingly, Count 5 will be dismissed.

**D.**      **Claim for Fraud/Fraudulent Concealment (Count 6)**

Count 6 alleges that Ford committed fraud by making misrepresentations about the performance of vehicles equipped with the 10R80 transmission and by concealing material facts regarding the alleged transmission defect.  (FAC ¶¶ 194-200).  Ford contends that Count 6 should be dismissed because the complaint does not allege any actionable misrepresentation, any knowledge of the falsity of any such representation, any intent to induce reliance, or any actual reliance on any representations.

Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  For that reason, "[g]reat specificity is ordinarily not required to survive a Rule 12(b)(6) motion."  *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992).  However, under Fed. R. Civ. P. 9(b), in cases "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The basic purposes of that requirement are (1) to give the defendants notice and enable them to prepare a meaningful response; (2) to preclude the

14

use of a groundless fraud claim as a pretext to using discovery as a fishing expedition; and (3) to safeguard defendants from frivolous charges that might damage their reputations. *See In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)).

Under the heightened pleading requirement of Fed. R. Civ. P. 9(b), a complaint alleging fraud must state "the who, what, where, and when" of the alleged deception. *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016) (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004)). The requirement applies both to general claims of fraud and also to "associated claims where the core allegations effectively charge fraud." *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009).

The complaint alleges fraud under two theories: fraudulent misrepresentation and fraud by omission. (FAC ¶¶ 194-200). Each will be considered in turn.

### 1.   Fraudulent Misrepresentation

Under Massachusetts law, a claim of fraudulent misrepresentation requires a plaintiff to show that "(1) the defendant made a 'false representation of a material fact with knowledge of its falsity for the purpose of inducing [the plaintiff] to act thereon'; (2) the plaintiff 'relied upon the representation as true and acted upon it to his [or her] detriment'; and (3) such 'reliance was reasonable under the circumstances.'" *Gattineri v. Wynn MA, LLC*, 63 F.4th 71, 87-88 (1st Cir. 2023) (alteration in original) (quoting *H1 Lincoln, Inc. v. S. Wash. St., LLC*, 489 Mass. 1, 18 (2022)).

"[F]or any misrepresentation claim, be it for deceit or for negligent misrepresentation: only statements of fact are actionable; statements of opinion cannot give rise to a deceit action." *Cummings v HPG Intern., Inc.*, 244 F.3d 16, 21 (1st Cir. 2001) (citing *McEneaney v. Chestnut*

*Hill Realty Corp.*, 38 Mass. App. Ct. 573 (1995)).  "To draw the difficult distinction between a statement of fact and a statement of opinion, Massachusetts courts have looked to the Restatement (Second) of Torts, which provides that a representation is one of opinion 'if it expresses only (a) the belief of the maker, without certainty, as to the existence of fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment.'"  *Id.* (quoting Restatement (Second) of Torts § 538A (1977)).

At the same time, "[e]ven a statement that in form is one of opinion 'may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.'"  *Cummings*, 244 F.3d at 22 (quoting *McEneaney*, 38 Mass. App. Ct. at 575).  It is also possible assert a claim based on a statement of future intention if that statement was false when it was made.  See *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 226 (1st Cir. 2003) (quoting *McEvoy Travel Bureau Inc. v. Norton Co.*, 408 Mass. 704 (1990)) (noting that "statements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.").

In general, "[i]n construing what is the true meaning of the language used, it is often necessary to consider the subject matter, the relationship of the parties, the opportunity afforded for investigation and reliance, and the attendant circumstances."  *John A. Frye Shoe Co. v. Williams*, 312 Mass. 656, 665 (1942).

The complaint sets out various examples of marketing materials from Ford that include statements about the benefits of the 10R80 transmission,  Many, indeed most, of the statements represent advertising puffery that cannot form the basis of a claim of fraud.  Adjectives such as

"improved," "innovative," "optimized," and "enhanced," (FAC ¶¶ 26-37), at least in this context, neither state a fact that can be proved to be true or false, nor suggest to the reader that there are underlying facts that are inconsistent with those claims.

There are, however, at least two sets of statements that appear to be actionable under the circumstances presented here. First, the marketing materials state that the shifting of the 10R80 transmission is "smooth," (*see, e.g.*, FAC ¶ 35), whereas the complaint alleges that it was in fact "rough" and "harsh" (*see, e.g., id.* at ¶ 40-41). Second, those materials state that the shifting is "quick," (*see, e.g., id.* at ¶ 93), whereas the complaint alleges that in fact it is "slow" and that the vehicles "slip gears" and "hesitate" (*see, e.g., id.* at ¶ 40).

It is true that those claims, to some degree, involve judgments of quality without precise answers; whether something is "fast" or "slow" is entirely context-dependent. But while those statements could be said to express a "judgment as to quality," they also could be "reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it.'" *Cummings*, 244 F.3d at 21-22.

In *O'Connor*, the court addressed the identical issue presented here in another suit alleging fraud in the sale of Ford vehicles with the 10R80 transmission. *O'Connor*, 567 F. Supp. 3d at 930. The court concluded as follows:

> The Complaint's strongest support for the fraud claim is the alleged false representation that the Transmission is "smooth." The Court cannot determine based solely on the pleadings that this is puffery. Arguably, "smooth" is a measurable attribute in the context of transmissions. The Complaint contains numerous allegations that the Transmission does not switch smoothly between gears. All of the Plaintiffs reported experiencing problems with the Transmission, including jerky and rough acceleration and deceleration and delayed engagement of the Transmission and gears holding too long then roughly slamming into gear. And Defendant's own TSBs stated that 2017 and 2018 F-150 vehicles "may exhibit harsh/bumpy upshift, downshift and/or engagement concerns," which is at least arguably in direct contradiction to the representation that the transmissions are "smooth."

*Id.* at 964.   For similar reasons, this Court concludes that those statements may form the basis of a fraud claim, and are sufficient to meet the particularity requirements of Rule 9(b).

The complaint also sufficiently alleges knowledge and intent.   Despite the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Fed. R. Civ. P. 9(b).   Here, the circumstances alleged in the complaint give rise to a plausible inference that Ford knew that its statements were false at the time they were made.

The complaint cites to a number of complaints from the complaint database of the National Highway and Transportation Safety Administration concerning the 10R80 transmission in F-150s sold between 2017-2021, including complaints alleging that the "[d]efect has often led to potentially life-threatening situations."   (FAC ¶ 64-65).   In addition, it alleges that Ford issued several Technical Service Bulletins as well as Special Service Messages in response to those customer complaints.   (*Id.* at ¶ 43-44).   It further alleges that "the Transmission malfunctions disclosed in [Technical Service Bulletin] 18- 2079 reflected knowledge of the Defect that Ford had maintained throughout the design and testing of the 10-speed Transmission, prior to its first sale to consumers."   (*Id.* at ¶ 70).

Ford contends that the complaint fails to "allege facts to support a finding that Ford was aware of the existence of the NHTSA complaints at the time of the alleged misrepresentations." (ECF No. 31, 32).   It further asserts that "[e]ven assuming Ford had actual knowledge of the NHTSA complaints," the FAC "does not allege a *sufficient number* of complaints to warrant an inference that Ford was aware of the alleged defect."   (*Id.* at 33) (emphasis added).

The mere existence of some consumer complaints, without more, is not normally a sufficient basis from which to infer knowledge.   In *Deras v. Volkswagon Grp. of Am., Inc.*, the

court held that "consumer complaints suffice to establish knowledge only where there were an *unusual* number of complaints, such that the manufacturer would be on notice of a specific problem." *Deras*, 2018 WL 2267448, at *4 (N.D. Cal. May 17, 2018) (internal quotations omitted) (emphasis added).  The *Deras* court further reasoned that "[f]orty-five, or even fifty-six, complaints out of hundreds of thousands of vehicles" would not "on its face indicate an unusually high number of complaints."  (*Id.*).  Similarly, in *Roe v. Ford Motor Co.*, the court recognized that "on any given day, there are millions of Fords (if not tens of millions of Fords) on the road" and that "applying common sense, that means that on any given day, there are dozens (if not hundreds) of complaints about Ford vehicles."  *Roe*, No. 18-12528, 2021 WL 2529825, at *7 (E.D. Mich. June 21, 2021) (internal quotations omitted).  Thus, the court held that a plaintiff must show that the complaints about the defect at issue "must have been frequent enough that they were not lost in a sea of complaints and repairs amassing by the dozens each day."  *Id.*

However, many courts have concluded that the existence of multiple NHTSA complaints, together with the issuance of service bulletins by the manufacturer, is a sufficient basis from which to infer a defendant's knowledge.  *See, e.g.*, *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) (denying motion to dismiss where plaintiffs alleged that defendant had issued Technical Service Bulletins in addition to alleging the existence of consumer complaints); *Stockinger v. Toyota Motor Sales USA, Inc.*, 2017 WL 10574372 (C.D. Cal. July 7, 2017) (same); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160 (D.N.J. May 8, 2017) (same); *Victorino v. FCA US LLC*, 2016 WL 6441518 (S.D. Cal. Nov. 1, 2016) (same).

Under the circumstances, the allegations here that Ford had knowledge of the problems, as reflected in the various Technical Service Bulletins, are sufficient.  The Court need not determine whether the NHTSA complaints, without more, would have been enough to plausibly allege knowledge.

Finally, the complaint alleges that plaintiffs reasonably relied on those representations when purchasing their respective vehicles.  (*Id.* ¶¶ 46, 52, 58).

Accordingly, the motion to dismiss will be denied as to the fraudulent misrepresentation claim in Count 6.

### 2.      <u>Fraud by Omission</u>

"To show fraud by omission, the [complaint] must allege both concealment of material information and a duty requiring disclosure."  *Costa*, 542 F. Supp. 3d at 101 (quoting *Buffalo-Water 1, LLC v. Fidelity Real Estate Co.*, 481 Mass. 13, 25 (2018)).  Defendant contends that "Plaintiffs' omission-based fraud claims fail because the FAC fails to allege Ford's knowledge of the alleged defect or that Ford owed Plaintiffs any duty of disclosure."  (ECF No. 31, 35).

Under Massachusetts law, a duty to disclose arises where "(i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction."  *Squeri v. Mount Ida College*, 954 F.3d 56, 71 (1st Cir. 2020).  The complaint here fails to plausibly allege that Ford had such a duty of disclosure to plaintiffs.

First, the complaint does not allege any fiduciary relationship between plaintiffs and Ford.  Second, it does not identify any "partial or ambiguous statement of the facts" made by Ford.  *Squeri*, 954 F.3d at 71.  As to the third scenario in which the duty to disclose arises under Massachusetts law, the Second Restatement of Torts provides that "[o]ne party to a business

transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated facts basic to the transaction, *if he knows that the other is about to enter into it under a mistake as to them*, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."  Restatement (Second) of Torts § 551(2)(e) (1977) (emphasis added); *see also Costa*, 542 F. Supp. 3d at 83, n.15 (discussing the Restatement in relation to the duty to disclose).  Accordingly, a complaint "must plead that [the plaintiff] put a seller on notice of his or her subjective motivations for purchase in order to allege that seller had a duty to disclose information material to those subjective motivations."  *Rezendes*, 2023 WL 1864405, at *4.

Here, nothing in the complaint suggests that "the automaker was aware of plaintiffs' reasons for buying the Car and therefore would have no reason to believe that [the 10R80 transmission] was basic to the transaction."  *Id.* (internal punctuation omitted).  As a result, even if the transmission was "one of the primary reasons" that plaintiffs purchased the vehicles, that "does not mean that that the effectiveness of the [transmission] goes to the essence of the transaction."  *Costa*, 542 F. Supp. 3d at n.15.

The complaint therefore fails to state a claim for fraudulent omission under Massachusetts law, and the motion to dismiss will be granted as to that portion of Count 6.

### E.      Claim for Unjust Enrichment (Count 7)

In their opposition to defendants' motion to dismiss, plaintiffs state that they "agree to dismiss" their claim for unjust enrichment.  (ECF No. 58, 7).  Accordingly, Count 7 will be dismissed.

### F.      Claim for Violation of Chapter 93A (Count 8)

Finally, Count 8 alleges that Ford violated Mass. Gen. Laws ch. 93A.  Under Chapter 93A, "unfair methods of competition and unfair or deceptive acts or practices in the conduct of

any trade or commerce are . . . unlawful."  Mass. Gen. Laws ch. 93A, § 2(a).  Any "act or

practice is unfair if it falls within at least the penumbra of some common-law, statutory, or other

established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes

substantial injury to consumers."  *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016)

(internal quotations omitted).  The scope of Chapter 93A is "extremely broad[]."  *Butler v.

Sigma-Aldrich, Inc.*, 2006 WL 8458677, at *5 (D. Mass. Aug. 31, 2006).  Accordingly, "whether

or not particular conduct violates Chapter 93A is generally determined on a case-by-case basis."

*McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, at *117 (1st Cir. 2014).

Ford asserts that Count 8 should be dismissed because it is barred by the decision of the

Supreme Judicial Court in *Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008).  In

*Iannacchino*, the court held that "[w]here . . . there is no allegation that the plaintiffs—or indeed

anyone else—have suffered personal injury or property damage, the complaint must identify a

legally required standard that the vehicles were at least implicitly represented as meeting, but

allegedly did not" in order to state a claim under Chapter 93A.  *Iannacchino*, 451 Mass. at 633.

Furthermore, the court explained:  "When the standard that a product allegedly fails to meet is

not one legally required by and enforced by the government, a claim of economic injury based

on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that

met that standard."  *Id.*

Here, the complaint alleges that Ford violated a federal regulation, the Transportation

Recall Enhancement, Accountability, and Documentation ("TREAD") Act, 49 U.S.C. § 30101 *et

seq.*, when it "failed to timely notify owners, purchasers and dealers" of the 10R80

transmission's "safety defect."  (FAC ¶ 185).  Under the TREAD Act, motor vehicle

manufacturers must notify the owners, purchasers, and dealers of a vehicle if the manufacturer

"learns the vehicle . . . contains a defect and decides in good faith that the defect is related to motor vehicle safety." 49 U.S.C. § 30118(c). The complaint also alleges that plaintiffs were "denied the use of their Class Vehicles, expended money on replacement and repairs, and suffered unreasonable diminution in value of their Class Vehicles." (*Id.* at ¶ 225). In similar circumstances, courts have denied motions to dismiss. *See, e.g.*, *Duncan v. Nissan N. Am., Inc.*, 305 F. Supp. 3d 311, 325 (D. Mass. 2018) (denying motion to dismiss where "the injury alleged by the Plaintiffs is not sufficiently similar to the injury alleged in *Iannacchino* to render the allegations insufficient to state a claim for relief under Chapter 93A."); *O'Connor*, 567 F. Supp. 3d at 973-74 (finding that "*Iannacchino* did not hold that noncompliance with a government safety standard is required in every case" and denying motion to dismiss where the complaint alleged that plaintiffs were "denied the use of Class Vehicles" and "expended money on replacements and repairs.").

Under the circumstances, the complaint sets forth sufficient allegations to state a claim under Chapter 93A, and the motion to dismiss will therefore be denied as to Count 8.

## IV.   <u>Conclusion</u>

For the foregoing reasons, defendant's motion to dismiss the amended complaint is DENIED as to Count 2, the fraudulent misrepresentation claim of Count 6, and Count 8, and otherwise GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 8, 2024                           Chief Judge, United States District Court