# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                    )
**DANIEL MCCABE, et al., individually**             )
**and on behalf of all others similarly situated,**  )
                                                    )
           **Plaintiffs,**                          )
                                                    )          **Civil Action No.**
           **v.**                                   )          **23-10829-FDS**
                                                    )
**FORD MOTOR COMPANY,**                             )
                                                    )
           **Defendant.**                           )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## <u>MOTION TO COMPEL ARBITRATION</u>

**SAYLOR, C.J.**

This is a consolidated set of putative class actions alleging defects in the transmissions of

certain Ford vehicles.  Jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C.

§ 1332(d)(2).

Plaintiffs have brought suit against defendant Ford Motor Company.  They represent

putative classes of purchasers and lessees of Ford vehicles equipped with a 10R80 10-speed

automatic transmission.  According to the consolidated complaint, the transmission "can shift

harshly and erratically, causing the vehicle to jerk, lunge, clunk, and hesitate between gears."

(Am. Consolidated Class Action Compl. ("ACC") ¶ 4).

The consolidated complaint asserts claims for breach of express warranty; breach of the

implied warranty of merchantability; fraud and fraudulent concealment; and violations of the

trade and consumer-protection laws of various states.

The consolidated complaint asserts claims on behalf of 46 individual named plaintiffs. Ford has moved to compel arbitration of the claims brought by 19 of the individual plaintiffs. For the reasons set forth below, the motion will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

#### 1.    The Underlying Lawsuit

The facts are set forth as alleged in the Amended Consolidated Class Action Complaint ("ACC").

According to the complaint, plaintiffs are consumers who purchased or leased vehicles designed and manufactured by defendant Ford Motor Company equipped with a 10R80 10-speed transmission.  (ACC ¶¶ 35-73).  Plaintiffs represent classes of consumers in nine states— Massachusetts, Florida, Alabama, Illinois, Texas, New York, California, Oklahoma, and Pennsylvania.

The complaint alleges that when Ford first introduced the 10R80 transmission in the 2017 F-150, it "advertised the 'improved acceleration and performance' and 'enhanced shifting performance' offered by the Transmission."  (*Id.* ¶ 83).  Ford also described the transmission as "innovative" and "class-exclusive," advertising its "responsiveness and all-around performance." (*Id.* ¶¶ 94, 119).

According to the complaint, however, the transmission did not live up to Ford's representations.  It alleges that vehicles equipped with the transmission "slip gears, hesitate, jerk, lunge, clunk, and/or shift roughly."  (*Id.* ¶ 132).  It further alleges that "[s]ome consumers have reported that their Vehicle loses power while accelerating, including onto a freeway or through an intersection, when the Transmission failed to shift up or down."  (*Id.*).  As a result, drivers have "reported whiplash and discomfort due to harsh shifting," "distraction from driving due to

2

loud and unusual sounds," "concerns about reliability," and "that they do not feel safe driving [their vehicles] in normal traffic conditions." (*Id.* ¶¶ 133-34).

According to the complaint, "[s]ince the 10R80 transmission was introduced . . . drivers have repeatedly complained to Ford about problematic shifting, including Vehicles lunging, jerking, hesitating, clunking, and otherwise shifting erratically." (*Id.* ¶ 677). It alleges that numerous complaints filed with the National Highway Transportation Safety Administration demonstrate that the defects with the 10R80 are "widespread." (*Id.* ¶ 558).

The vehicles in question are covered by Ford's "New Vehicle Limited Warranty," which provides that (subject to certain limitations, such as time and mileage) Ford will repair or replace any defective parts. (*Id.* ¶ 846). An owner or lessor seeking repairs under the Warranty must satisfy two preconditions: the vehicle must (1) be "properly operated and maintained" and (2) "taken to a Ford dealership for a warranted repair during the warranty period." (Def. Mot. to Dismiss Mem. Exs. 1-7 ("Warranties") at 9). At that point, the "authorized Ford Motor Company dealer[] will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." (*Id.*).

In March 2018, Ford issued its first of several "Technical Service Bulletins," instructing technicians on how to address "harsh or delayed shifts" in vehicles equipped with 10R80 transmissions. (ACC ¶¶ 680, 685). The complaint alleges that these Technical Service Bulletins "reflected knowledge of the [d]efect that Ford had maintained throughout the design and testing of the 10-speed [t]ransmission, prior to its first sale to consumers." (*Id.* ¶ 686). Ford released further Technical Support Bulletins and "Special Service Messages" between 2018 and 2024 addressing issues with the 10R80. (*Id.* ¶¶ 679-716). The complaint alleges that these

"recommendations fail to remedy the [10R80]'s shifting problems reported in Class Vehicles." (*Id.* ¶ 716).

The complaint alleges that from 2017 to the present, Ford "has misrepresented the safety, performance and reliability of the 10R80 . . . through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians." (*Id.* ¶ 721). According to the complaint, Ford has characterized the purported defect with the 10R80 as "'normal,' or simply a limited period of adjustment and adaptation." (*Id.* ¶ 741). Although Ford allegedly knew about the defect with the 10R80, it "has allowed Plaintiffs and Class Members to continue to drive the Class Vehicles," "has not recalled the [v]ehicles," and "has not offered to reimburse [v]ehicle owners and lessees who incurred costs in an attempt to address [transmission problems] . . . [or] for any diminished value of their [v]ehicles resulting from the [d]efect." (*Id.* ¶¶ 744, 746-48).

The complaint alleges that plaintiffs "have not received the benefit for which they bargained when they purchased or leased the Class Vehicles," and "the value of the Class Vehicles has diminished." (*Id.* ¶¶ 751-52).

## 2.     **The Arbitration Agreements**[1]

The plaintiffs subject to defendant's motion to compel arbitration each signed one of the following forms of financing agreement in connection with the purchase of their vehicle:  a vehicle retail installment contract ("VRIC"); a motor vehicle lease agreement ("MVLA"); or a

---

[1] "In addressing a motion to compel arbitration, the Court may consider evidence outside of the pleadings." *Kaiser v. StubHub, Inc.*, 2024 WL 3445059, at *1 n.1 (S.D.N.Y. July 17, 2024) (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)); *see also Lysik v. Citibank, N.A*, 2017 WL 4164037, at *1 (N.D. Ill. Sept. 20, 2017) ("A court ruling on a motion to compel arbitration may consider evidence beyond the pleadings."  (citing *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)); *Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021) ("A court may consider evidence outside the pleadings when ruling on a . . . motion to compel arbitration.")

retail installment sales contract ("RISC").

Plaintiffs Peter Adduci, Richard Bunger, Cruz Garza, James Grier, Julie and Todd Haworth, Richard Metz, Steve Ropieski, Matthew Skole, Bridgett Thompson, Brian and Kelly Wolfe, Daniel Wright, and Jeffrey Wright each signed a VRIC.  In each instance, the dealership assigned its "rights, privileges, and remedies" under the VRIC to Ford Motor Credit Company, LLC ("Ford Credit").  (Def. Mot. to Compel Arb. Mem. ("MTC") Exs. A, C, H, J, K, M, & N at 8; Exs. D, E, I, & L at 7.)[2]  Ford Credit is a wholly-owned subsidiary of defendant Ford Motor Company.  (Friedrichs Decl. ¶ 21).

Each VRIC contains an arbitration provision stating the following:

> Either you or Creditor ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration.  Neither party waives the right to arbitrate by first filing suit in a court of law.  Claims include but are not limited to the following:  1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification; 3) Claims between you and us, your/our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

(MTC Exs. A, C, H, J-K, M, & N at 7; Exs. D, E, I, & L at 6; Ex. O at 2.)  The arbitration provisions also state:

> You or we may choose the American Arbitration Association, . . . or any other organization subject to our approval, to conduct the arbitration.  The applicable rules . . . may be obtained from the selected organization.  If there is a conflict between the Rules and this contract, this contract shall govern.

---

[2] The Bunger VRIC does not expressly identify Ford Credit as the assignee in the assignment section. However, the assignment section is signed by the dealership, and Ford Credit is identified as the lienholder in the vehicle services contract and bill of sale for his vehicle.  (MTC Exs. Q & R).

The Haworth VRIC states that it was assigned to "Lincoln Automotive Financial Services."  (MTC Ex. E at 7).  "'Lincoln Automotive Financial Services' is a registered trade name of Ford Motor Credit Company LLC, and not an independent company."  *Reyes v. Lincoln Automotive Fin. Servs.*, 861 F.3d 51, 53 n.1 (2d Cir. 2017).

(*Id.*).  The arbitration provisions state that they are subject to the Federal Arbitration Act ("FAA") and the VRICs state that they shall be governed by the law of the state of contracting. (*See* MTC Exs. A, D, E, H-N at 5; Ex. C at 6; Ex. O at 2.)

Plaintiffs Justin and Erin Barlup, Pablo Martinez, and Daniel McCabe each signed a MVLA.  Each MVLA identifies the "Finance Company" as Ford Credit.  (MTC Exs. B, F, G at 1).  And each MVLA contains the following arbitration provision:

> Either you or Lessor/Finance Company/Holder ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration.  Neither party waives the right to arbitrate by first filing suit in a court of law.  Claims include but are not limited to the following:  1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification; 3) Claims between you and us, our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

(MTC Exs. B & G at 7; Ex. F. at 6).  Each provision contains the same choice-of-arbitrator language as the VRICs, and each MVLA is similarly governed by the FAA and the law of the state of contracting.

Plaintiff Shannon Hartman signed a RISC.  The dealership assigned the RISC to "FMCC."  (MTC Ex. P at 2).  The RISC contains an arbitration provision stating the following:

> Any claim or dispute, whether in contract, tort, statute, or otherwise (including the interpretation and scope of this Arbitration Provision and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

(*Id.*).  It also states:  "You may choose the American Arbitration Association . . . , or any other organization to conduct the arbitration subject to our approval. . . .  If the chosen arbitration

organization's rules conflict with this Arbitration Provision, then the provisions of this

Arbitration Provision shall control." (*Id.*). The provision is governed by the FAA. (*Id.*).

Importantly, it also provides: "The arbitration hearing shall be conducted in the federal district

in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the

hearing will be held in the federal district where this contract was executed." (*Id.*)

**B.    Procedural Background**

Massachusetts plaintiffs McCabe, Wright, and Pollack filed the first amended class action

complaint on June 23, 2023. Ford moved to dismiss that complaint, which the Court granted in

part and denied in part. On April 24, 2024, Ford filed its answer, which asserted as an

affirmative defense that "[t]he claims of [p]laintiffs . . . are barred by contractual provisions

requiring that those claims be resolved through mediation and/or arbitration." (ECF No. 82 at

35).

By the time the Court ruled on defendant's motion to dismiss the first amended

complaint, plaintiffs' counsel had filed eight other putative class actions concerning the 10R80,

and on April 12, 2024, those actions were consolidated with the action filed by the original

Massachusetts plaintiffs. On June 14, 2024, plaintiffs filed the operative consolidated complaint,

which asserts claims on behalf of 46 individual named plaintiffs and on behalf of "all similarly

situated persons . . . who purchased or leased a Ford vehicle equipped with a 10R80 10-speed

transmission . . . ." (ACC ¶ 2).

On June 21, 2024, Ford moved to dismiss a significant majority of the claims under Fed.

R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Court is

issuing its memorandum and order on that motion today, March 28, 2025.

On July 12, 2024, the parties submitted a joint status report in which Ford indicated that it anticipated filing a motion to compel arbitration and was "working expeditiously to obtain copies of all the relevant agreements." (ECF No. 110 at 3).

On July 30, 2024, Ford filed a motion to compel arbitration as to 18 named plaintiffs. On August 14, 2024, in an unopposed motion for an amended case management order, Ford indicated that it had discovered, through plaintiffs' first document production, that New York plaintiff Bunger had also entered into a VRIC containing an arbitration provision and sought leave to file an amended motion to compel arbitration. (ECF No. 119 at 2-3). That motion was granted, and on August 20, 2024, Ford filed an amended motion to compel arbitration as to 19 named plaintiffs that is currently before the Court.

## II.     <u>Standard of Review</u>

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements implicating interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12, 119 (2001). "Section 2 is the primary substantive provision of the Act . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). It provides, in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2.

The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (first quoting *Moses H. Cone*, 460 U.S. at 24, and then quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67

(2010)).  "In line with th[o]se principles, courts must place arbitration agreements on an equal footing with other contracts."  *Id.*  They must also "'rigorously enforce' arbitration agreements according to their terms."  *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (citation and internal quotation marks omitted).  "Whether or not a dispute is arbitrable is typically a question for judicial determination."  *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011).  "Therefore, 'except where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter.'"  *Id.* (quoting *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)).

When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration, 9 U.S.C. § 3, or compelling the parties to arbitrate and staying the action, 9 U.S.C. § 4.  *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.).

## III.    <u>Analysis</u>

Plaintiffs contend that Ford may not compel arbitration for two basic reasons:  (1) because Ford has waived any right to arbitration by participating in this litigation, and (2) because Ford was not a signatory to the relevant contracts, it is not entitled to compel arbitration.

A.    __Waiver__

"[T]here is a strong presumption *against* inferring waiver—so strong that any 'reasonable doubts as to whether a party has waived the right to arbitrate should be resolved in favor of arbitration.'" *Toddle Inn Franchising, LLC v. KPJ Assocs., LLC*, 8 F.4th 56, 64 (1st Cir. 2021) (quoting *In re Tyco Int'l Ltd. Sec. Litig.*, 422 F.3d 41, 44 (1st Cir. 2005)).

In assessing whether a party has waived its right to arbitration, a court should be guided by the following non-exhaustive factors:

> (1) whether the parties participated in a lawsuit or took other action inconsistent with arbitration; (2) whether the "litigation machinery has been substantially invoked and the parties [are] well into preparation of a lawsuit by the time an intention to arbitrate [is] communicated"; (3) "whether there has been a long delay" and trial is near at hand; (4) whether the party seeking to compel arbitration has "invoked the jurisdiction of the court by filing a counterclaim"; [and] (5) whether discovery not available in arbitration has occurred . . . .

*FPE Found. v. Cohen*, 801 F.3d 25, 29 (1st Cir. 2015).[3]  "These factors should be considered to the extent that they clarify whether [movant] 'knowingly relinquished the right to arbitrate by acting inconsistently with that right.'" *Buruk v. Experian Info Sols., Inc.*, 2024 WL 2025747, at *5 (D. Mass. May 6, 2024) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022)); *see also In re Intuniv Antitrust Litig.*, 2023 WL 2662173, at *10 (D. Mass. Mar. 15, 2023) ("[T]he appropriate focus of the waiver analysis is the '*intentional* relinquishment or abandonment of a *known* right.'" (quoting *Morgan*, 596 U.S. at 417).

Defendant's participation in the lawsuit thus far is not so inconsistent with an intent to arbitrate that it overcomes the strong presumption against finding waiver.  To begin, "it is well-established that a party does not waive its right to arbitrate merely by filing a motion to

---

[3] *FPE Foundation* laid out a sixth factor:  "whether the party asserting waiver has suffered prejudice."  801 F.3d at 29.  Consideration of that factor was later abrogated by the Supreme Court in *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417-19 (2022).  *See Crean v. Morgan Stanley Smith Barney, LLC*, 652 F. Supp. 3d 171, 183 (D. Mass. 2023).

dismiss." *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726-27 (7th Cir. 2004) (citing *Creative Sols. Grp., Inc. v. Pentzer Corp.*, 252 F.3d 28, 33 (1st Cir. 2001)).

And defendant's request to consolidate the nine putative class actions in the interest of procedural efficiency likewise is not a waiver of the right to arbitrate.  First, even if all 19 relevant plaintiffs are required to arbitrate their claims, at least one named plaintiff from each of the consolidated actions will remain in the litigation.  Thus, because all nine actions will remain before the Court, there is no inconsistency between seeking consolidation of those actions for the purposes of litigation and seeking to compel arbitration as to the present plaintiffs.[4]

Furthermore, defendant's service of initial disclosures and discovery demands is not inconsistent with an intent to arbitrate.  To start, in its initial disclosures, defendant "expressly reserve[d] its rights to compel arbitration against any plaintiff that has entered into an arbitration agreement that applies to any claims in this action."  (Reply Ex. T at 1).  And prior to determining which plaintiffs might be subject to arbitration agreements, defendant naturally would not be able to limit the scope of any preliminary discovery in which it engaged.  Simply engaging in limited preliminary discovery is not sufficient to find waiver.  *See In re Intuniv*, 2023 WL 2662173, at *11 ("[T]he amount of discovery received from [plaintiff] is not enough to strongly support a finding of waiver.  Once again, the problem that the waiver defense is intended to address—a party sitting on a right to arbitrate to obtain more extensive discovery in litigation—is not present here because [defendant] was not yet aware of its asserted right when it engaged in the discovery."); *Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles*, 570 F. Supp. 2d 220, 224 (D.P.R. 2008) (finding no waiver where "discovery is in its initial

---

[4] Even in a theoretical scenario in which defendant had moved to compel arbitration as to all 46 plaintiffs, it would still be perfectly rational to seek consolidation so that a single court could consider the motion, as opposed to seeking relief through nine separate motions in nine districts.  Thus, even in that scenario, consolidation would not be inconsistent with an intent to arbitrate.

stages"); *Rodriguez Font v. Paine Webber Inc.*, 649 F. Supp. 462, 466-67 (D.P.R. 1986) ("Mere delay in filing the petition to compel arbitration, or active participation in discovery, cannot alone justify a finding of waiver.").

Finally, the trial is not "near at hand," and, in light of the procedural complexity of the matter, defendant's motion to compel arbitration was not so substantially delayed that the delay should be construed as a waiver. Plaintiffs filed their amended consolidated class action complaint on June 14, 2024. On July 12, 2024, defendant indicated that it had become aware of 18 arbitration agreements, and states that it received a complete set of those agreements from Ford Credit on July 19, 2024. Eleven days later, defendant filed its first motion to compel arbitration. Defendant then filed an amended motion upon discovering that an additional plaintiff had signed a financing agreement containing an arbitration provision.

Plaintiffs contend that the period of alleged delay ought to be measured from the dates of each plaintiff's original filing, as opposed to the date of the consolidated filings. As discussed, consolidation would have been a reasonable measure even if defendant intended to arbitrate from the beginning, and thus the date of the consolidated filings would seem the more appropriate starting point. Even so, measuring the delay from the dates of the first filings, the duration prior to filing of the initial motion to compel would range from eight to fifteen months. In the context of this complex case, that is still not *undue* delay. *See Hall v. Internet Cap. Grp., Inc.*, 338 F. Supp. 2d 145, 153 (D. Me. 2004) ("The length of delay must be evaluated in the context of litigation activities engaged in during that time."); *Crean v. Morgan Stanley Smith Barney, LLC*, 652 F. Supp. 3d 171, 184 (D. Mass. 2023) ("With respect to the length of delay, the plaintiffs note that the defendant waited 13 months after being served with the original complaint to file the motion to compel arbitration. However, where the defendant timely filed an answer asserting

the affirmative defense of arbitration and thereafter engaged in relatively minimal litigation, the court cannot find that the defendant engaged in *undue* delay.").

The claims of the Massachusetts plaintiffs warrant separate analysis. Those were the first-filed claims, and thus were pending for the longest duration prior to filing of the motion to compel arbitration. Defendant also invoked the "litigation machinery" as to the claims of those plaintiffs to a greater degree than with respect to the claims of the plaintiffs whose actions were transferred to this Court; in particular, defendant moved to dismiss the Massachusetts claims before all claims were consolidated and the currently pending motion to dismiss was filed. The Court ruled on the prior motion to dismiss, and defendant seeks to take advantage of that ruling going forward.

Again, "the appropriate focus of the waiver analysis is 'the *intentional* relinquishment or abandonment of a *known* right.'" *In re Intuniv*, 2023 WL 2662173, at *10 (quoting *Morgan*, 596 U.S. at 417). There is no indication from the record that defendant was aware of its potential right to arbitrate pursuant to the financing agreements at the time of its pre-consolidation litigation. At the time defendant moved to dismiss the Massachusetts plaintiffs' amended complaint, the only agreements in the record were Ford's limited warranties. Those warranties did not contain provisions that would empower defendant to compel arbitration. Again, defendant only received a complete set of the first 18 arbitration agreements from Ford Credit on July 19, 2024, after it had filed its motions to dismiss. (Reply Ex. 1 at 4).

While more robust and expeditious due diligence as to potential arbitration rights on the part of defendant may have been reasonable, or even proper, the presumption against waiver is "so strong that any 'reasonable doubts as to whether a party has waived the right to arbitrate should be resolved in favor of arbitration.'" *Toddle Inn*, 8 F.4th at 64 (quoting *In re Tyco*, 422 at

44). At a minimum, there is reasonable doubt as to whether defendant was willfully blind to its arbitration rights such that it might be treated as having constructive knowledge of those rights. Thus, while the circumstances are appreciably different with respect to plaintiffs Daniel McCabe and Daniel Wright, the Court will still not find waiver as to those plaintiffs.[5]

In sum, considering the factors set forth in *Cohen*, 801 F.3d at 29, defendant's conduct did not indicate an intent to forego arbitration sufficient to overcome the strong presumption against waiver.

### B.    Arbitrability

Plaintiffs do not contest either the existence or the basic enforceability of the arbitration provisions. Instead, they contend that defendant, as a non-signatory to the agreements, is not empowered to compel arbitration pursuant to those agreements. And they contend that issue should be resolved by this Court, not an arbitrator.

The Supreme Court "has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the

---

[5] Importantly, arbitration will only be compelled as to the claims that are currently before the Court. While plaintiffs McCabe and Wright repleaded their claims for breach of express warranty and fraudulent concealment in the amended consolidated complaint, those claims had already been dismissed by the Court without leave to amend or replead. Thus, those claims are not properly before the Court, not technically in controversy, and are therefore arguably not even subject to the present motion to compel arbitration. Furthermore, dismissal for failure to state a claim operates as a judgment on the merits. "[T]he intention behind [arbitration] clauses, and the reason for judicial enforcement of them, are not to allow or encourage the parties to proceed . . . sequentially[] in multiple forums." *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). Thus, the Court will not facilitate the re-litigation in arbitration of claims upon which it has already entered judgment on the merits. The claims that the Court did not dismiss in its prior order remain live and thus remain amenable to resolution through arbitration. Specifically, as to plaintiffs Daniel McCabe and Daniel Wright, the remaining arbitrable claims are those for breach of the implied warranty of merchantability, fraudulent misrepresentation, and violation of Mass. Gen. Laws ch. 93A.

contract.  In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."  *Id.* at 68.

Each VRIC and MVLA explicitly provides that "claims" to be decided by arbitration include "claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification."  (MTC Exs. A-C, G-H, J-K, & M-N at 7; Exs. D-F, I, & L at 6; Ex. O at 2).  That amounts to a robust, clear, and unmistakable delegation clause.  *See Lyman v. Ford Motor Co.*, 2022 WL 856393, at *3 (E.D. Mich. Mar. 22, 2022) (finding identical language to "clearly and unmistakably show an intent to arbitrate issues of arbitrability"); *Cunningham v. Ford. Motor Co.*, 2022 WL 2819115, at *4 (E.D. Mich. July 19, 2022) (finding identical language to be "'clear and unmistakable evidence that the parties agreed to have an arbitrator decide' arbitrability"); *O'Connor v. Ford Motor Co.*, 2023 WL 130522, at *4 (N.D. Ill. Jan. 9, 2023) (describing identical language as a "robust delegation clause").[6]

While that language alone suffices, the reference in the agreements to AAA rules is further evidence of intent to arbitrate issues of arbitrability.  *See Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 29 (1st Cir. 2021) ("This Court is clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability

---

[6] Similar language has been treated similarly in the First Circuit and this District.  *See Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021) (finding that clause stating "any dispute as to whether any dispute, claim or controversy arising between [the parties] is arbitrable, shall be resolved by arbitration" to "clearly, unmistakably, and unambiguously delegate[] the arbitrability dispute at issue . . . to the arbitrator"); *Symonds v. Credico (USA), LLC*, 2020 WL 7075028, at *4 (D. Mass. Dec. 3, 2020) (finding where clause stated "[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration policy," that "the delegation provision explicitly delegates the applicability and enforceability *of the arbitration agreement itself*, which is clear and unmistakable evidence of an intent to arbitrate arbitrability" (emphasis in original)); *Fairfield v. DCD Auto. Holdings, Inc.*, 2023 WL 4186191, at *3 (D. Mass. June 26, 2023) (finding clause stating that "[a]ny controversy or dispute arising out of or relating in any way to this [contract], including without limitation the applicability of this arbitration clause and the validity of the [contract], shall be resolved by neutral binding arbitration," to be "'clear and unmistakable' evidence of the delegation of this determination to the arbitrator").

issues to the arbitrator."); *Tel. Invs. USA, Inc. v. Lumen Techs., Inc.*, 2022 WL 2828751, at *4 (N.D. Ill. July 20, 2022) ("[A]lthough the Seventh Circuit has not addressed this issue, the consensus view among district courts in this circuit and among the other appellate circuits holds that reference to or incorporation of AAA rules constitutes clear and unmistakable evidence to delegate arbitrability to an arbitrator.") (collecting cases).

The remaining question is whether plaintiffs' challenge to defendant's standing to enforce the arbitration agreements is an issue of "arbitrability"—and has therefore been delegated—or a prior issue of contract formation to be decided by the Court.  That question presents a "logical conundrum," thus "it is not surprising that there is some inconsistency in the federal case law concerning who—the court or the arbitrator—decides a challenge to a non-signatory's standing to demand arbitration."  *O'Connor*, 2023 WL 130522, at *5.  However, this Court is bound by the First Circuit's approach.  In *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989), the court held that where "[t]he contract . . . delegates to the arbitrator decisions about the arbitrability of disputes involving the existence and validity of a *prima facie* agreement to arbitrate. . . .  The arbitrator should decide whether a valid arbitration agreement exists between [plaintiff] and the [non-signatory] defendants under the terms of the contract . . . ."  886 F.2d at 473-74.  Courts in this district have consistently followed *Apollo* in finding that the standing of a non-signatory to enforce an arbitration agreement is an issue of arbitrability, and thus an issue properly delegated to an arbitrator when the contract contains a delegation clause. *See, e.g.*, *Visibility Corp. v. Schilling Robotics, LLC*, 2011 WL 5075816, at *4 (D. Mass. Oct. 25, 2011) ("The question remaining—whether [defendants] can compel [plaintiff] to arbitrate the issue of arbitrability even though neither of the defendants was a signatory to the [a]greement containing the arbitration clause—has been squarely addressed by the First Circuit in

16

*Apollo . . . .*"); *Symonds*, 2020 WL 7075028, at *6 ("[B]ecause the arbitration agreement delegates the arbitrability determination to the arbitrator, it is the arbitrator, rather than the Court, who must decide whether nonsignatories Credico and Verizon can compel [p]laintiff to arbitrate her claims against them."); *In re Intuniv Antitrust Litig.*, 2021 WL 517386, at *6 (D. Mass. Feb. 11, 2021) ("[B]ecause both [contracts] delegate the arbitrability determination to the arbitrator, it is for an arbitrator, rather than the Court, to decide whether nonsignatory Shire can compel Meijer to arbitrate its claims.").

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein*, 586 U.S. at 69.  Thus, the arbitrator must decide the threshold issue of whether defendant may enforce the arbitration agreement, not the Court.  Accordingly, the Court will compel arbitration of the claims brought by the 18 plaintiffs that signed either a VRIC or MVLA, and the Court will stay those claims pending arbitration.

### C.   **The Hartman RISC**

Finally, the Court must address an issue not raised by the parties—that is, whether the Court is empowered to compel arbitration as to plaintiff Hartman.  Again, the relevant arbitration provision contains the following:

> The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed.

(MTC Ex. P at 2).  Hartman resides in the Central District of California, and he purchased his vehicle in that district.  (ACC ¶¶ 66, 467).

Section 4 of the FAA provides that "[t]he hearing and proceedings, under [an arbitration agreement], shall be within the district in which the petition for an order directing such arbitration is filed."  9 U.S.C. § 4.  "There is a split among the Circuits on the question of

whether section 4 of the FAA permits a district court to compel arbitration to take place in a different jurisdiction," *Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*, 754 F. Supp. 2d 782, 786 (D. Md. 2010), and "[t]he First Circuit has not had an opportunity to address [the] issue," *Montoya v. GoPro, Inc.*, 2023 WL 5177446, at *3 (D.P.R. Aug. 11, 2023).

The Circuits that have addressed the issue "have taken three different approaches when the underlying agreement states that an arbitration shall proceed in another district." *Montoya*, 2023 WL 5177446, at *3. "The first approach is that a district court may compel arbitration in the venue specified in the agreement, even when that venue is in another district. . . . The second approach permits a district court to compel arbitration in its own district, even when an arbitration clause specifies another venue. . . . The third, majority approach is when an arbitration provision contains a forum selection clause, the only proper venue in which to compel arbitration is the venue encompassing that forum." *Id.* (citations omitted).

The Court is persuaded by the reasoning of the majority that "a district court lacks authority to compel arbitration in other districts, or in its own district, if another [district] has been specified for arbitration," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 328 (7th Cir. 1995), and that "[a]ny other result renders meaningless the § 4 mandate that arbitration and the order compelling arbitration issue from the same district," *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1220 (10th Cir. 2005).

Section 4 is appropriately treated as a venue provision. *See Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co.*, 628 F. Supp. 2d 674, 685 (E.D. Va. 2009) ("§ 4 of the FAA speaks only to venue."); *Lauer*, 49 F.3d at 327 ("In addition to setting forth the circumstances under which parties may seek to compel relief, § 4 also establishes the appropriate venue in which they may do so."); *Nat'l Indem. Co. v. Transatlantic Reinsurance Co.*, 13 F. Supp. 3d 992, 1000 (D.

Neb. 2014) ("[Section 4] sets forth the proper venue for [actions to compel arbitration].").

Because this District is not the proper venue in which to seek compulsion of arbitration as to plaintiff Hartman, the question before the Court is whether to dismiss his claims or sever and transfer his case to the Central District of California for resolution of the motion to compel arbitration. *See A.T. Massey*, 628 F. Supp. 2d at 685 ("[V]enue in this district is improper in this case. Hence, the Court can either dismiss the action or transfer it to a jurisdiction where venue is proper.").

"Courts have held that 'transfer is generally preferable to dismissal.'" *Stars for Art Prod. FZ, LLC v. Dandana, LLC*, 806 F. Supp. 2d 437, 449 (D. Mass. 2011) (quoting *Cormier v. Fisher,* 404 F. Supp. 2d 357, 363 (D. Me. 2005) (collecting cases)). While defendant did not request a transfer of venue as to plaintiff Hartman, and neither party raised the issue in its briefing, a Court may transfer a case to cure improper venue *sua sponte*. *See Lando & Anastasi, LLP v. Innovention Toys, L.L.C.*, 79 F. Supp. 3d 375, 376 (D. Mass. 2015) ("Courts have unanimously held that it is appropriate to transfer a case *sua sponte* pursuant to 28 U.S.C. § 1404(a)."); *Desmond v. Nynex Corp.*, 1994 WL 577479, at *3 (1st Cir. Oct. 20, 1994) ("It is well settled that a court may transfer a case *sua sponte* pursuant to 28 U.S.C. §§ 1404(a) and 1406(a).").

The proper mechanism for enforcement of a forum-selection clause is Section 1404(a). *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013) ("Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a).").

Because the relief requested cannot be granted in this venue, transfer of plaintiff

Hartman's claims to the Central District of California is "in the interest of justice," 28 U.S.C. § 1404(a).  *See Atl. Marine*, 571 U.S. at 63 ("[B]ecause the overarching consideration under § 1404(a) is whether a transfer would promote 'the interest of justice,' 'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring))).

## IV.    Conclusion

For the foregoing reasons,

1.      Defendant's motion to compel arbitration is GRANTED as to the claims of plaintiffs Peter Adduci, Richard Bunger, Cruz Garza, James Grier, Julie and Todd Haworth, Richard Metz, Steve Ropieski, Matthew Skole, Bridgett Thompson, Brian and Kelly Wolfe, Jeffrey Wright, Justin and Erin Barlup, and Pablo Martinez.  Those plaintiffs' claims are STAYED pending further arbitration proceedings.

2.      Defendant's motion to compel arbitration is GRANTED as to the claims of plaintiffs Daniel Wright and Daniel McCabe for breach of the implied warranty of merchantability, fraudulent misrepresentation, and violation of Mass. Gen. Laws ch. 93A.  Those claims are STAYED pending further arbitration proceedings.

3.      Defendant's motion to compel arbitration is DENIED without prejudice as to the claims of plaintiff Shannon Hartman.  Those claims are hereby severed from the present action and transferred to the United States District Court for the Central District of California for resolution of the arbitration issue.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 28, 2025                    Chief Judge, United States District Court