# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————— )
DANIEL MCCABE, et al., individually )
and on behalf of all others similarly situated, )
)
        Plaintiffs, )
)     **Civil Action No.**
     v. )     **23-10829-FDS**
)
FORD MOTOR COMPANY, )
)
        Defendant. )
———————————————————————— )

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

**SAYLOR, C.J.**

This is a consolidated set of putative class actions alleging defects in the transmissions of

certain Ford vehicles.  Jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C.

§ 1332(d)(2).

Plaintiffs have brought suit against defendant Ford Motor Company.  They represent

putative classes of purchasers and lessees of Ford vehicles equipped with a 10R80 10-speed

automatic transmission.  According to the consolidated complaint, the transmission "can shift

harshly and erratically, causing the vehicle to jerk, lunge, clunk, and hesitate between gears."

(Am. Consolidated Class Action Compl. ("ACC") ¶ 4).

The consolidated complaint asserts claims for breach of express warranty; breach of the

implied warranty of merchantability; fraud and fraudulent concealment; and violations of the

trade and consumer-protection laws of various states.

Treating the allegations of fraud and fraudulent concealment as a single claim, the consolidated complaint contains 203 claims, asserted by 46 individual plaintiffs. Ford has moved to dismiss a significant majority of those claims for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the motion will be granted in part and denied in part.

## I.    Background

### A.    Factual Background

The facts are set forth as alleged in the Amended Consolidated Class Action Complaint ("ACC").

According to the complaint, plaintiffs are consumers who purchased or leased vehicles designed and manufactured by defendant Ford Motor Company equipped with a 10R80 10-speed transmission. (ACC ¶¶ 35-73). Plaintiffs represent putative classes of consumers in nine states—Massachusetts, Florida, Alabama, Illinois, Texas, New York, California, Oklahoma, and Pennsylvania.

The complaint alleges that when Ford first introduced the 10R80 transmission in the 2017 F-150, it "advertised the 'improved acceleration and performance' and 'enhanced shifting performance' offered by the Transmission." (*Id.* ¶ 83). Ford also described the transmission as "innovative" and "class-exclusive," advertising its "responsiveness and all-around performance." (*Id.* ¶¶ 94, 119).

According to the complaint, however, the transmission did not live up to Ford's representations. It alleges that vehicles equipped with the transmission "slip gears, hesitate, jerk, lunge, clunk, and/or shift roughly." (*Id.* ¶ 132). It further alleges that "[s]ome consumers have reported that their Vehicle loses power while accelerating, including onto a freeway or through an intersection, when the Transmission failed to shift up or down." (*Id.*). As a result, drivers

have "reported whiplash and discomfort due to harsh shifting," "distraction from driving due to loud and unusual sounds," "concerns about reliability," and "that they do not feel safe driving [their vehicles] in normal traffic conditions." (*Id.* ¶¶ 133-34).

According to the complaint, "[s]ince the 10R80 transmission was introduced . . . drivers have repeatedly complained to Ford about problematic shifting, including Vehicles lunging, jerking, hesitating, clunking, and otherwise shifting erratically." (*Id.* ¶ 677). It alleges that numerous complaints filed with the National Highway Transportation Safety Administration demonstrate that the defects with the 10R80 are "widespread." (*Id.* ¶ 558).

The vehicles in question are covered by Ford's "New Vehicle Limited Warranty," which provides that (subject to certain limitations, such as time and mileage) Ford will repair or replace any defective parts. (*Id.* ¶ 846). An owner or lessor seeking repairs under the warranty must satisfy two preconditions: the vehicle must (1) be "properly operated and maintained" and (2) "taken to a Ford dealership for a warranted repair during the warranty period." (Def. Mem. Exs. 1-7 ("Warranties") at 9).[1] At that point, the "authorized Ford Motor Company dealer[] will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." (*Id.*).

In March 2018, Ford issued its first of several "Technical Service Bulletins" ("TSBs"), instructing technicians on how to address "harsh or delayed shifts" in vehicles equipped with 10R80 transmissions. (ACC ¶¶ 680, 685). The complaint alleges that these TSBs "reflected

---

[1] The warranties themselves are referenced in, and critical to, the ACC. (*See, e.g.*, ACC ¶¶ 128-31, 814). Thus, the Court is permitted to, and will, consider them in deciding the motion to dismiss. *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("Where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

knowledge of the Defect that Ford had maintained throughout the design and testing of the 10-speed Transmission, prior to its first sale to consumers." (*Id.* ¶ 686). Ford released further TSBs and "Special Service Messages" ("SSMs") between 2018 and 2024 addressing issues with the 10R80. (*Id.* ¶¶ 679-716). The complaint alleges that these "recommendations fail to remedy the [10R80]'s shifting problems reported in Class Vehicles." (*Id.* ¶ 716).

The complaint alleges that from 2017 to the present, Ford "has misrepresented the safety, performance and reliability of the 10R80 . . . through its website, multimedia advertisements, brochures, and in-person statements by its employees, authorized dealers, agents, sales representatives and/or repair technicians." (*Id.* ¶ 721). According to the complaint, Ford has characterized the purported defect with the 10R80 as "'normal,' or simply a limited period of adjustment and adaptation." (*Id.* ¶ 741). Although Ford allegedly knew about the defect with the 10R80, it "has allowed Plaintiffs and Class Members to continue to drive the Class Vehicles," "has not recalled the [v]ehicles," and "has not offered to reimburse [v]ehicle owners and lessees who incurred costs in an attempt to address [transmission problems] . . . [or] for any diminished value of their [v]ehicles resulting from the [d]efect." (*Id.* ¶¶ 744, 746-48).

The complaint alleges that plaintiffs "have not received the benefit for which they bargained when they purchased or leased the Class Vehicles," and "the value of the Class Vehicles has diminished." (*Id.* ¶¶ 751-52).

## B.    Procedural Background

Massachusetts plaintiffs McCabe, Wright, and Pollack filed the first amended class action complaint on June 23, 2023. Ford moved to dismiss that complaint, which the Court granted in part and denied in part. Specifically, the Court dismissed the claims for breach of express warranty; breach of the implied warranty of fitness; violation of the Magnusson-Moss Warranty Act ("MMWA"); negligence; unjust enrichment; and fraudulent omission, but denied dismissal

of the claims for breach of the implied warranty of merchantability; fraudulent

misrepresentation; and violation of Chapter 93A.

By that point, plaintiffs' counsel had filed eight other putative class actions concerning

the 10R80.  And on April 12, 2024, those actions were consolidated with the action filed by the

Massachusetts plaintiffs.  On June 14, 2024, plaintiffs filed the operative consolidated complaint,

which asserts claims pleaded on behalf of 46 individual named plaintiffs and on behalf of "all

similarly situated persons . . . who purchased or leased a Ford vehicle equipped with a 10R80 10-

speed transmission . . . ."  (ACC ¶ 2).  As noted, the consolidated complaint asserts claims for

breach of express warranty (Count 1); breach of the implied warranty of merchantability

(Count 2); violation of the Song-Beverly Consumer Warranty Act ("SBCWA") for breach of

express warranties, Cal. Civ. Code §§ 1791.2, 1793.2 (Count 3); of the SBCWA for breach of

implied warranties, Cal. Civ. Code §§ 1791.1, 1792 (Count 4); fraud and fraudulent concealment

(Count 5); violation of the Massachusetts Consumer Protection Law, Mass. Gen. Laws ch. 93A

(Count 6); the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat.

§§ 501.201, *et seq.* (Count 7); the Alabama Deceptive Trade Practices Act ("ADTPA"), AL

Code § 8-19-1, *et seq.* (Count 8);  the Illinois Consumer Fraud and Deceptive Trade Practices

Act ("ICFA"), 815 Ill. Comp. Stat. 505/1, *et seq.* (Count 9); the Texas Deceptive Trade Practices

and Consumer Protection Act ("TDTPA"), Tex. Bus. Com. Code §§ 17.41, *et seq.* (Count 10);

New York General Business Law § 349 (Count 11); New York General Business Law § 350

(Count 12); the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et

seq.* (Count 13); the California Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code §§

17200, *et seq.* (Count 14); the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. §§ 752, *et

*seq.* (Count 15); and the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201-1, *et seq.* (Count 16).

Ford has moved to compel arbitration as to 19 of the named plaintiffs. The Court has granted that motion as to plaintiffs Adduci, Bunger, Garza, Grier, Julie and Todd Haworth, Metz, Ropieski, Skole, Thompson, Brian and Kelly Wolfe, Daniel Wright, Jeffrey Wright, Erin and Justin Barlup, Martinez, and McCabe. The claims of those plaintiffs are stayed pending arbitration. The Court denied the motion as to plaintiff Hartman because the relief sought could not be granted in this District. The Court accordingly severed and transferred Hartman's claims to the Central District of California for resolution of Ford's motion to compel arbitration. Thus, this memorandum and order does not address the claims of those 19 plaintiffs.

Ford has moved to dismiss a significant majority of the claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.    <u>Standard of Review</u>

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary

to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III. <u>Analysis</u>

#### A. <u>Massachusetts Plaintiffs' Re-Pleaded Claims (McCabe, Wright, and Pollack)</u>

As noted, the Court previously dismissed several of the claims asserted by Massachusetts plaintiffs McCabe, Daniel Wright, and Pollack for failure to state a claim upon which relief can be granted. The parties dispute whether that dismissal was with prejudice, such that those plaintiffs cannot now resurrect those claims in the now-operative amended class-action complaint. The Court's prior dismissal was indeed with prejudice, and those claims cannot now be renewed.

The procedural history is instructive. Defendant moved to dismiss plaintiffs' initial complaint for failure to state a claim upon which relief can be granted. In response, plaintiffs filed an amended complaint. Defendant then moved to dismiss the amended complaint with prejudice. The Court granted that motion as to all counts except those for breach of the implied warranty of merchantability, fraudulent misrepresentation, and violation of Chapter 93A. In their opposition, plaintiffs requested "leave to amend to cure any such deficiencies." (ECF No. 58 at 31). The Court did not address that request in its order.

It is well settled that "in the absence of a clear statement to the contrary, a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is presumed to be with prejudice." *Ross v. Deutsche Bank Nat'l Tr. Co.*, 2023 WL 8351577, at *1 (1st Cir. Apr. 6, 2023) (quoting *Karvelas v. Melrose-*

*Wakefield Hosp.*, 360 F.3d 220, 241 (1st Cir. 2004)).[2]  The Court made no such statement in its order.

Furthermore, plaintiffs' request for an opportunity to amend consisted of a sentence-long conditional entreaty in their opposition memorandum.  It was not accompanied by any motion or argument, nor by a proposed amended complaint such that the Court could reasonably assess the request.  These types of requests are disfavored in this Circuit to such a degree that they are treated as holding "no legal significance."  *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 36 (1st Cir. 2022) ("The district court treated th[e] 'contingent' request [for an opportunity to amend] as holding 'no legal significance.'  We see no reason to treat it otherwise." (internal citation omitted)); *Fisher v. Kadant, Inc.*, 589 F.3d 505, 507 (1st Cir. 2009) ("[S]uch a passing request is without effect . . . [and] does not constitute a motion to amend a complaint." (quoting *Gray v. Evercore Restructuring, LLC*, 544 F.3d 320, 327 (1st Cir. 2008))).  "Allowing plaintiffs to hedge their bets by adding a cursory contingent request in an opposition to a motion to dismiss would encourage plaintiffs to test the mettle of successive complaints and freely amend under Rule 15(a) if their original strategic choices prove inadvisable."  *Fisher*, 589 F.3d at 510.  Permitting such a practice "would lead to delays, inefficiencies, and wasted work."  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008).  Thus, "[p]laintiffs may not, having the needed information, deliberately wait in the wings . . . with another amendment to a complaint should the court hold the first amended complaint was insufficient."  *Id.*[3]

---

[2] *See also* Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise . . . any dismissal not under this rule [(Fed. R. Civ. P. 41)]—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits.").

[3] For the same reasons, plaintiffs' conditional request for leave to amend in their memorandum of opposition to the present motion will not be granted.

The Court's direction to file a consolidated amended complaint—as a means of efficiently capturing the many claims of once disparate plaintiffs in a single operative filing—was not intended to contravene those principles, or to provide the Massachusetts plaintiffs with a third bite at the apple. The Court dismissed the claims of plaintiffs McCabe, Wright, and Pollack for breach of express warranty and fraudulent concealment; those dismissals were with prejudice; and they cannot be resurrected through the vehicle of the amended consolidated complaint.

### B.    Claims for Breach of Express Warranty (Counts 1 and 3)

Counts 1 and 3 allege that Ford breached its express warranty to plaintiffs by failing to repair the defects in the 10R80 transmission. (ACC ¶¶ 810, 852). Count 1 alleges breach of each respective state's statutory codification of § 2-313 of the Uniform Commercial Code ("UCC"), and Count 3 alleges violation of the California SBCWA's express-warranty provision.

Those claims are based on Ford's "New Vehicle Limited Warranty," which provides:

Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:

- your Ford vehicle is properly operated and maintained, and

- was taken to a Ford dealership for a warranted repair during the warranty period,

then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

This warranty does not mean that each Ford vehicle is defect free. Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. Ford provides the New Vehicle Limited Warranty only to remedy manufacturing defects that result in vehicle part malfunction or failure during the warranty period.

(Warranties at 8-9).

1.    **Manufacturing Versus Design Defect**

Defendant contends that the warranty covers only manufacturing defects; that the complaint alleges only a design defect in the 10R80; and that therefore the defects alleged in the complaint are not covered by the warranty.

The parties do not dispute that the warranty covers only manufacturing defects.  The warranty language clearly states that "Ford provides the New Vehicle Limited Warranty *only to remedy manufacturing defects*."  (*Id.* at 9) (emphasis added).

The question, then, is whether the complaint alleges a claim for a manufacturing defect in the 10R80.  "A 'design defect' exists 'when the product is built in accordance with its intended specifications, but the design itself is inherently defective.' . . .  By contrast, a 'manufacturing defect exists when an item is produced in a substandard condition,' i.e., where a manufacturer 'fails to comply with its own design specifications,' and is 'often demonstrated by showing the product performed differently from other ostensibly identical items of the same product line.'" *Sharma v. BMW of N. Am., LLC*, 2014 WL 2795512, at *4 (N.D. Cal. June 19, 2014) (citation omitted); *Secura Ins. Co. v. Deere & Co.*, 101 F.4th 983, 987 (8th Cir. 2024) ("[R]elating to defective products, flaws in materials and workmanship refer to mistakes made during the construction or assembly of a product, while defects in design refer to inadequacies in the plans used to construct or assemble a product.").[4]

Without question, the complaint alleges a claim of defective design—indeed, that is

---

[4] That distinction is recognized under the laws of all the relevant states.  *See, e.g.*, *Troup v. Toyota Motor Corp.*, 545 Fed. App'x 668, 668 (9th Cir. 2013) (California); *Caracci v. Am. Honda Motor Co.*, 2024 WL 1300919, at *7 (N.D. Ill. Mar. 27, 2024) (Illinois); *Orange Trans. Servs., Inc. v. Volvo Grp. N. Am., LLC*, 450 F. Supp. 3d 311, 318 (W.D.N.Y. 2020) (New York); *Mack Trucks, Inc. v. BorgWarner Turbo Sys., Inc.*, 508 Fed. App'x 180, 184 (3d Cir. 2012) (Pennsylvania); *Harman v. Taurus Int'l Mfg., Inc.*, 661 F. Supp. 3d 1123, 1131 (M.D. Ala. 2023) (Alabama); *Salinas v. Ford Motor Co.*, 2016 WL 8461424, at *5 (S.D. Tex. May 13, 2016) (Texas); *Davenport v. Thor Motor Coach, Inc.*, 2015 WL 13021664, at *4 (M.D. Fla. Aug. 6, 2015) (Florida).

exactly how plaintiffs characterize their claims.  In its introductory "nature of the case" section, the complaint states that "[p]laintiffs assert claims related to and resulting from the defective *design* of the 10R80 [t]ransmission."  (ACC ¶ 2) (emphasis added).  It alleges that Ford attempted but failed to remedy the transmission problems with a "differently designed" component.  (*Id.* ¶¶ 14-15).  And it asserts that "[a]n auto manufacturer that is aware of *design* conditions or decisions that cause its vehicles to jerk, hesitate, surge, or slip gears should promptly disclose and remedy such defects," and that Ford was "aware of the [t]ransmission [d]efect during . . . *pre-production design*."  (*Id.* ¶¶ 31, 687) (emphases added).

If plaintiffs also intended to assert a claim for manufacturing defects, that intention is well-disguised.  The complaint—which is 226 pages long—makes only four mentions of possible manufacturing defects.  Two are passing references to "design and/or manufacturing defects."  (*Id.* ¶¶ 4, 7).  The third is an allegation that "'smoothness' of shifting" is referred to as "an objective metric" that is "the subject of Ford's design and manufacturing efforts."  (*Id.* ¶ 81). Finally, the question of "[w]hether the [v]ehicles and their [t]ransmissions are defectively manufactured" is included in a list of common questions of law and fact in the class-allegations section.  (*Id.* ¶ 792).

Those vague and conclusory references to manufacturing defects are not accompanied by any specific factual allegations.  That alone is sufficient reason to conclude that the complaint does not state a claim arising out of any such defects.  *See Cummings v. FCA US, LLC*, 401 F. Supp. 3d 288, 314-15 (N.D.N.Y. 2019) ("[A]lthough plaintiff made passing notations of a defect in material, manufacturing and/or workmanship (i.e., that one of the class questions is whether the transmission contains either type of defect, that the transmission was 'not adequately designed, manufactured, and/or tested,' that the vehicles were 'designed and manufactured in

such a way as to present an inherent safety risk'), her overall [c]omplaint suggests that she is really alleging a design defect."); *Garcia v. Chrysler Grp., LLC*, 127 F. Supp. 3d 212, 227 (S.D.N.Y. 2015) ("[A] manufacturing defect claim [pleaded] in the alternative to a design defect claim is subject to dismissal at the motion to dismiss stage where the complaint makes only 'offhand references to manufacturing defects' and the purported class includes '*all* purchasers or lessees' of the vehicles at issue.").

Furthermore, the fact that the complaint alleges that all 10R80 transmissions share the same defect strongly suggests that the only asserted claims are for defective design. "Where a defect is common to all vehicles, such a defect is typically considered one of design, rather than a manufacturing defect." *Rollolazo v. BMW of N. Am., LLC*, 2017 WL 6888501, at *8 (C.D. Cal. May 2, 2017); *see also Buniatyan v. Volkswagen Grp. of Am., Inc.*, 2016 WL 6916824, at *5 (C.D. Cal. Apr. 25, 2016) ("If [p]laintiffs maintain that the S/S Defect is common to all Audi models equipped with an S/S System, they are by definition alleging a design defect; [p]laintiffs in a class action may not simultaneously maintain that their vehicles contain only a manufacturing defect."). Here, the complaint defines the class as "[a]ll persons in the United States and its territories who formerly or currently own(ed) or lease(d) one or more [c]lass [v]ehicles equipped with a 10R80 10-speed automatic Transmission." (ACC ¶ 777). As explained in *Miller v. Hyundai Motor America*, "[t]he very definition of the putative class as '*all* persons in a particular area who purchased and/or leased [a particular model of automobile]' contradicts the nature of manufacturing defects, which, 'by definition, are imperfections that inevitably occur in a typically small percentage of products of a given design as a result of the fallibility of the manufacturing process.'" 2017 WL 4382339, at *5 (S.D.N.Y. Sept. 29, 2017) (quoting *Gunn v. Hytrol Conveyor Co.*, 2013 WL 2249241, at *8 (E.D.N.Y. May 22, 2013)).

It is true that a handful of courts have found the determination of whether an alleged defect is the of result design or manufacturing to be inappropriate at the pleading stage.[5] Certainly, "it is logically possible that either could be the case; perhaps the transmissions work badly even though built as designed; or maybe *all* were badly built, even though well-patterned." *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 673 (E.D. Mich. 2020).  And while a manufacturing defect "is more likely to occur sporadically, it is entirely possible that some grave error in material or workmanship during assembly caused all Class Vehicles to deviate from [d]efendant's intended design."  *Granillo v. FCA US LLC*, 2016 WL 9405772, at *14 (D.N.J. Aug. 29, 2016).  And it is also true that the facts bearing on the source of the defect are likely to be uniquely in the defendant's possession, and thus "require discovery and perhaps expert analysis to determine."  *O'Connor v. Ford Motor Co.*, 567 F. Supp. 3d 915, 936 (N.D. Ill. 2021); *see also Haag v. Hyundai Motor Am.*, 969 F. Supp. 2d 313, 316 (W.D.N.Y. 2013) ("Whether [the] alleged defects arose from a faulty design, faulty materials or faulty workmanship cannot be ascertained absent discovery, since any information concerning the true origin of the alleged defect is within the sole possession of the defendant."); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 467 (S.D.N.Y. 2014) (following *Haag*); *Francis v. General Motors, LLC*, 504 F. Supp. 3d 659, 673 (E.D. Mich. 2020) ("[B]ecause the amended complaint does not commit to either theory on the origin of the defect, and it states facts consistent with a defect that could be due either to poor design, or to poor materials and workmanship[,] [t]he revelation of which may be the culprit here must await development of the record.").

Those cases are distinguishable for a variety of reasons.  The complaint here alleges that

---

[5] *See, e.g.*, *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *12 (D.N.J. May 8, 2017) ("Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleading stage of litigation.").

Ford had knowledge of the defect "during pre-production design and testing"—an allegation that is logically inconsistent with an allegation of defective manufacture. (*Id.* ¶ 687). And the "nature of the case" is described as "claims related to and resulting from the *defective design* of the 10R80 [t]ransmission." (*Id.* ¶ 2). In contrast to the circumstances in *Marshall* and *Haag*—in which the plaintiffs specifically contended that there were "material and/or workmanship defects existing within [the relevant components]," 504 F. Supp. 3d at 673; *see* 969 F. Supp. 2d at 316—no such direct allegations appear in the complaint. And in contrast to *Francis*, where the complaint "expressly disclaim[ed] any theory of origin for the transmission defect," 504 F. Supp. 3d at 673, here, plaintiffs expressly characterize their entire action as one "related to and resulting from . . . defective design," (ACC ¶ 2).

More importantly, the complaint in this case simply does not allege a theory of liability arising out of manufacturing defects. That is surely not an oversight. Plaintiffs are represented by sophisticated counsel; they are not proceeding *pro se*. They could have pleaded such a theory, directly or in the alternative, but chose not to—presumably, for strategic reasons.[6] Whatever their motivation for failing to do so, it is not the proper role of the Court to revisit that issue now.

In short, while the ACC makes a smattering of conclusory references to "design and/or manufacturing defects," that is not sufficient to assert a claim for manufacturing defects. Rather, the complaint alleges only claims for defective design, as evidenced by plaintiffs' own characterization of their claims, the facts alleged, the lack of any direct allegation of a manufacturing defect, and the universal nature of the claims. Because the alleged design defect

---

[6] It is possible, for example, that plaintiffs elected not to complicate the litigation unnecessarily, or to introduce individual issues that might greatly undermine their ability to obtain class certification.

does not fall within the coverage of Ford's New Vehicle Limited Warranty, all of the express-warranty claims will be dismissed.

### C.  Claims for Breach of The Implied Warranty of Merchantability (Counts 2 and 4)

Count 2 alleges that Ford breached the implied warranty of merchantability because the 10R80 transmissions were "defective," "posed a serious safety risk at the time of sale," and "are not fit for the ordinary purposes for which such goods are used," thereby violating each respective state's statutory codification of § 2-314 of the UCC.  (ACC ¶ 829).  Count 4 alleges violation of the California SBCWA's implied warranty provision.[7]

### 1.  Privity (Count 2) (Alabama, California, Florida, Illinois, New York)

Defendant contends that a large number of the implied warranty claims should be dismissed due to lack of contractual privity with Ford under relevant state law.  The ACC asserts two bases for privity, as well as one basis for exception from the privity requirements.

First, the ACC alleges that "[p]laintiffs had and continue to have sufficient direct dealings with Ford and/or its authorized dealers, franchisees, representatives, and agents to establish any required privity of contract," because "Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles."  (ACC ¶ 824).  Instead, "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class Vehicles, *i.e.*, Plaintiffs and Class Members."  (*Id.*).

Second, the ACC alleges that "by extending express written warranties to end-user purchasers and lessees, [defendant] brought itself into privity with Plaintiffs and all Class

---

[7] In their opposition brief, the Illinois plaintiffs and Alabama plaintiff Houseal withdrew their implied warranty claims.  Accordingly, those claims will be dismissed.

Members." (*Id.* ¶ 826).

Third, the ACC alleges that "[p]rivity is not required to assert this claim because Plaintiffs and the Class Members are intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents." (*Id.* ¶ 825).

The Court will address the arguments under each state's law in turn. When applying state law, a federal court first "looks to pronouncements of the highest court of the state." *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 52 (1st Cir. 2008). When that court has not resolved the question, the federal court "is to ascertain the rule the state court would most likely follow under the circumstances . . . tak[ing] care not to extend state law beyond its well-marked boundaries." *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 58 (1st Cir. 2020) (citations and quotations omitted). While not binding, intermediate appellate state-court decisions are relevant data points "for ascertaining state law which [are] not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

### a.     Alabama

Under Alabama law, "without privity of contract, there is no right of action against a manufacturer for direct economic loss." *Rhodes v. Gen. Motors Corp., Chevrolet Div.*, 621 So.2d 945, 947 (Ala. 1993); *see Rampey v. Novartis Consumer Health, Inc.*, 867 So.2d 1079, 1087 (Ala. 2003) ("The law in this State is that a claim for breach of an implied warranty is not available against a manufacturer who was not involved in the transaction pursuant to which the complaining party purchased the product."); *Varney v. Ford Motor Co.*, 2007 WL 2780566, at *3 (M.D. Fla. Sept. 15, 2007) ("Under Alabama law, implied warranty claims require privity between the plaintiff and the defendant . . . even if the suit is brought against a manufacturer." (citation omitted)).

16

Plaintiffs contend that they fall within a third-party-beneficiary exception to the Alabama privity requirement. Some federal courts have found such an exception to exist under Alabama law. *See, e.g.*, *Hurry v. Gen. Motors, LLC*, 622 F. Supp. 3d 1132, 1146 (M.D. Ala. 2022); *Freeman v. NIBCO, Inc.*, 526 F. Supp. 3d 1112, 1132 (N.D. Ala. 2020); *Naef v. Masonite Corp.*, 932 F. Supp. 1504, 1508 (S.D. Ala. 1996). Others, however, have come to the opposite conclusion. *See, e.g.*, *Droesser v. Ford Motor Co.*, 2023 WL 2746792, at *17 (E.D. Mich. Mar. 21, 2023); *Pistorio v. FCA U.S., LLC*, 2022 WL 141524, at *9 (E.D. Mich. Jan. 14, 2022); *Weidman v. Ford Motor Co.*, 2019 WL 3003693, at *4 (E.D. Mich. July 10, 2019). The Court agrees that Alabama law might recognize a limited form of third-party-beneficiary exception. However, the narrow scope of that exception does not extend to the claims in this case.

It is well settled that "under Alabama's version of the [UCC], implied warranties are applicable *only to sellers*." *Ex parte Gen. Motors Corp.*, 769 So.2d 903, 910 (Ala. 1999) (emphasis added). And the Alabama Supreme Court has repeatedly distinguished "sellers" from "manufacturers." *See, e.g.*, *Horton Homes, Inc. v. Brooks*, 832 So.2d 44, 48 (Ala. 2001) ("Generally, implied warranties apply only to the seller, not the manufacturer."); *Rhodes*, 621 So.2d at 947 ("[E]ach section in the Uniform Commercial Code dealing with implied warranties places obligations on the *seller* of goods. In this case, General Motors was the manufacturer of the automobile . . . ." (emphasis in original)); *Wellcraft Marine, a Div. of Genmar Indus., Inc. v. Zarzour*, 577 So.2d 414, 419 ("There is no right of action on an implied warranty theory against a *manufacturer* . . . without privity of contract." (emphasis in original)).

As a general matter, Alabama courts strictly apply that distinction. However, the Alabama Supreme Court has recognized that under some circumstances an implied warranty may apply to a manufacturer despite the presence of an intermediary between it and the ultimate

consumer.  In *Horton Homes*, the court stated that "implied warranties can apply to the

manufacturer when . . . the product has been specially manufactured for a particular customer

and the manufacturer can reasonably expect the customer to be affected by any problems with

the product."  832 So.2d 44, 48.[8]  Outside that narrow set of circumstances, Alabama courts have

not recognized, post-*Rhodes*, any form of third-party-beneficiary exception to the privity

requirement in implied warranty actions.[9]  This case does not present such a narrow set of

circumstances; the ACC does not contain any allegations suggesting that Ford "specially

manufactured" any vehicle "for a particular consumer."  Thus, Ford is a "manufacturer" in the

traditional sense under Alabama law, not a seller—and not, therefore, subject to implied-

warranty-of-merchantability liability as to the ultimate purchasers of its vehicles.  *See Kidd v.

Kilpatrick Chevrolet, Inc.*, 613 So.2d 336, 338 (Ala. 1993) ("[B]ecause [defendant] was not the

'seller,' the implied warranty sections are not applicable.")

Plaintiffs' attempt to derive privity from Ford's express warranty is likewise unavailing

under Alabama law.  *See Wellcraft*, 577 So.2d at 419 ("[Plaintiff] cites no authority for the

---

[8] That is fundamentally the same reasoning underlying *Morris Concrete, Inc. v. Warrick*, 868 So.2d 429 (Ala. Civ. App. 2003), a case that served as a basis (and in some instances the sole basis) for the federal-court decisions finding a third-party-beneficiary exception under Alabama law.  In *Morris Concrete*, the court remained within the boundaries of the "seller" limitation to implied-warranty actions by finding that the manufacturer functionally "*was* the seller."  868 So.2d at 435 (emphasis added).  That finding was based on the facts that (1) the intermediary expressly informed the manufacturer of the specific person for whom he was buying the concrete; (2) the intermediary provided the particular specifications that the ultimate user would need; and (3) the ultimate user called the manufacturer himself, informed it of the arrangement between himself and the intermediary, and requested delivery, and the manufacturer delivered the concrete directly to the ultimate user.

[9] The other Alabama case that federal courts have most frequently relied upon in finding a third-party-beneficiary exception is *Chandler v. Hunter*, 340 So.2d 818 (Ala. Civ. App. 1976).  Not only is *Chandler* a lower-court case, but it pre-dates the Alabama Supreme Court's holdings in *Rhodes* and *Rampey* by 17 years, and thus does not take into account the subsequently developed Alabama authority restricting the applicability of a third-party-beneficiary exception to the privity requirement.  Furthermore, it shares with *Morris Concrete* the crucial distinction that the only seller *was* the manufacturer—the intermediary never actually *sold* the relevant product to the ultimate user.  *Chandler*, 340 So.2d at 822 ("Under the terms of a divorce decree, [the intermediary] was to furnish Mrs. Hunter a place to live in lieu of making child support payments.  [The intermediary] brought [*sic*] the mobile home for that purpose and no other.").

proposition that an express warranty converts a manufacturer into a 'seller' for the purpose of the commercial code's implied warranty provisions.  Regardless of any express warranties that a manufacturer may wish to give with a product, by their very language the commercial code's implied warranty sections apply to the seller of the product."); *Rhodes*, 621 So.2d at 947-48 ("We see no reason to disturb [*Wellcraft*'s] holding [on the effect of express manufacturer warranties] in this case.").

Plaintiffs' citation to *Bolling v. Mercedes-Benz USA, LLC*, 2024 WL 3972987 (N.D. Ga. Aug. 27, 2024) is unpersuasive.  The court in *Bolling* treated a manufacturer's express warranty as sufficient to plead privity without considering the clearly contrary Alabama precedent in *Wellcraft* and *Rhodes*.  *Bolling*, 2024 WL 3972987, at *11.  The court then looked to *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 848 (Ala. 1993), a case considering third-party-beneficiary status in the context of fraud and breach of contract claims,[10] and *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1339 (11th Cir. 2015), a case considering third-party-beneficiary rights in the context of an *express* warranty.  *Id.* at 11-12.  And the court further relied upon *Hurry v. Gen. Motors*,[11] which overstated the import of the holdings in *Chandler* and *Morris Concrete* to find a broad third-party-beneficiary exception, 622 F. Supp. 3d at 1146-47, when, as shown above, the exception that does exist under Alabama law is narrowly restricted, *see Horton Homes*, 832 So.2d at 48.

In sum, Alabama law provides that (1) privity is required to bring a claim for breach of the implied warranty of merchantability; (2) such causes of action are available only against

---

[10] Furthermore, the *McGowan* court found that the plaintiff had failed to show that he "was either a direct or an intended beneficiary, as opposed to an incidental beneficiary, [of the warranty contract between manufacturer and dealer]," and thus "had no valid third-party contract claim."  631 So. 2d at 848.

[11] *Bolling*, 2024 WL 3972987, at *12

sellers, not manufacturers; (3) although there is an exception to that rule, it is only in the narrow

context of a manufacturer that specially produces a product for a particular consumer; and (4) a

manufacturer's express warranty for repairs through a dealer does create implied-warranty

liability.  Thus, under Alabama law and the facts alleged, the complaint does not assert claims

for breach of the implied warranty of merchantability against Ford, and those claims will be

dismissed.

###                   b.      California

"California Commercial Code § 2314 requires vertical privity for an implied warranty of

merchantability claim," but "[t]he privity requirement is not required for an implied warranty of

merchantability claim brought under California's Song–Beverly Act."  *Allen v. Similasan Corp.*,

96 F. Supp. 3d 1063, 1075 (S.D. Cal. 2015).  Thus, defendant's challenge to plaintiffs' privity

has no bearing on the SBCWA claims but is relevant to plaintiffs' implied-warranty claims under

the California Commercial Code.

Again, plaintiffs contend that they fall within a third-party-beneficiary exception to the

privity requirement.  And again, federal courts considering the matter are split as to whether such

an exception exists under California law.  *See Synder v. TAMKO Bldg. Prod. Inc.*, 2019 WL

4747950, at *7 (E.D. Cal. Sept. 30, 2019) ("California district courts are split on the application

of the third party beneficiary exception to the rule of privity." (citations omitted)).

The majority of federal courts to consider the issue have recognized such an exception.

*See Neu v. FCA U.S., LLC*, 2023 WL 10406710, at *3 (C.D. Cal. Nov. 13, 2023) ("[T]he

majority of courts in the Ninth Circuit recognize an exception to the privity requirement when

the plaintiff alleges it is a third-party beneficiary to a contract that gives rise to the implied

warranty of merchantability."); *In re Seagate Tech., LLC Litig.*, 233 F. Supp. 3d 776, 787 (N.D.

Cal. 2017) ("[T]he majority of district court decisions to consider the question have held that a

consumer who purchased a product from a retailer can invoke the third party beneficiary exception to bring an implied warranty claim against the manufacturer."); *In re Toyota Motor Corp. Unintended Acceleration Mktg, Sales Pracs., & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1184 (C.D. Cal. 2010) ("Although courts applying California law regarding the third-party beneficiary exception to the vertical privity requirement of implied warranty claims have come to differing conclusions, the clear weight of authority compels a conclusion that where plaintiffs successfully plead third-party beneficiary status, they successfully plead a breach of implied warranty claim."); *O'Connor*, 567 F. Supp. 3d at 942 ("[T]his Court will follow . . . the bulk of federal district courts in concluding that the third-party beneficiary exception to the privity requirement is viable under California law.").

The Court respectfully disagrees with the majority, and is instead convinced that, in this context, recognizing a third-party-beneficiary exception to the privity requirement under California law would be an abrogation of the Court's duty not to "extend state law beyond its well-marked boundaries." *Lavin*, 951 F.3d at 58.

For the purposes of asserting a breach of warranty claim under California law, "a buyer and seller stand in privity if they are in adjoining links of the distribution chain." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (citing *Osborne v. Subaru of Am., Inc.*, 198 Cal. App. 3d 646, 656 n.6 (Cal. Ct. App. 1988)). "Thus, an end consumer . . . who buys from a retailer is not in privity with a manufacturer." *Id.* However, "some particularized exceptions to the rule exist." *Id.* The court in *Clemens* went on to list a series of exceptions that did not include an exception for third-party beneficiaries. *Id.* However, neither that omission nor the remainder of the *Clemens* decision definitively establishes that California law would not recognize such an exception. The court in *Clemens* did "decline [the] invitation to create a new

exception" in response to the plaintiff's "urg[ing] that [the exceptions identified by the court] are exemplary rather than exhaustive, and that similar equities support an exception for his case." *Id.* Yet the court never explicitly stated that its list of exceptions was in fact exhaustive. And the plaintiff only averred a vague exception based on "similar equities," so the court was never presented with the prospect of an exception for third-party beneficiaries and never provided a direct holding on the matter one way or the other. Thus, while "a federal court sitting in diversity is not free to create *new* exceptions," *id.* (emphasis added), *Clemens* does not resolve whether an exception to the privity requirement for third-party beneficiaries would be an extension of California law, as opposed to an already existing feature.

Courts finding a third-party-beneficiary exception under California law have "typically cited *Gilbert Financial Corp. v. Steelform Contracting Co.*, 82 Cal. App. 3d 65, 145 Cal.Rptr. 448 (1978), in support." *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 983 (N.D. Cal. 2014). "In *Gilbert*, the plaintiff-homeowner asserted an implied warranty claim against a subcontractor. The trial court dismissed the claim on the basis of lack of privity. On appeal, the appellate court stated: '[U]nder the facts of this case we do not need to decide the issue of privity per se' because, '[u]nder Civil Code section 1559 and the cases interpreting it, we conclude [the plaintiff-homeowner] is a third party beneficiary of the contract between [the contractor] and [the defendant-subcontractor] and therefore can sue for breach of the implied warranty of fitness.'" *Id.* (quoting *Gilbert*, 82 Cal. App. 3d at 69).

Courts critical of that approach assert that the holding of *Gilbert* is restricted to the specific factual circumstances of the case. *See, e.g.*, *Quakenbush v. Am. Honda Motor Co., Inc.*, 650 F. Supp. 3d 837, 843 (N.D. Cal. 2023) ("*Gilbert* . . . involved the specific circumstance of a homeowner suing a construction subcontractor . . . [and] [m]aintaining the application of the

exception to the real estate context is in alignment with the California authority and provides deference to California courts to define their own exceptions."); *Seagate*, 233 F. Supp. 3d at 787 ("Nor is it clear that *Gilbert*, a case considering a subcontract to build a roof for a specific, identifiable customer, . . . compels relaxing the privity rule for all end purchasers of products sold through retailers." (citation omitted)); *In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 707 F. Supp. 3d 103, 130 (D. Mass. 2023) ("The Court is persuaded that *Gilbert*, a case based on the relationship between a homeowner and subcontractor, does not stand for the proposition that a consumer is a more than incidental beneficiary of the contract between a manufacturer and retailer." (citing *Seagate*, 233 F. Supp. 3d at 787)).

Exceptions to the privity requirement under California law have typically been narrow and fact-specific. *See, e.g.*, *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 695-96 (1954) (recognizing an exception "in cases involving foodstuffs" and "in a few cases where the purchaser of a product relied on representations made by the manufacturer in labels or advertising material"); *Gottsdanker v. Cutter Lab'ys*, 182 Cal. App. 2d 602, 607 (Cal. Ct. App. 1960) (pharmaceuticals); *Arnold v. Dow Chem. Co.*, 91 Cal. App. 4th 698, 720-21 (Cal. Ct. App. 2001) (pesticides); *Peterson v. Lamb Rubber Co.*, 54 Cal.2d 339, 347-48 (1960) (end-user employee of purchaser). And "no reported California decision has held that the purchaser of a consumer product may dodge the privity rule by asserting that he or she is a third-party beneficiary of the distribution agreements linking the manufacturer to the retailer who ultimately made the sale." *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1083 (N.D. Cal. 2011).

As articulated in *Clemens*, "California courts have painstakingly established the scope of the privity requirement." 534 F.3d at 1024. Thus, to extrapolate from *Gilbert*—a lower-court case concerning the specific relationship between a subcontractor and homeowner—to a broader

23

third-party-beneficiary exception applicable to a vehicle manufacturer and the ultimate purchaser would be an abrogation of the Court's duty not to "extend state law beyond its well-marked boundaries." *Lavin*, 951 F.3d at 58.  Accordingly, the complaint does not state a claim against Ford for breach of the implied warranty of merchantability under the California Commercial Code, and those claims will be dismissed.

### c.  Florida

"Under Florida law, a consumer must enjoy privity of contract with a supplier to recover for breach of an implied warranty." *Kelly v. Lee Cnty. RV Sales Co.*, 819 F. App'x 713, 717 (11th Cir. 2020) (citing *Mesa v. BMW of N. Am., LLC*, 904 So.2d 450, 458 (Fla. Dist. Ct. App. 2005)).[12]

Plaintiffs assert that they fall within a third-party-beneficiary exception to the Florida privity requirement.  As with Alabama and California, federal courts are split as to whether such an exception is recognized under Florida law.  *Compare Weiss v. Gen. Motors, LLC*, 418 F. Supp. 3d 1173, 1182-83 (S.D. Fla. 2019) (finding third-party-beneficiary exception); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2013) (same); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 2018 WL 3109632, at *7 (S.D. Fla. Apr. 5,

---

[12] Plaintiffs appear to contend that there is no privity requirement to bring an implied warranty claim under Florida law, relying on *Manheim v. Ford Motor Co.*, 201 So.2d 440 (Fla. 1967).  The court in *Manheim* concluded that "neither the absence of privity between the manufacturer and a purchaser . . . , nor the execution of a written warranty agreement between the manufacturer and its dealer . . . operates to preclude recovery on the basis of implied warranty."  201 So.2d at 442.  However, it appears that *Manheim* is no longer good law.  As explained by the court in *Leon v. Continental AG*, "the Florida Supreme Court later abrogated [*Manheim*,]" and "subsequent implied warranty cases have required privity."  301 F. Supp. 3d 1203, 1223-24 (S.D. Fla. 2017); *see also Rife v. Newell Brands, Inc.*, 632 F. Supp. 3d 1276, 1303 n.15 (S.D. Fla. 2022) ("Before *Kramer* (it's true), Florida law allowed implied-warranty claims *without* a showing of privity between the manufacturer and the ultimate consumer. . . . But *Kramer* changed all that." (emphasis in original) (citations omitted)); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233 (S.D. Fla. 2013) ("While the Florida Supreme Court may very well explain in the future that *Kramer* has not effectively overruled *Manheim,* the best indication for this Court at the present of what the Florida Supreme Court would decide is the Third District Court of Appeal's holding in *Mesa,* that, '[u]nder Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity.'  904 So.2d at 458.").

2018) (same); *Pegasus Aviation IV, Inc. v. Aircraft Composite Techs., Inc.*, 2016 WL 3390122, at *5 (S.D. Fla. June 17, 2016) (same); *Feldman v. BRP U.S., Inc.*, 2018 WL 8300534, at *8 (S.D. Fla. Mar. 28, 2018) (same); *Varner v. Domestic Corp.*, 2017 WL 3730618, at *12 (S.D. Fla. Feb. 7, 2017) (same); *O'Connor*, 567 F. Supp. 3d at 943 (same), *with Valiente v. Unilever United States, Inc.*, 2022 WL 18587887, at *14 (S.D. Fla. Dec. 8, 2022) (finding no third-party-beneficiary exception); *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1117-19 (S.D. Fla. 2019) (same); *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *10 (S.D. Fla. July 12, 2018) (same); *Nuwer v. FCS U.S., LLC*, 2023 WL 8724014, at *6-7 (S.D. Fla. Sept. 29, 2023) (same); *Hawkins v. Shimano N. Am. Bicycle, Inc.*, 729 F. Supp. 3d 989, 1024 (C.D. Cal. 2024) (same); *Burgos v. Am. Honda Motor Co., Inc.*, 2024 WL 2108843, at *6-7 (C.D. Cal. May 7, 2024) (same).

The most compelling critique of the decisions declining to find an exception arises from their reliance on *In re Takata Airbag Products Liab. Litig.*, 193 F. Supp. 3d 1324 (S.D. Fla. 2016). That critique is summarized in *Weiss*:

> Defendant's argument relies on a line of cases citing [*In re Takata*]. . . . The problem with this line of cases is that the plaintiffs in *Takata* did not respond to the defendant's privity argument. . . . Therefore, the court did not consider or analyze a fully briefed and contested third-party beneficiary argument. Therefore, the Court finds this line of cases unpersuasive.

418 F. Supp. 3d at 1182-83; s*ee also O'Connor*, 567 F. Supp. 3d at 943 (adopting the same reasoning).

While that may be a valid reason to question reliance on those cases, the critique does not address the underlying state of Florida law on the matter. *Perez v. Toyota Motor Sales, U.S.A., Inc.*, 2022 WL 17886035, at *4 (C.D. Cal. July 1, 2022) ("The *Weiss* case, in turn, relies on a series of federal district court cases . . . . None of these cases, however

constitute or cite to binding Florida-state authority applying a third-party beneficiary theory in a manufacturer-dealership-consumer context.").

In fact, Florida law demonstrates consistent adherence to a strict privity requirement for implied-warranty actions, and reflects a notable absence of recognition for any third-party beneficiary exception.  *See Padilla*, 391 F. Supp. 3d at 1116 ("Time and again, Florida courts have dismissed breach of implied warranty claims under Florida law for lack of contractual privity where the plaintiff purchaser did not purchase a product directly from the defendant." (collecting Florida-state cases)); *Hawkins*, 729 F. Supp. 3d at 1024 ("[T]he 'overwhelming weight of Florida law' does not recognize a third-party beneficiary exception." (citation omitted)); *Valiente*, 2022 WL 18587887, at *14 ("Although some *federal* courts have applied a third-party beneficiary exception to the privity requirement . . . , the Court has found no *Florida* case applying a third-party beneficiary exception to the privity requirement for a breach of implied warranty claim." (emphasis in original) (citation omitted)).

Because Florida courts have consistently maintained a strict privity requirement in the implied-warranty context and have not recognized a third-party-beneficiary exception, despite ample opportunity to do so, the Court will not take the liberty of recognizing such an exception itself.[13]  Accordingly, the Florida plaintiffs' claims for breach of the implied warranty of merchantability will be dismissed.

---

[13] Furthermore, even if such an exception were recognized, the pleadings here would likely be insufficient to invoke that exception under Florida law.  The only contract specifically identified in the ACC is Ford's express warranty.  *See Weimar v. Yacht Club Point Ests., Inc.*, 223 So.2d 100, 103 (Fla. Dist. Ct. App. 1969) ("[I]t behooves one seeking to establish a cause of action as a third party beneficiary to sufficiently allege the terms and provisions of the contract which he asserts was made for his benefit.  Failure to do so may result in dismissal of the cause[.]").  But an express warranty alone cannot support an implied-warranty claim under Florida law.  *See Hicks v. Bombardier Recreational Prods., Inc.*, 684 F. Supp. 3d 1223, 1248 (S.D. Fla. 2023) ("[Defendant's] limited warranty does not support claims for breaches of *implied* warranties.  A manufacturer's express warranty may only give rise to a claim for breach of that *express* warranty." (emphasis in original) (citing *Mesa v. BMW of N. Am., LLC*, 904 So.2d 450, 458 (Fla. Dist. Ct. App. 2005))).

<strong>d.      Illinois</strong>

The implied-warranty claims of the Illinois plaintiffs have been withdrawn and will accordingly be dismissed.

<strong>e.      New York</strong>

"[U]nder New York law, express and implied breach of warranty claims seeking to recover for financial injuries . . . require a showing of privity between the manufacturer and the plaintiff unless an exception applies." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 101 (2d Cir. 2023). The parties do not dispute that New York law recognizes a third-party-beneficiary exception to the privity requirement. *See Praxair, Inc. v. Gen. Insulation Co.*, 611 F. Supp. 2d 318, 330 (W.D.N.Y. 2009) ("Under New York law, . . . [a]n intended beneficiary of a contract may assert a claim as a third-party beneficiary, . . . including for breach of implied warranty."); *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 557 (S.D.N.Y. 2016) (recognizing, implicitly, existence of a third-party-beneficiary exception under New York law); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 469-70 (S.D.N.Y. 2014) (same). "Under New York law, a plaintiff claiming rights as a third-party beneficiary must demonstrate: (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Catalano*, 167 F. Supp. 3d at 557; *Marshall*, 51 F. Supp. 3d at 469 (same).

The core dispute concerns whether the New York plaintiffs have sufficiently pleaded third-party-beneficiary status. As summarized in *O'Connor*:

> Courts applying the third-party beneficiary exception in cases that are factually similar to this one have come to mixed conclusions on the level of specificity required to plausibly allege a breach of implied warranty claim based on the theory that the purchasers of vehicles are intended third-party beneficiaries of contracts between a vehicle manufacturer and its dealers. The resolution of each

27

case ultimately came down to how much specificity the court required concerning the terms of the contract between the manufacturer and its dealers.

567 F. Supp. 3d at 945.

Several federal district courts in New York have dismissed implied-warranty claims under New York law where the complaint failed to "identify[] specific contracts and contract terms between manufacturers and dealers." *Id.* (citing *Cummings v. FCA U.S., LLC*, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019); *Catalano*, 167 F. Supp. 3d at 557; *Dixon v. Ford Motor Co.*, 2015 WL 6437612, at *6 (E.D.N.Y. Sept. 30, 2015)). The court in *Cummings* dismissed such a claim where the complaint did "not include[] any factual allegations regarding the contract between [d]efendant and the authorized dealer." 401 F. Supp. 3d at 313. The court in *Catalano* dismissed the claim where the plaintiff, without citing any contractual provisions, "baldly allege[d] that he and the other class members were 'intended third-party beneficiaries of the contracts for sale of the [c]lass [v]ehicles from [d]efendants to the dealerships who ultimately sold the [c]lass [v]ehicles to [p]laintiff and [c]lass members' and that defendants knew that consumers were the 'end-users of the Class Vehicles.'" 167 F. Supp. 3d at 557. Finally, the court in *Dixon* dismissed the claim where "the complaint allege[d], in conclusory fashion, that plaintiff was the intended beneficiary of 'Ford's written warranties and its contractual relationships with Ford dealerships' and that 'Ford's express warranties were designed for and intended to benefit the consumers only.'" 2015 WL 6437612, at *6.

The allegations in the ACC are nearly identical. Specifically, the ACC asserts, without elaboration, that "Ford's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles"; that "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and lessees of the Class

Vehicles, i.e., [p]laintiffs and [c]lass [m]embers"; and that plaintiffs "are intended third-party beneficiaries of contracts between Ford and its dealers, franchisees, representatives, and agents." (ACC ¶¶ 824-25).

While those facts would certainly be insufficient at a later stage of litigation, that does not necessarily mean they fail at the pleading stage. Importantly, as noted in *O'Connor*, "this is a matter of applying the federal pleading standards, rather than predicting how the New York courts would rule substantively on plaintiff[s'] claim[s]." 567 F. Supp. 3d at 946. In assessing a motion to dismiss for failure to state a claim, a federal court is to "take the complaint's well-pl[eaded] (*i.e.*, non-conclusory, non-speculative) facts as true . . . and see if they plausibly narrate a claim for relief." *Bourgeois v. TJX Cos., Inc.*, 2025 WL 500524, at *2 (1st Cir. Feb. 14, 2025). That is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, while being careful to "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

The bare assertion that intermediaries were not the intended ultimate consumers cannot alone suffice to establish third-party-beneficiary status—that would completely nullify the privity requirement as to most manufacturers. And the assertion that plaintiffs "are intended third-party beneficiaries of contracts between Ford and its dealers," (ACC ¶ 825), without more, is plainly a legal conclusion that the Court should "isolate and ignore," *Schatz*, 669 F.3d at 55. Thus, the entirety of plaintiffs' claim to third-party-beneficiary status must be derived from the allegations that the dealers "have no rights under the warranty agreements" and that "[t]he warranty agreements were designed for and intended to benefit only the ultimate purchasers and

lessees." (ACC ¶ 824). Those allegations, however, do not set forth "the existence of a valid and binding contract between *other parties*" as required under New York law. *State of California Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434-35 (2000) (emphasis added); *see In re Seagate Tech. LLC Litig.*, 2017 WL 3670779, at *7 (N.D. Cal. Aug. 25, 2017) ("There is no indication . . . that the express warranty is a contract between Seagate *and its retailers*, as opposed to between Seagate and its customers." (emphasis in original)). While it may not be explicitly alleged in the ACC, common sense would suggest that there is likely some form of contractual arrangement directly between Ford and the dealers in order to ensure that the dealers actually perform the repairs covered by the warranty.

However, a supportable claim of third-party-beneficiary status for the purposes of the implied warranty of merchantability would require yet another layer of conjecture. New York's Commercial Code creates an implied warranty of merchantability "in a *contract for . . . sale*" of goods. N.Y. U.C.C. § 2-314(1) (emphasis added). The Court would not only have to read into the ACC that the warranty was part of a direct contract between Ford and its dealers, but also assume that the contract was one *of sale*. While the Court may be bound to give plaintiffs "the benefit of all reasonable inferences," *Ruiz*, 496 F.3d at 5, there is a point beyond which inference turns to speculation, and here the claim can only be sustained by speculation.

As stated in *Marshall*, the "contention that . . . 'sales contracts' [between defendant and its authorized dealers] included the warranty provisions by which [d]efendant provided coverage for [p]laintiffs' vehicles may provide a basis to infer that the contracting parties intended to benefit [p]laintiffs," but "no such allegation appears in [p]laintiffs' Amended [Consolidated] Complaint." 51 F. Supp. 3d at 469. Thus, the complaint fails to sufficiently plead an exception to the privity requirement, and the implied-warranty claims under New York law will be

dismissed.[14]

### 2.      Pre-Suit Notice (Count 2) (Pennsylvania)

Defendant contends that the Pennsylvania implied-warranty claim asserted by plaintiff

Ropieski fails because he failed to provide Ford with the requisite pre-suit notice of his claim.[15]

Because plaintiff Ropieski's claims are currently stayed pending arbitration, the Court need not

address the issue at this stage.

### 3.      Used Vehicles (Count 4) (California)

Plaintiff Simmons has withdrawn her implied-warranty claim under the SBCWA, and

accordingly that claim will be dismissed.

### 4.      Lack of Merchantability (Counts 2 and 4)

Defendant contends that the claims of California plaintiff Butler, Massachusetts plaintiff

San Angelo, and Oklahoma plaintiffs Kyle and Valerie Johnson for breach of the implied

warranty of merchantability should be dismissed because they fail to allege that the relevant

vehicles were unmerchantable.[16]

Defendant's argument is based upon the allegations in the ACC that plaintiffs used their

vehicles without issue for extended periods of time.  Specifically, the ACC alleges that Butler

"started to notice" transmission problems "years after purchasing the vehicle."  (ACC ¶ 459).  It

---

[14] Plaintiffs also contend that their implied-warranty claims fall under a "thing of danger" exception to the privity requirement.  Their argument relies on *Hubbard v. Gen. Motors Corp.*, 1996 WL 274018 (S.D.N.Y. May 22, 1996).  However that case has been widely rejected, or at the very least cabined to claims involving non-economic loss.  *See Cummings*, 401 F. Supp. 3d at 313 ("[T]he Court agrees with the other courts that have rejected *Hubbard*'s interpretation in concluding that no thing-of-danger exception exists under New York law for claims involving purely economic injury." (collecting cases)).  This Court likewise "concludes that New York law does not include a 'thing of danger' exception to the privity requirement in implied warranty claims for purely economic loss." *Evenflo*, 707 F. Supp. 3d at 133.

[15] Defendant also challenges the New York implied-warranty claims for failure to provide pre-suit notice.  Because those claims will be dismissed for lack of privity, the Court will not reach the issue.

[16] Defendant makes the same argument as to New York plaintiff Bunger, but his implied-warranty claim has already been deemed insufficient for lack of privity, and therefore the Court will not reach the issue as to that plaintiff.

alleges that San Angelo "started to notice" transmission problems three years after his purchase and after driving 78,000 miles. (*Id.* ¶ 174). And, as with Butler, it alleges that the Johnsons "started to notice" transmission problems "years after purchasing the vehicle." (*Id.* ¶ 524).

As a preliminary matter, the Court has already deemed the types of symptoms alleged in the ACC sufficient to plead a defect rendering the vehicles unmerchantable. *See McCabe v. Ford Motor Co.*, 720 F. Supp. 3d 14, 25 (D. Mass. 2024). The specific question, then, is whether the delay in manifestation of symptoms impacts that determination or precludes plaintiffs from maintaining that "the defect existed at the time the vehicle was sold or leased." *Awalt v. Gen. Motors, LLC*, 2023 WL 2743294, at *3 (D. Mass. Mar. 31, 2023); *see Collins Radio Co. of Dallas, Tex. v. Bell*, 623 P.2d 1039, 1053 (Okla. Civ. App. 1980) ("To recover for a breach of the implied warranty of merchantability[,] a plaintiff must prove . . . the goods were not 'merchantable' at the time of sale . . . ."). On the latter point, the Court finds that while the symptoms of the alleged defect may not have arisen for some time, it is nonetheless plausible that their "cause was attributable to a defect in the [vehicles] at the time of purchase." *Walsh v. Atamian Motors, Inc.*, 10 Mass. App. Ct. 828, 828 (Mass. App. Ct. 1980).

The issue then becomes whether a car can be considered unmerchantable when it operated without issue for a period of years, or for 78,000 miles, before the complained-of problems arose. *Szymczak v. Nissan N. Am.* observed that "[c]ourts . . . have consistently held that an automobile that was driven for years without problems was merchantable and fit for its ordinary use at the time of sale." 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011). In *Sheris v. Nissan N. Am.*, the court noted that "'[t]he weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability under the facts' where plaintiffs have driven their cars without problems for years." 2008 WL

2354908, at *6 (D.N.J. June 3, 2008) (quoting *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 2001 WL 1266317, at *22 (D.N.J. Sept. 30, 1997)).  Because the named plaintiffs only "started to notice" issues with their transmissions after years of serviceable driving, the Court finds that their vehicles were in fact merchantable at the time of sale, and their claims for breach of the implied warranty of merchantability under California, Massachusetts, or Oklahoma law will be dismissed.

### D.    The Economic-Loss Rule (Applicable to Counts 5 and 7)

Defendant next contends that the "economic loss rule" precludes the fraudulent-misrepresentation and concealment claims asserted by the California, Florida, and Pennsylvania plaintiffs, the fraudulent-concealment claims asserted by the Texas plaintiffs, and the FDUTPA claims asserted by the Florida plaintiffs.

As a general matter, "[t]he economic loss doctrine denies a tort remedy for product defects when the loss 'is rooted in disappointed contractual or commercial expectations.'" *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (citing *Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 615 (7th Cir. 2001)).  "Not all states have adopted the economic loss rule, and those that have vary widely in their understanding of the doctrine's scope. . . .  While some states apply the economic loss doctrine only in products liability cases or when it is apparent that a plaintiff in privity with the defendant is seeking to circumvent provisions of the contract, other states apply the doctrine widely, barring all claims in tort that fail to allege either personal injury or property damage." *Portier v. NEO Tech. Sols.*, 2019 WL 7946103, at *16 (D. Mass. Dec. 31, 2019) (quoting *Banknorth, N.A. v. BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283, 287 (D. Me. 2005)), *report and recommendation adopted*, 2020 WL 877035 (D. Mass. Jan. 30, 2020).  Accordingly, the Court will address the argument under each state's law in turn.

1.    <u>**California**</u>

The California plaintiffs have withdrawn their claims of fraudulent misrepresentation, and those claims will therefore be dismissed.  However, they oppose dismissal of their fraudulent-concealment claims on the basis that, at the time of briefing, the California Supreme Court had pending before it the certified question of the economic-loss rule's applicability to claims of fraudulent concealment.

The California Supreme Court has now ruled on that question.  *See Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1 (2024).  Its opinion is summarized as follows:

> The Ninth Circuit asked:  'Under California law, are claims for fraudulent concealment [as opposed to affirmative deception] exempted from the economic loss rule?'  This is the question the majority left open in *Robinson.*  The answer is yes because, as explained, the economic loss rule does not apply to limit recovery for intentional tort claims like fraud.  The doctrine only applies to bar tort recovery for negligently inflicted economic losses unaccompanied by physical or property damage under the limits recognized in *Sheen*. . . .  This conclusion, however, does not provide the dispositive answer the Ninth Circuit has requested.
>
> Therefore, we have reformed the question as follows:  Can a plaintiff assert an independent claim of fraudulent concealment in the performance of a contract?  The answer to this question is also yes.  A plaintiff may assert a tort claim for fraudulent concealment based on conduct occurring in the course of a contractual relationship, if the elements of the cause of action can be established independently of the parties' contractual rights and obligations and the tortious conduct exposes the plaintiff to a risk of harm beyond the reasonable contemplation of the parties when they entered into the agreement.

*Id.* at 38 (citations omitted).

To the extent there is a contract at all between plaintiffs and Ford, it is the express warranty.  That express warranty clearly contemplates a risk of harm from defective parts—limiting coverage to harms arising from manufacturing defects, and thus disavowing coverage for defects of design.  Accordingly, to the extent plaintiffs' fraudulent-concealment claims are based upon harms such as repair costs or damages from the defect itself, those claims are not "beyond the reasonable contemplation of the parties when they entered into the agreement," and

are barred by the economic-loss doctrine.  *See id.*

However, the ACC also alleges that plaintiffs "relied upon Ford's representations and omissions regarding the quality of Class Vehicles and the defect in deciding to purchase or lease Class Vehicles," and absent Ford's alleged concealment, plaintiffs "would not have purchased or leased" the vehicles.  (ACC ¶¶ 890-91).  Those allegations sound in fraudulent inducement.  And it is well settled under California law that "fraudulent inducement [is] an existing exception to the economic loss rule."  *Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 841 (Cal. Ct. App. 2022) (citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal.4th 979, 989-90 (Cal. Ct. App. 2004)); *see Rattagan*, 17 Cal. 5th at 41 ("As we observed in *Lazar*, 'fraudulent inducement of contract—as the very phrase suggests—is not a context where the "traditional separation of tort and contract law" obtains. . . . [I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud.'" (alteration omitted) (quoting *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 645 (1996))).

Thus, to the extent that the California plaintiffs' fraudulent-concealment claims are based on post-purchase harms, those claims will be dismissed, but to the extent they are based upon inducement to purchase or lease the vehicles, they are not barred by the economic-loss doctrine.

### 2.    Florida (Count 7)

The Florida plaintiffs have withdrawn their claims for fraudulent misrepresentation and omission, and those claims will therefore be dismissed.  However, they maintain that the economic-loss rule under Florida law does not preclude their FDUTPA claims.

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So.3d 399 (Fla. 2013) is the governing Florida authority on the scope of the economic-loss doctrine.  The central holding of *Tiara* is "that the application of the economic loss rule is limited to products liability cases," retracting the rule's previous extension to the broader "contractual privity context."  110 So.2d at

35

403, 407.  In arriving at that conclusion,

> [t]he Court . . . explained its attempt in *Indemnity Insurance Co. of North America v. American Aviation, Inc.*, 891 So. 2d 532 (Fl. 2004), to retract its 'unprincipled extension of the rule' and limit it to its 'original rationale and intent' that 'a manufacturer or distributor in a commercial relationship has no duty beyond that arising from its contract to prevent a product from malfunctioning or damaging itself.' *Tiara*, 110 So. 3d at 406 (citing *American Aviation*, 891 So. 2d at 542). At the same time, *Tiara* explained, *American Aviation* 'reaffirmed that in cases involving either privity of contract or products liability, the other exceptions to the economic loss rule that we have developed, such as for professional malpractice, fraudulent inducement, and negligent misrepresentation, or free-standing statutory causes of action' remained viable and were 'untouched' by *American Aviation.*

*O'Connor*, 567 F. Supp. 3d at 958.  As to *American Aviation*, the court went on to say:  "Thus, despite our effort to roll back the economic loss rule to its products liability roots, we left untouched a number of exceptions which continue to extend the application of the rule beyond our original limited intent."  *Tiara*, 110 So.2d at 406.

That dictum is somewhat confusing.  The listed "exceptions" that were left "untouched" were exceptions to the *application* of the economic-loss rule—that is, they reflected instances in which the economic-loss rule would *not* apply.  Therefore, those exceptions do not represent *extensions* of the rule, but in fact quite the opposite—they reflect *restrictions* of the rule's application.  Regardless, "[t]hese exceptions were irrelevant to the decision reached in *Tiara*." *Takata*, 193 F. Supp. 3d at 1338.  And the main thrust of *Tiara* remains the restriction of the economic-loss rule to the context of product liability, as opposed to the broader context of contract-based relationships.

While *Tiara* restricted the economic-loss rule to its roots in product liability, it also suggested that the rule ought to be applied robustly within that sphere.  The *Tiara* court described the essence of the rule as a "doctrine that sets forth the circumstances under which a *tort* action is prohibited if the only damages suffered are economic losses."  110 So.3d at 401

(emphasis added).  Federal courts have thus reasonably read *Tiara* to signal a disavowal of exceptions to the doctrine for fraud claims.  *See Burns v. Winnebago Indus., Inc.*, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013) ("[T]he exceptions to the economic loss rule for fraudulent inducement and negligent misrepresentations do not apply."); *Aprigliano v. Am. Honda Motor Co., Inc.*, 979 F. Supp. 2d 1331, 1338 (S.D. Fla. 2013) ("Given the *Tiara* court's resounding approval of the economic loss rule in the products liability context, the Court . . . concludes the economic loss rule bars Plaintiffs' claim for negligent misrepresentation under the facts alleged."); *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1339 (S.D. Fla. 2016) ("The Court agrees with other courts in this Circuit that have concluded that Florida's Supreme Court did not intend to allow [fraudulent-inducement and negligent-misrepresentation] products liability claims to survive.").

Barring a statutory cause of action through a judicially-created doctrine, however, is an entirely different matter.  Defendant cites to *Karpel v. Knauf Gips KG*, 635 F. Supp. 3d 1336 (S.D. Fla. 2022) for the proposition that Florida's economic-loss rule bars claims under the FDUTPA.  However, this Court declines to follow *Karpel* on that issue.

*Karpel* quotes *Tiara*'s observation that "the essence of the early holdings discussing the [economic-loss] rule is to prohibit a party from suing in tort for purely economic losses." *Karpel*, 635 F. Supp. 3d at 1338 (quoting *Tiara*, 110 So.3d at 405).  However, the court focused on "economic losses," without regard for the limitation to suits "in tort."  *Id.* at 1338-39.  The distinction between tort causes of action and those arising from statute is significant.  As the court explained in *Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So.2d 602, 608 (Fla. Dist. Ct. App. 1997):

> [I]n administering the FDUTPA, courts do not have the right to limit and, in
> essence, to abrogate, as the trial court did in this case, the expanded remedies

granted to consumers under this legislatively created scheme by allowing the
judicially favored economic loss rule to override a legislative policy
pronouncement and to eliminate the enforcement of those remedies. . . .  In sum,
any tension between the legislative policy embodied in the FDUTPA and the
judicial policy embodied in the economic loss rule must be resolved under the
doctrine of the separation of powers in favor of the legislative will so long as the
FDUTPA passes constitutional scrutiny.

*Delgado*, 693 So.2d at 609 (citations omitted).

In sum, "Florida courts have consistently held that statutory causes of action are not

limited by the economic loss rule," *New Lenox Indus., Inc. v. Fulton*, 510 F. Supp. 2d 893, 909

(M.D. Fla. 2007), and *Tiara*'s restriction and reaffirmation of the economic-loss rule's

application to tort claims does not abrogate that principle.[17]  Thus, the FDUTPA claims are not

barred by the economic-loss rule under Florida law.

### 3.    Pennsylvania

In *Werwinski v. Ford Motor Co*., the Third Circuit predicted that the Pennsylvania

Supreme Court would likely not recognize an exception to the economic-loss rule for intentional

fraud.  286 F.3d 661, 674-81 (3d Cir. 2002).  However, the court later abrogated *Werwinski*,

although only to the extent that it had held that the economic-loss doctrine precluded claims

under the UTPCPL.  *Earl v. NVR, Inc.*, 990 F.3d 310, 314 (3d Cir. 2021) ("[T]he economic loss

doctrine no longer may serve as a bar to UTPCPL claims.").  Although there were no common-

law fraud claims in *Earl*, the court noted that one of the Pennsylvania cases supporting its

abrogation of *Werwinski* acknowledged not only "the significance of the distinction between

statutory claims and tort claims," but also between "claims grounded in negligence as opposed to

intentional misrepresentation."  *Id.* at 313 (referring to *Knight v. Springfield Hyundai*, 81 A.3d

---

[17] *See Comptech Int'l, Inc. v. Milam Com. Park, Ltd.*, 753 So.2d 1219, 1223 (Fla. 1999) ("[T]he Second, Fourth, and Fifth District Courts of Appeal have held that statutory causes of action are not limited by the economic loss rule.  We agree.").

940 (Pa. Super. Ct. 2013)).

This Court will follow the approach of the Third Circuit in *Werwinski*: where the court is "torn between two competing yet sensible interpretations of Pennsylvania law . . . , [it] should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of Pennsylvania decides differently." *Werkwinski*, 286 F.3d at 680. Thus, the Court will not find an exception to Pennsylvania's economic-loss doctrine for intentional fraud, and the common-law fraud claims of the Pennsylvania plaintiffs will be dismissed.

### 4. Texas

The Texas plaintiffs have withdrawn their fraudulent-omission claims, and those claims will therefore be dismissed.

### E. Claims for Fraud (Count 5)

Count 5 alleges that Ford committed fraud by making misrepresentations about the performance of vehicles equipped with the 10R80 transmission and by concealing material facts concerning the alleged transmission defect. (ACC ¶¶ 886-96). Ford contends that the fraudulent-misrepresentation claims should be dismissed because the complaint does not allege any actionable misrepresentation or any actual reliance by plaintiffs on any specific representations made by Ford. As to the fraudulent-concealment claims, Ford contends that the ACC does not allege facts giving rise to a duty to disclose under the laws of the various states.

Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, under Fed. R. Civ. P. 9(b), in cases "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The basic purposes of that requirement are (1) to give the defendants notice and enable them to prepare a meaningful response; (2) to preclude the use of a groundless fraud claim as a pretext to using discovery as a fishing expedition; and (3) to

39

safeguard defendants from frivolous charges that might damage their reputations. *See In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)).

Under the heightened pleading requirement of Fed. R. Civ. P. 9(b), a complaint alleging fraud must state "the who, what, where, and when" of the alleged deception. *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016) (quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004)). The requirement applies both to general claims of fraud and also to "associated claims where the core allegations effectively charge fraud." *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009).

Here, the ACC alleges fraud under two theories: fraudulent misrepresentation and fraud by omission. (ACC ¶¶ 886-92). Each will be considered in turn.

### 1.    Misrepresentation

The California and Florida plaintiffs have withdrawn their fraudulent-misrepresentation claims, and the claims of the Pennsylvania plaintiffs for fraudulent misrepresentation are precluded by the economic-loss doctrine. All of those claims will therefore be dismissed. That leaves the misrepresentation claims asserted under the laws of Alabama, Illinois, Massachusetts, New York, Oklahoma, and Texas.

The elements of a cause of action for fraudulent misrepresentation are fundamentally identical across those states. A claim of fraudulent misrepresentation requires a plaintiff to show that "(1) the defendant made a 'false representation of a material fact with knowledge of its falsity for the purpose of inducing [the plaintiff] to act thereon'; (2) the plaintiff 'relied upon the representation as true and acted upon it to his [or her] detriment'; and (3) such 'reliance was reasonable under the circumstances.'" *Gattineri v. Wynn MA, LLC*, 63 F.4th 71, 87-88 (1st Cir.

2023) (alterations in original) (quoting *H1 Lincoln, Inc. v. S. Wash. St., LLC*, 489 Mass. 1, 18

(2022)) (Massachusetts); *see Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 866 (7th Cir.

2020) (Illinois); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 165 (S.D.N.Y.

2021) (New York); *CBE Grp., Inc. v. Lexington Law Firm*, 993 F.3d 346, 350 (5th Cir. 2021)

(Texas); *Alfa Life Ins. Corp. v. Hughes*, 861 So.2d 1088, 1097 (Ala. 2003); *Bowman v. Presley*,

212 P.3d 1210, 1217-18 (Okla. 2009).

### a.    Actual Reliance

The majority of the misrepresentation claims fail because the ACC does not allege actual

reliance on the part of each plaintiff with sufficient particularity.  Under Rule 9(b), a plaintiff

"must state with particularity the circumstances constituting fraud."  Fed R. Civ. P. 9(b).

Reliance is one of the "circumstances" that must be pleaded with particularity.  *Xia Bi v.*

*McAuliffe*, 927 F.3d 177, 185 (4th Cir. 2019) ("Particular allegations of reliance . . . lie at the

core of Rule 9(b)'s mandate."); *Wenzel v. Sand Canyon Corp.*, 841 F. Supp. 2d 463, 486 (D.

Mass. 2012) ("[Plaintiffs] must also plead reliance with particularity.")

The ACC sets forth a large number of representations made by Ford in advertisements

and on its website, along with the broad, conclusory assertion that "[p]laintiffs and the Class

relied upon Ford's representations and omissions regarding the quality of Class Vehicles and the

[d]efect in deciding to purchase or lease Class Vehicles."  (ACC ¶ 891).  However, those

allegations are not sufficiently particularized to plead actual reliance on the part of any individual

plaintiff.  *See Gandhi v. Sitara Cap. Mgmt., LLC*, 689 F. Supp. 2d 1004, 1012 (N.D. Ill. 2010)

("Federal Rule of Civil Procedure 9(b)'s pleading standards . . . [require] the particulars of how

*each* plaintiff was defrauded and how *each* defendant committed fraud."  (emphases added)).

For the most part, "[t]he [c]omplaint does not allege that [particular] plaintiffs did any particular

research or reviewed Ford's websites or advertising prior to deciding to purchase their

[v]ehicles." *O'Connor*, 567 F. Supp. 3d at 962. For the majority of plaintiffs, the ACC also fails

to "identify any conversations that [the particular] plaintiffs had with any Ford representatives."

*Id.* Where the ACC fails to make any such allegations as to a particular plaintiff, that plaintiff's

claim for fraudulent misrepresentation will be dismissed.[18]

Texas plaintiff Smith is the only plaintiff as to whom there is a specific allegation of

individual reliance upon an identified representation made by Ford.[19] The ACC alleges that

Smith "encountered several Ford television commercials that touted the safety, reliability and

enhanced towing capabilities of the [v]ehicle because of its 10-speed [t]ransmission." (ACC

¶ 366).

However, those representations are too generalized to be actionable. As a preliminary

matter, the ACC nowhere alleges that the 10R80 does not in fact have "enhanced towing

capabilities." Therefore, the only allegedly false representations concern the transmission's

"safety" and "reliability." As described in the Court's prior order, "[a]djectives such as

---

[18] *See In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 217 (S.D.N.Y. 2019) ("Because there is no assertion that any plaintiff saw, read, or otherwise noticed Atkins' April 27, 2017 Tweet, there is no allegation that there was 'actual reliance' at all."); *Webb v. Volvo Cars of N.A., LLC*, 2018 WL 1470470, at *6 (E.D. Pa. Mar. 26, 2018) (dismissing claim where plaintiff "does not at any time allege a single actual representation made by Volvo that she justifiably relied on"); *Deburro v. Apple, Inc.*, 2013 WL 5917665, at *4 (W.D. Tex. Oct. 31, 2013) (dismissing claim where "plaintiffs do not plead they personally saw any of the press releases quoted in the Second Amended Complaint"); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 497 (1996) (affirming dismissal where plaintiffs alleged that "Suzuki made fraudulent misrepresentations in magazine advertisements" but "the complaint fails to state which, if any, of the plaintiffs heard these representations and relied on them"); *Kaufman v. Wyeth Co.*, 2011 WL 10483568, at *3 (S.D. Fla. Apr. 12, 2011) (dismissing fraudulent misrepresentation claim where "although Kaufman identifies two advertisements, one starring Patti LaBelle and one starring Lauren Hutton, she fails to identify the specific celebrity advertisement she saw"); *Deleon v. Gen. Motors LLC*, 2023 WL 9319286, at *2 (C.D. Cal. Dec. 20, 2023) (dismissing fraud claim where "although the FAC is filled with statements GM made in press releases and advertisements from 2015 through the 2021 recall notice, it is not clear which of these statements Plaintiff himself saw or on which he allegedly relied"); *Zetz v. Bos. Sci. Corp.*, 398 F. Supp. 3d 700, 714 (E.D. Cal. 2019) (dismissing fraud claims where plaintiff failed to "identif[y] a specific advertisement that either he or his physician viewed"); *Bradshaw v. Uber Techs., Inc.*, 2017 WL 2455151, at *8 & n.4 (W.D. Okla. June 6, 2017) (dismissing fraud claim based on alleged misrepresentations that "were made to third parties" and where plaintiff "fails to allege that as a driver he relied on promotional material directed to riders").

[19] The same is true of the claims of Texas plaintiff Garza and Oklahoma plaintiffs Todd and Julie Haworth. However, their claims have been stayed pending arbitration.

improved,' 'innovative,' 'optimized,' and 'enhanced,' . . . at least in this context, neither state a fact that can be proved to be true or false, nor suggest to the reader that there are underlying facts that are inconsistent with those claims," and thus constitute non-actionable "puffery." *McCabe*, 720 F. Supp. 3d at 28. And "general statements about big-picture concepts such as trust, security, reputation, and safety" are also "non-actionable puffery." *Costa v. FCA U.S., LLC*, 542 F. Supp. 3d 83, 101 (D. Mass. 2021); *see Diais v. Land Rover Dallas, L.P.*, 2016 WL 129832, at *4 (Tex. App. Apr. 4, 2016) ("[Plaintiff] cannot rely on Land Rover's statements that the car was the most luxurious, rugged vehicle, with a supercharged, high performance engine because such statements involve mere opinion or puffery.")

While the Court previously held that descriptions of the transmission as "smooth" and "quick" were sufficiently concrete in the context of transmissions to sustain a claim, the ACC does not allege that Smith relied on any such representations. Instead, he was exposed to advertisements "touting" the "safety" and "reliability" of the 10R80. Those representations are "obviously so vague as to lack any discernable meaning," such that "plaintiff cannot plausibly show either that the statement[s] [are] false or that [he] reasonably relied on [them]." *O'Connor*, 567 F. Supp. 3d at 962 n.6.

### i.       Whether Dealerships are Agents of Ford

The remaining representations allegedly made to individual plaintiffs came from employees of Ford dealerships. Some of those representations may be sufficiently particular to satisfy Rule 9(b); however, they can be attributed to Ford only if the dealerships were acting as Ford's agents.

The essential elements of an agency relationship are "(1) the agent's power to alter the legal relationships between the principal and third parties; (2) a fiduciary relationship toward the principal regarding matters within the scope of the agency; and (3) the principal's right to control

43

the agent's conduct in matters within the scope of the agency." *CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 150 (1st Cir. 2016).

Where an allegation of an agency relationship is integral to an allegation of fraud, such that both rely upon the same facts, the agency relationship should be evaluated under the heightened standard of Rule 9(b). *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir. 1999) ("[W]hen the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant, the reasons for more particularized pleading that animate Rule 9(b) apply with equal force to the issue of agency and to the underlying fraud claim."); *see Archdiocese of San Salvador v. FM Int'l, LLC*, 2006 WL 437493, at *8-9 (D.N.H. 2006) (analyzing allegations of principal-agent relationship according to heightened standard of Rule 9(b)); *cf. Gunderson v. ADM Investor Servs., Inc.*, 230 F.3d 1363 (table), 2000 WL 1154423, at *3 (8th Cir. Aug. 16, 2000) (assuming, without deciding, that Rule 9(b) applied to the pleading of agency relationship); *but see Holloway v. Oxygen Media, LLC*, 361 F. Supp. 3d 1213, 1222-23 (N.D. Ala. 2019) (applying Rule 9(b) standard to alleged fraudulent statement made by agents but analyzing under Rule 12(b)(6) standard whether agent-principal relationship allowed for attribution of statement to principal).

In any event, the ACC fails to allege facts sufficient to allege an agency relationship even in the absence of a heightened pleading standard.  Dealerships are not automatically considered agents of automobile manufacturers, despite the use of terms such as "authorized dealership." *See Acevedo v. DMAX Ltd.*, 2015 WL 12696176, at *28 (C.D. Cal. Nov. 13, 2015) (holding that "authorized independent dealerships" were not agents of General Motors despite allegedly identical branding of dealerships and the training support General Motors provided to dealerships to ensure "standardized brand experience"); *Herremans v. BMW of N. Am., LLC*, 2014 WL

5017843, at *6-7 (C.D. Cal. Oct. 3, 2014) (holding that statements of authorized dealership concerning repairs made to vehicle could not be attributed to manufacturer under agency theory); *Theo & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 746 (2000) (holding that use of manufacturer's logo on dealer's signs and invoices did not create genuine issue of material fact as to whether dealer acted with apparent authority); *Malmberg v. American Honda Motor Co., Inc.*, 644 So.2d 888, 891 (Ala. 1994) (holding that evidence of Honda logos displayed on signs, literature, products, brochures, and dealership itself was alone insufficient to establish agency relationship).[20]  At a minimum, something more is required.

Here, the ACC does not even expressly allege that authorized dealers are agents of Ford, and in fact refers to "dealers" and "agents" separately throughout the pleading.  (*See* ACC ¶¶ 19, 721, 741, 753, 824-25, 874).  Plaintiffs only contend that the dealers are agents in their memorandum of opposition.  (Opp. at 35-36).  There, plaintiffs assert that they "specifically plead[ed] that Ford compensates and instructs authorized dealers regarding TSBs for the transmissions as well as what to tell [c]lass [m]embers regarding the transmission . . . [; and] implemented policies at its authorized dealerships to discourage [c]lass members from obtaining inspections and repairs for their transmissions."  (*Id.*) (citing ACC ¶¶ 22-23, 742, 754).  But the portions of the ACC cited do not allege a principal-agent relationship between Ford and the authorized dealers.  Mere compensation is indicative of nothing beyond a standard contractual relationship.  And while the ACC characterizes Ford's TSBs and SSMs as "directions" and

---

[20] Under certain circumstances, an agency relationship may be inferred between a dealership and manufacturer, but such an inference depends on the specific facts demonstrating such a relationship.  *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 975 (N.D. Cal. 2018) (holding that evidence that Ford had issued repair instructions to dealerships and required dealers to submit data regarding repairs supported plausible inference that dealership acted as agent of manufacturer); *O'Neil v. DaimlerChrysler Corp.*, 538 F. Supp. 2d 304, 315 (D. Mass. 2008) (finding that testimony of manufacturer's customer relationship manager stating that manufacturer used dealerships to interact with customers supported inference that dealership was agent of manufacturer for purposes of selling service contracts and performing warranty work).  Here, however, no such specific facts are alleged concerning the relationship between Ford and the authorized dealers.

"instructions," there are no allegations that dealerships are in any way contractually or legally obligated to follow TSBs or SSMs. As suggested by their names, "Technical Service Bulletins" and "Special Service Messages" appear to be publications providing information and guidance rather than mandatory directives. Thus, those allegations, without more, are not indicative of any actual control exercised, or right to control held by Ford over the authorized dealers. Furthermore, the ACC does not contain any allegations suggesting an intent on the part of either Ford or the dealers to enter into a fiduciary relationship.

In sum, the ACC does not allege that dealerships are Ford's agents, and it contains no facts that would suggest such a relationship exists between the parties, let alone particularized allegations that might suffice to survive the pleading requirements of Rule 9(b). Therefore, the dealerships are not alleged to be Ford's agents, and, in turn, the representations made by dealership employees cannot be imputed to Ford. To the extent that the complaint relies upon such allegations to support claims for fraudulent misrepresentation, those claims will be dismissed.

The only fraudulent-misrepresentation claim that remains is that of Massachusetts plaintiff Pollack.[21] In its order on defendant's previous motion to dismiss, the Court declined to dismiss Pollack's fraudulent-misrepresentation claim, finding that the complaint had "allege[d] that plaintiff[] reasonably relied on [the representations in Ford's advertisements] when purchasing [his] . . .vehicle[]." *McCabe*, 720 F. Supp. 3d at 30. For the reasons outlined above, the Court has reason to doubt whether the ACC sufficiently pleads actual reliance by Pollack on any particular, actionable representation. Defendant, however, does not now seek dismissal of his fraudulent-misrepresentation claim, in light of the Court's earlier order. (*See* Def. Mem. at

---

[21] The claims of Massachusetts plaintiffs McCabe and Wright have been stayed pending arbitration.

37 n.22) ("While Ford believes this basis for dismissal is equally applicable to Massachusetts
Plaintiffs McCabe, Pollack, and Daniel Wright, Ford is not seeking dismissal of their claims due
to the Court's holding sustaining the claims in the MTD Order.").  The Court will not revisit that
issue *sua sponte* and will instead give defendant an opportunity to file a renewed motion to
dismiss as to Pollack, so that any such decision may be rendered with the benefit of full briefing
and argument.

### 2.    Fraudulent Concealment

The Texas and Florida plaintiffs have withdrawn their fraudulent-concealment claims,
and those claims will accordingly be dismissed.  Defendant does not challenge the fraudulent-
concealment claims of the California plaintiffs.  The Court's reasoning in its prior dismissal of
the fraudulent-concealment claims of the other Massachusetts plaintiffs applies equally to
Massachusetts plaintiff San Angelo; accordingly, San Angelo's fraudulent-concealment claim
will also be dismissed.  And the Pennsylvania plaintiffs' fraudulent-concealment claims are
precluded by Pennsylvania's economic-loss doctrine.  That leaves the fraudulent-concealment
claims of the Alabama, Illinois, New York, and Oklahoma plaintiffs.

Some states refer to fraudulent concealment as "fraud by omission" or, in the case of
Alabama, "suppression."  In any event, to state such a claim, each state's law requires a plaintiff
to show that the defendant "intentionally induce[d] a false belief through the concealment of a
material fact while under a duty to speak."  *Nartey v. Franciscan Health Hosp.*, 2 F.4th 1020,
1026 (7th Cir. 2021) (Illinois); *see Fed. Deposit Ins. Corp. v. Murex, LLC*, 500 F. Supp. 3d 76,
116 (S.D.N.Y. 2020) (New York); *Parsons & Whittemore Enters. Corp. v. Cello Energy, LLC*,
613 F. Supp. 2d 1271, 1288 (S.D. Ala. 2009) (Alabama); *Hicks v. FG Mins., LLC*, 2020 WL
2104928, at *3 (E.D. Okla. May 1, 2020) (Oklahoma).

Defendant contends that the ACC fails to state claims for fraudulent concealment under

the laws of Alabama, Illinois, New York, and Oklahoma because it fails to allege facts sufficient to show that Ford had a duty to disclose the allegedly concealed fact. The Court will address each state's law in turn.

### a.    Alabama

Under Alabama law, a duty to disclose "can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Mason v. Chrysler Corp.*, 653 So.2d 951, 954 (Ala. 1995). The ACC does not allege a confidential relationship between Ford and plaintiffs, and it does not allege that any plaintiff requested information from Ford concerning the 10R80 transmission. Thus, the only potential basis for a duty to disclose would be "the particular circumstances of the case." *Id.*

As a general matter, "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Id.* at 954-55. That said, "a duty to disclose may still be found when the parties engage in an arm's length business transaction and there are special circumstances" at play. *Aliant Bank, a Div. of USAmeribank v. Four Star Invs., Inc.*, 244 So.3d 896, 931 (Ala. 2017).[22] However, the ACC does not allege any such special circumstances. The mere allegation that Ford "had greater knowledge" than plaintiffs does not give rise to a duty to disclose. *See id.* And Alabama courts have found substantially identical factual circumstances insufficient to create such a duty. *See Mason*, 653 So.2d at 955 (finding no duty to disclose potential need for additional repairs where plaintiffs "took their car in for repairs on several

---

[22] It is not clear that the subsequent analysis is even needed, as plaintiffs purchased their vehicles from dealers and were therefore not parties to a transaction with Ford. That further attenuates any alleged relationship between the parties and further undermines any basis from which to derive a duty to disclose.

occasions" and "were assured by the salesman and Chrysler Corporation's promotional material that the car they bought would give a smooth ride"); *McGowan v. Chrysler Corp.*, 631 So.2d 842, 844-48 (Ala. 1993) (finding no duty to disclose where plaintiff repeatedly took his car in for repairs, only to later discover that defendant allegedly knew at the time of his purchase that the car "had recurring defects, but represented the car as a top-of-the-line, smooth-riding luxury car, and sold it to him without disclosing any of the problems that they [allegedly] knew existed").

Because Ford did not have a duty to disclose, the complaint fails to state a claim for fraudulent concealment under Alabama law, and those claims will accordingly be dismissed.

### b.    Illinois

"In Illinois, a duty to disclose can arise where (1) the plaintiff and defendant are in a fiduciary or confidential relationship; or (2) where the plaintiff places trust and confidence in the defendant, thereby placing the defendant in a position of influence and superiority over the plaintiff." *Rodriguez v. Ford Motor Co.*, 596 F. Supp. 3d 1050, 1058 (N.D. Ill. 2022) (citing *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (Ill. 1996)). "The second option, the 'special trust relationship,' must be 'extremely similar to that of a fiduciary relationship.'" *Id.* (quoting *Benson v. Stafford*, 407 Ill. App. 3d 902, 919 (Ill. App. Ct. 2010)). "In short, the defendant accused of fraudulent concealment must exercise 'overwhelming influence' over the plaintiff." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 572 (7th Cir. 2012) (quoting *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 657 (Ill. App. Ct. 2001)).

Again, the ACC does not allege any facts suggesting any form of fiduciary, confidential, or other special-trust relationship between Ford and plaintiffs. And again, the mere allegation that Ford had greater knowledge, even substantially greater knowledge, than plaintiffs does not give rise to a duty to disclose under Illinois law. *See Rodriguez*, 596 F. Supp. 3d at 1058 ("Rodriguez has not alleged any facts to show Ford's overwhelming influence over him and the

rest of the putative class.  To be sure, Ford had more knowledge than Rodriguez as to the

functionality of its vehicles and their parts.  But the fact that Ford had more information than

Rodriguez does not show an overwhelming influence."); *Fleury v. Gen. Motors, LLC*, 654 F.

Supp. 3d 724, 735 (N.D. Ill. 2023) ("[A] car manufacturer's knowledge of its vehicles' parts and

function does not establish an 'overwhelming influence' over the consumer.").  Thus, the ACC

fails to allege facts supporting a duty to disclose under Illinois law, and the claims of the Illinois

plaintiffs for fraudulent concealment will therefore be dismissed.

### c.    <u>New York</u>

Under New York law, "[a] duty to disclose in fraudulent concealment claims arises in

one of three circumstances: [(1)] where the parties are in a fiduciary relationship; [(2)] under the

'special facts doctrine,' where 'one party possesses superior knowledge, not readily available to

the other, and knows that the other is acting on the basis of mistaken knowledge'; or [(3)] where

a party has made a partial or ambiguous statement, whose full meaning will only be made clear

after complete disclosure."  *Boateng v. Bayerische Motoren Werke Aktiengesellschaft*, 2022 WL

4357555, at *23 (E.D.N.Y. Sept. 20, 2022) (quoting *Aaron Ferer & Sons Ltd. v. Chase*

*Manhattan Bank*, 731 F.2d 112, 123 (2d Cir. 1984)); *Brass v. Am. Film Technologies, Inc.*, 987

F.2d 142, 150 (2d Cir. 1993)).  The ACC does not allege that the parties were in a fiduciary

relationship, and it does not cite any "partial or ambiguous statements" made by Ford upon

which plaintiffs relied.  Thus, a duty to disclose could only arise under the "'special facts

doctrine,' where 'one party possesses superior knowledge, not readily available to the other, and

knows that the other is acting on the basis of mistaken knowledge.'"  *Boateng*, 2022 WL

4357555, at *23.

As a threshold matter, the ACC does not allege that Ford knew that any particular

plaintiff was "acting on the basis of mistaken knowledge."  *Id.*  For that reason alone, it would

appear that no duty to disclose existed under New York law.  Furthermore, as observed in *Vita v. General Motors, LLC*, where "design defect-related claims [are] brought against car manufacturers" under New York law, "courts have determined that car manufacturers owed no duty to disclose defects to consumer plaintiffs."  2023 WL 3772530, at *2 (E.D.N.Y. June 2, 2023).  The *Vita* court cited reasoning from *Boateng* and *Garcia v. Chrysler Grp.*, 127 F. Supp. 3d 212, 237 (S.D.N.Y. 2015), indicating that a duty to disclose arising from "superior knowledge" may only be imposed upon a seller in a direct arm's-length transaction, not on a manufacturer separated from the consumer by an intermediate dealer.  *Id.*  The court then concluded:

> It is undisputed that here, as in *Garcia* and *Boateng*, GM did not engage in any direct transaction with FXR.  Like the defendants in *Garcia* and *Boateng*, GM manufactured the vehicle—it did not sell the vehicle to FXR.  GM and FXR "thus sit farther apart than ordinary seller and buyer."  *Boateng*, 2022 WL 4357555, at *24.  As a result, FXR has failed to establish a relationship between it and GM that would give rise to a duty to disclose.

*Id.*  Similarly, the ACC fails to establish a duty to disclose and fails to state a claim for fraudulent concealment under New York law.  Accordingly, those claims will be dismissed.

### d.    Oklahoma

Under Oklahoma law, "where there is no fiduciary relationship a legal or equitable duty to disclose all material facts may arise out of the situation of the parties, the nature of the subject matter of the contract, or the particular circumstances surrounding the transaction."  *Sutton v. David Stanley Chevrolet, Inc.*, 475 P.3d 847, 854 (Okla. 2020).  Again, the particular circumstances alleged in the ACC do not give rise to a duty to disclose.  "[N]o duty to speak arises where the circumstances of the relationship [are] merely pursuant to an arms-length commercial transaction."  *Morgan v. Sewell*, 2024 WL 1771029, at *8 (S.D. Miss. Apr. 24,

2024) (citing *Silver v. Slusher*, 770 P.2d 878, 882 n.11 (Okla. 1988)).  As noted, Ford was not a direct party to plaintiffs' transactions, and the ACC does not allege facts plausibly establishing a principal-agent relationship between Ford and the dealers such that statements or omissions made by dealer employees may be attributed to Ford.

However, Oklahoma law "permits recovery in certain circumstances even though a party initially has no duty to speak."  *CashCall, Inc. v. BancFirst*, 2016 WL 9559037, at *5 (W.D. Okla. Dec. 15, 2016).  "If a party volunteers to convey information that may influence the conduct of another, in those instances, that party has a duty to convey the whole truth, and if it does not, it may be held liable."  *Id.*  On that basis, the court in *Hampton v. General Motors, LLC* found that a car manufacturer had a duty to disclose where the plaintiff alleged that "he spoke about the vehicle with a sales representative at [an authorized dealership] at a time when GM had knowledge of the . . . [d]efect . . . [, and] [b]y disclosing some information about the vehicle, GM arguably had a duty to disclose the . . . [d]efect."  631 F. Supp. 3d 1041, 1049 (E.D. Okla. 2022). However, the court did not consider whether the complaint had sufficiently alleged that dealers were agents and made its finding by treating the dealer's conduct as GM's.  By treating manufacturers as dealers, the court improperly concluded that the manufacturer had a direct buyer-seller relationship with the ultimate consumer.  While Oklahoma recognizes a duty to disclose in relatively broad non-fiduciary circumstances, it has not imposed such a duty upon a party that was not either in a direct buyer-seller relationship or otherwise engaged in direct contractual negotiations with the alleged victim.  Neither of those circumstances reflects the relationship here between Ford and the Oklahoma plaintiffs.

The ACC fails to allege "peculiar circumstances" that would give rise to a duty to disclose under Oklahoma law.  *See Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, 1236 (10th

Cir. 2013).  As a result, it fails to state a claim for fraudulent concealment under Oklahoma law, and those claims will accordingly be dismissed.

### F.    State Consumer-Protection Law Claims (Counts 6-16)

#### 1.    Alabama (Count 8)

Defendant contends that "by virtue of their affirmative assertion of common law fraud claims, the Alabama Plaintiffs, under Alabama law, have procedurally waived their right to pursue claims under the ADTPA."  (Def. Mem. at 48).

The ADTPA provides:  "The civil remedies provided herein and the civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment are mutually exclusive."  Ala. Code. § 8-19-15(a).  "An election to pursue the civil remedies prescribed in this chapter shall exclude and be a surrender of all other rights and remedies available at common law," and "an election to pursue any civil remedies available at common law, by statute or otherwise, . . . arising out of any act, occurrence or transaction actionable under this chapter shall exclude and be a surrender of all rights and remedies available under this chapter."  *Id.* § 8-19-15(a)-(b).

While the savings clause clearly precludes recovery under both the ADTPA and common law, and even limits plaintiffs' ability to "pursue" such claims simultaneously, defendant contends that it also bars plaintiffs from *pleading* ADTPA and common-law fraud claims in the alternative.  "[T]here is a split among the district courts sitting within the Eleventh Circuit—and even within the Northern District of Alabama—over whether a plaintiff may simultaneously [plead] common law fraud claims and claims under ADTPA."  *Morris v. Walmart, Inc.*, 2020 WL 470287, at *6 (N.D. Ala. Jan. 29, 2020).  The Court will align itself with those courts that find simultaneous pleading permissible.

Federal courts apply federal rules to matters of procedure.  *See Hanna v. Plumer*, 380

U.S. 460, 465 (1965).  And "the right to *plead* alternative, or even inconsistent, claims is not a matter of substance; it is a quintessential matter of procedure."  *In re Gen. Motors, LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 405-06 (S.D.N.Y. 2017).  Rule 8(d)(3) provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  And "it is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability."  *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014).

In *Holmes v. Behr Process Corp.*, the court found that a complaint could not plead ADTPA and common-law fraud claims in the alternative, because to do so "would enlarge the substantive right and remedy of the ADTPA" in contravention of *Hanna*.  2015 WL 7252662, at *3 (N.D. Ala. Nov. 17, 2015).  That is clearly not the case.  To allow a plaintiff to *recover* under both theories of liability would indeed be a federal incursion into the state's prerogative to limit the substantive remedy afforded under the ADTPA.  However, merely allowing both theories to be pleaded does not determine the outcome of the case, threaten neglect of the state's remedial limitation, or have any impact on the ultimate rights afforded under the statute.  Furthermore, "although the plain language of the savings clause requires a plaintiff to elect one or the other remedy, it does not specify *when* in the proceedings the plaintiff must do so."  *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 405 (emphasis in original).  Thus, while the Court must require an election of remedies at some relatively early point in the proceeding, it is not required to do so at the pleading stage.

Accordingly, the Court will not dismiss plaintiffs' ADTPA claims on the ground that they have been procedurally waived.

2.    **California (Counts 13 and 14)**

a.    **Consumer Legal Remedies Act ("CLRA") (Count 13)**

"The California Consumer Legal Remedies Act (CLRA) 'proscribes particular unfair methods of competition and unfair or deceptive acts or practices in transactions for the sale or lease of goods or services to consumers.'"  *Taleshpour v. Apple. Inc.*, 2022 WL 1577802, at *1 (9th Cir. May 19, 2022) (quoting *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1172 (Cal. Ct. App. 2015)).  "To state a claim under the CLRA, a plaintiff generally must allege a misrepresentation, reliance, and damages." *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020).  "A plaintiff can state a claim under the CLRA by alleging either an affirmative misrepresentation or a failure to disclose." *Id.*  Plaintiffs' CLRA claims are subject to the heightened pleading standard of Rule 9(b) because they "sound in fraud." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Brown v. Madison Reed, Inc.*, 2023 WL 8613496, at *1 (9th Cir. Dec. 13, 2023).

For the reasons stated above, the ACC does not sufficiently plead reliance to sustain a misrepresentation-based CLRA claim.  However, the ACC also alleges a violation of the CLRA on the basis of a failure to disclose.

In California, a duty to disclose "'arises in four circumstances:  (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from plaintiff; or (4) when the defendant makes partial representations but also suppresses some material facts.'" *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1149 (N.D. Cal. 2021) (quoting *In re Apple In-App Purchase Litig.*, 855 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012)).  The ACC does not allege that a fiduciary relationship existed, and does not cite any partial representations by Ford.  Nevertheless, the Court agrees with the finding in *O'Connor* that the circumstances

alleged track those alleged in *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007) closely enough "to allow the CLRA claim to go forward." *O'Connor*, 567 F. Supp. 3d at 971.

As in *Falk*, while it "is true that prospective purchasers, with access to the Internet, could have read the many complaints about the [transmission defect]," Ford is "alleged to have *known* a lot more about the defective [transmission], including information unavailable to the public." *Falk*, 496 F. Supp. 2d at 1097. Furthermore, as in *Falk*, despite allegedly receiving a large number of complaints about the 10R80 over the course of multiple years, Ford "never made any attempt to notify other customers or effect a recall" and published TSBs downplaying the issue suggesting that ford "tried to gloss over the problems." *Id.* Thus, Ford plausibly had a duty to disclose under California law.

And in the context of a violation based upon an allegedly fraudulent *omission*, "the Rule 9(b) standard is somewhat relaxed because a plaintiff cannot plead either the specific time of an omission or the place, as he is not alleging an act, but a failure to act." *Clark v. Am. Honda Motor Co., Inc.*, 528 F. Supp. 3d 1108, 1122-23 (C.D. Cal. 2021).[23] Nevertheless, a complaint must allege actual reliance on an omission to state a claim. "A plaintiff may do so by simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman,* 5 Cal. 4th 1082, 1093 (Cal. 1993)). "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Id.* "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question,' and

---

[23] It is important to note that "[t]he omissions analysis differs from affirmative misrepresentation principles where reliance requires the consumer to have seen or read the misrepresentation." *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018).

as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'" *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (Cal. 1997) (citations omitted).  Here, the alleged transmission defects, purportedly leading to shifting problems and loss of power at speed, are not "obviously unimportant," and thus at the very least plausibly material.

The question that remains, then, is whether the complaint sufficiently pleads that plaintiffs "would have been aware" of any remedial disclosure made by Ford.  *Daniel*, 806 F.3d at 1225.  The court in *Daniel* found "evidence that [plaintiffs] interacted with and received information from sales representatives at authorized Ford dealerships prior to purchasing" their vehicles was "sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through Ford's authorized dealerships." *Id.* at 1226; *see also Baranco v. Ford Motor Co.*, 294 F. Supp.3d 950, 967-68 (N.D. Cal. 2018) ("Though [plaintiff] does not specifically allege that she received information or promotional information from Ford . . . , the Court can plausibly draw an inference in her favor that she could have received such information had Ford publicized the defect through the dealer.").[24]

In sum, the ACC alleges facts sufficient to assert a duty to disclose under California law, the materiality of the alleged omission, and the plausible channel through which the concealed information could have been disclosed.  Thus, making all inferences in plaintiffs' favor, the ACC plausibly states a claim for violation of the CLRA based on a failure to disclose.

---

[24] Without more, the fact that Ford might be able to publicize particular information through a dealership does not render the dealership an agent of Ford.

### b.    Unfair Competition Law ("UCL") (Count 14)

The claims of the California plaintiffs under the UCL will be dismissed because the ACC fails to plead that they lack an adequate remedy at law.

"The UCL provides only for equitable remedies" and is "generally limited to injunctive relief and restitution."  *Hodge v. Superior Ct.*, 145 Cal. App. 4th 278, 284 (Cal. Ct. App. 2006).  "Federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under California's Unfair Competition Law," including "the principle precluding courts from awarding equitable relief when an adequate legal remedy exists."  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 837, 842 (9th Cir. 2020).  In *Guzman v. Polaris Indus., Inc.*, the court held that "because [plaintiff] had an adequate legal remedy in his time-barred CLRA claim, the district court lacked equitable jurisdiction to hear [his] UCL claim."  49 F.4th 1308, 1313 (9th Cir. 2022).  Here, the California plaintiffs have an adequate legal remedy in their CLRA and common-law fraudulent-concealment claims for damages.  And while alternative pleading is allowed, the ACC does not contain even a bare allegation that plaintiffs lack an adequate remedy at law.

However, the procedural postures in *Sonner* and *Guzman* were significantly different than here.  *Sonner* considered dismissal of a UCL claim "on the brink of trial."  971 F.3d at 837.  *Guzman* considered dismissal of a UCL claim at summary judgment.  49 F.4th at 1310.  Here, the court is faced with the question of whether to retain jurisdiction over UCL claims at the initial pleading stage.

Prior to *Sonner* and *Guzman*, California federal district courts were split "on the issue of whether it is appropriate to dismiss UCL claims at the pleading stage when they are based on identical facts as other claims providing the legal remedy of damages."  *Eason v. Roman Cath. Bishop of San Diego*, 414 F. Supp. 3d 1276, 1282 (S.D. Cal. 2019).  Courts allowing UCL claims

to proceed have primarily relied upon the general rule allowing claims to be pleaded in the alternative, and a recognition that, in the particular circumstances of the cases before them, "[d]iscovery may reveal that [plaintiffs'] claims providing legal remedies are inadequate." *Wildin v. FCA U.S., LLC*, 2018 WL 3032986, at *7 (S.D. Cal. June 19, 2018).  While it is true that equitable and legal claims may be pleaded in the alternative, "alternate claims must also be adequately pl[eaded]." *Azizpour v. Lowe's Home Centers, LLC*, 2024 WL 1349650, at *6 (S.D. Cal. Mar. 29, 2024).  And "[w]hile Federal Rule of Civil Procedure 8 provides general permission for plaintiffs to pursue alternative claims, it does not alter or limit *Sonner's* holding or the underlying principles of federal equitable jurisdiction." *EpicentRx, Inc. v. Carter*, 2023 WL 4339679, at *4 (S.D. Cal. May 10, 2023).

Here, "[p]laintiffs do not assert that they have pleaded that their legal remedies are inadequate or explained how equitable relief they seek in this case would redress an injury that damages would not." *Azizpour*,  2024 WL 1349650, at *6.  As the Court will address later, plaintiffs cannot be awarded the non-monetary equitable remedies requested in the complaint. And while *Sonner* considered a late-stage dismissal, it was still a dismissal based on the insufficiency of a complaint.  971 F.3d at 844 ("[T]he operative complaint does not allege that Sonner lacks an adequate legal remedy.").  Furthermore, while not precedential, the Ninth Circuit found a district court's dismissal of a UCL claim at the pleading stage appropriate where "[p]laintiffs were obligated to allege that they had no adequate legal remedy in order to state a claim for equitable relief" and failed to do so.  *In re Apple Processor Litig.*, 2023 WL 5950622, at *2 (9th Cir. Sept. 13, 2023).

Accordingly, because the court lacks equitable jurisdiction over the UCL claims, those claims will be dismissed.  And while it is not clear how plaintiffs could plausibly assert the

absence of an adequate legal remedy, the Court will follow *Guzman* and dismiss the UCL claims without prejudice. *See Guzman*, 49 F.4th at 1314-15 (holding that because the district court did not dismiss the claim on its merits and it is possible that plaintiffs could refile the claim in state court, dismissal ought to be without prejudice.)[25]

### 3.    Florida (Count 7)

Defendant contends that the claim of Florida plaintiff Klontz under the FDUTPA fails to comply with the territoriality requirement of the statute, as the complaint does not allege that he purchased his vehicle in Florida.

The FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of" Florida. *Millenium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs., State of Fla.*, 761 So.2d 1256, 1262 (Fla. Dist. Ct. App. 2000). Thus, the "FDUTPA applies only to actions that occurred within the state of Florida." *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012).

Thus, to state a claim under the FDUTPA, a complaint must allege with "sufficient specificity . . . the location of the conduct giving rise to the FDUTPA claim." *Id.* As to plaintiff Klontz, the ACC does not do so. Klontz contends that while the complaint does not allege that he purchased his vehicle in Florida, the territoriality requirement might still be satisfied "so long as sufficient conduct occurred in Florida—e.g., driving of the [v]ehicle in Florida, experiencing malfunctions related to the [d]efect in Florida." (Opp. at 48). Even if such allegations would constitute "conduct giving rise to" the claim, that does not save the claim here, as no such allegations are made in the ACC. Furthermore, there are no allegations suggesting that Ford

---

[25] It is worth noting why alternative pleading was allowed for the ADTPA and not the UCL. In the ADTPA context, the alternatively pleaded claims both seek remedies at law, and thus the controlling federal rule is Rule 8's permission to plead claims in the alternative. In the UCL context, the alternatively pleaded claims are *equitable* and legal, and thus federal principles of equity jurisdiction control.

made representations to Klontz in Florida, that Ford made any decisions related to the transmissions in Florida, or that Ford manufactured, designed, or tested *any* transmissions in Florida.

Because the complaint fails to allege any conduct occurring in Florida giving rise to the FDUTPA claim of plaintiff Klontz, that claim will be dismissed.

### 4. __Illinois (Count 9)__

"The ICFA prohibits unfair or deceptive acts or practices . . . in the conduct of trade or commerce." *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 717-18 (N.D. Ill. 2020). The ACC alleges that Ford violated the ICFA by engaging in deceptive conduct in the form of misrepresentations and omissions concerning the alleged 10R80 defect. (ACC ¶¶ 957-59). "Where an ICFA claim rests on allegations of deceptive conduct, Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud." *O'Connor*, 477 F. Supp. at 718.[26]

To state a deceptive-act claim under the ICFA, a plaintiff must show that "the deceptive act proximately caused any damages." *De Bouse v. Bayer*, 235 Ill. 2d 544, 550 (Ill. 2009). "[T]o maintain an action under the [ICFA], the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *Id.* at 555. As previously discussed, the ACC does not allege that any Illinois were actually exposed to any representations from Ford (as opposed to dealership salespeople). Thus, the complaint fails to establish the proximate cause necessary to state misrepresentation-

---

[26] Despite the inclusion of the word "unfair" in the ACC, the ICFA claims are properly interpreted as deceptive-practices claims subject to the heighted Rule 9(b) pleading requirement. *See O'Connor*, 477 F. Supp. at 720 ("The addition of 'unfairness' language does not change an ICFA claim that is 'entirely grounded in fraud' to an unfairness claim." (citations omitted)).

based ICFA claims.

And "[u]nder the ICFA, an 'omission' is an omission from a communication, rather than a general failure to disclose." *Darne v. Ford Motor Co.*, 2017 WL 3836586, at *10 (N.D. Ill. Sept. 1, 2017). "If there has been no communication with the plaintiff, there have been no statements and no omissions." *De Bouse*, 235 Ill. 2d at 555. As in *O'Connor*, "[h]ere, [p]laintiff[s] do[] not identify any particular *direct statements from defendant* that contain material omissions . . . [; and] [f]or that reason, [p]laintiff[s] also fail[] to state an ICFA claim based on a 'material omission' theory." 477 F. Supp. 3d at 720 (emphasis added).

Accordingly, the ICFA claims will be dismissed.

### 5.     Massachusetts (Count 6)

"The SJC has clearly articulated the standard that if a Chapter 93A claim is 'derivative of' other claims which fail as a matter of law, the Chapter 93A claim 'must also fail.'" *Gattineri v. Wynn MA, LLC*, 93 F.4th 505, 511 (1st Cir. 2024) (quoting *Park Drive Towing, Inc. v. City of Revere*, 442 Mass. 80, 85-86 (2004)); *see also Cameron v. FCA U.S., LLC*, 2022 WL 619519, at *3 (Mass. App. Ct. Mar. 3, 2022) ("It is well settled that where a plaintiff's 93A claim is wholly derivative of a meritless statutory or common-law claim, the 93A claim must also fail as a matter of law."). Where a 93A claim is "based on the same economic theory of injury and the same alleged set of facts" as another, such that they are "factually and legally intertwined," the claims "should survive or fail under the same analysis." *Iannachino v. Ford Motor Co.*, 451 Mass. 623, 634-35 (2008).

Plaintiffs concede that "the 93A claims are based on the same conduct alleged in the[] misrepresentation and fraudulent omission claims." (Opp. at 52). Their only response is that the fraud claims "are properly set forth." (*Id.*). However, the Court has determined that in fact they are not, at least as to plaintiff San Angelo.

"[A] consumer plaintiff's claim of violation of [Chapter 93A] based solely on an underlying but meritless claim for common-law fraud is itself without merit . . . , because it is 'absorbed in and vanishes with the [meritless] misrepresentation claim.'" *Lily Transp. Corp. v. Royal Institutional Servs., Inc.*, 64 Mass. App. Ct. 179, 204 (2005) (Laurence, J., concurring in part and dissenting in part) (citation omitted) (quoting *Fernandes v. Rodrigue*, 38 Mass. App. Ct. 926, 928 (1995)). Thus, because the underlying Massachusetts common-law claims of plaintiff San Angelo for fraudulent misrepresentation and concealment fail, his derivative Chapter 93A claims will also be dismissed.[27]

### 6.     New York (Counts 11 and 12)

The ACC alleges violations of New York General Business Law § 349 and § 350. Section 349 proscribes "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). And "[t]he standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 n.1 (N.Y. 2002). "To state a claim, a plaintiff must allege (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are 'deceptive or misleading in a material way,' and (3) that the plaintiff has been injured as a result." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014).[28]

---

[27] Because the Court will provide defendant an opportunity to file a renewed motion to dismiss as to the fraudulent-misrepresentation claim of plaintiff Pollack, it will likewise provide the same opportunity as to his Chapter 93A claim.

[28] *See Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 240 n.7 (S.D.N.Y. 2020) ("Section 350 requires a plaintiff to plead that they relied on a defendant's statements at the time of purchase, *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 288 (E.D.N.Y. 2009), but section 349 does not require reliance, *see Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015). Section 349 does, however, require that a complaint plead causation, *see Belfiore*, 94 F. Supp. 3d at 446, and thus the pleading requirements end up being much the same, *see Tyman v. Pfizer, Inc.*, No. 16 Civ. 6941 (LTS) (BCM), 2017 WL 6988936, at *24 (S.D.N.Y. Dec. 27, 2017), *report and recommendation adopted*, No. 16 Civ. 6941 (LTS) (BCM), 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018).")

In order to state a misrepresentation-based claim under Sections 349 and 350, "[p]laintiffs must allege that they saw the misleading statements of which they complain before they purchased or came into possession of [the product]." *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 240 (S.D.N.Y. 2020); *see also Goldemberg*, 8 F. Supp. 3d at 480 ("To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased."); *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 98 (2d Cir. 2023) ("[Plaintiff] properly alleged causation because her First Amended Complaint claims that she saw the 'therapeutic-grade' label and the statements made about the individual [p]roducts' promised effects before purchasing the [p]roducts.").

The ACC does not allege that any of the New York plaintiffs actually saw or heard any of the alleged misrepresentations in Ford's advertisements or other communications. Thus, misrepresentation may not serve as a basis for their claims under Sections 349 and 350. *See Stern v. Electrolux Home Prods., Inc.*, 2024 WL 416495, at *7 (E.D.N.Y. Jan. 30, 2024) (dismissing claims under Sections 349 and 350 where plaintiff "failed to allege he saw any of the marketing materials prior to purchasing the [product]"); *Morales v. Apple, Inc.*, 2023 WL 5579929, at *3 (S.D.N.Y. Aug. 29, 2023) (dismissing claims under Sections 349 and 350 where the complaint was "silent as to when plaintiff saw any misrepresentation; let alone that plaintiff saw any misrepresentation prior to purchasing the [product]").[29]

The omission-based claims, however, fare better. "[A] plaintiff bringing an omission-based claim for § 349 liability must show that 'the business alone possesses material information

---

[29] Again, the Court will not treat statements made by dealership employees as statements made by Ford itself.

that is relevant to the consumer and fail[ed] to provide this information,' or that plaintiffs could not 'reasonably have obtained the relevant information they now claim the [defendant] failed to provide.'" *Paradowski v. Champion Petfoods, Inc.*, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26-27 (N.Y. 1995)).  Defendant contends that the existence of "Ford's TSBs," "various consumer complaints," and the "*O'Connor* class action" demonstrate that plaintiffs could reasonably have obtained the relevant information that they allege Ford concealed.  (Def. Mem. at 64).  However, that is far from clear.  As stated in *O'Connor*:  "[T]he Court cannot determine on the pleadings whether the NHTSA complaints were 'readily available' to [p]laintiffs or would have provided [p]laintiffs with sufficient notice of the [d]efect. . . .  It is not apparent that the average consumer would know about NHTSA complaints, know how to access them, or know how to interpret them or their importance to the decision to purchase a [v]ehicle." 567 F. Supp. 3d at 965.

The same reasoning applies here to the TSBs and "various consumer complaints" cited by defendant.  And similar reasoning applies to the filing of the *O'Connor* lawsuit itself.  Absent widespread news coverage, "the only way for consumers to directly access the complaints and documents filed in [*O'Connor*] is through PACER or other paid subscription services like LexisNexis or Westlaw," or through relatively niche legal-trade publications.  (Opp. at 57).  It is not reasonable to expect the average consumer to seek out, and potentially pay for, access to such platforms in the regular course of shopping for a new vehicle.  *Cf. In re Takata Airbag Prod. Liab. Litig.*, 677 F. Supp. 3d 1311, 1328 (S.D. Fla. 2023) ("[A]lthough the Takata recall generated significant publicity, public awareness of issues regarding Takata airbag ruptures does not equate with knowledge that Plaintiffs' specific [c]lass [v]ehicles were being sold with

defective airbags.").

In short, the ACC alleges sufficient facts to plausibly suggest under New York law that Ford had material information in its possession that plaintiffs "could not reasonably have obtained" prior to purchasing their vehicles. *Paradowski*, 2023 WL 3829559, at *2. Accordingly, it plausibly states a claim for violation of Sections 349 and 350 on the basis of omission, and those claims will not be dismissed.

### 7.    Oklahoma (Count 15)

Defendant contends that the OCPA claims must be dismissed because "the OCPA does not apply to misrepresentation claims involving motor vehicle advertisements." (Def. Mem. at 64). The OCPA states that it shall not apply to "[a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of this state or the United States." Okla. Stat. Ann. tit. 15, § 754(2).

Defendant contends that the OCPA claims—based upon Ford's alleged misrepresentations and omissions in advertising—are precluded because the Oklahoma New Motor Vehicle Commission ("ONMVC") regulates advertising. Specifically, the ONMVC's administrative code "provides that '[a] licensee'—i.e., 'any entity or person required to obtain a license from the Oklahoma [New] Motor Vehicle Commission'—'shall not use false or misleading advertising.'" *Sweeney v. Toyota Motor Sales, U.S.A., Inc.*, 2023 WL 2628697, at *14 (C.D. Cal. Feb. 9, 2023) (quoting Okla. Admin. Code §§ 465:15-3-1 & 465:15-1-2).

The OCPA exempts "actions . . . regulated . . . [by] any other regulatory body." Okla. Stat. Ann. tit. 15, § 754(2). While the OCPA may provide different remedies, it is clear that the ONMVC "regulates" "false or misleading advertising" of vehicles. Thus, if Ford is indeed required to obtain a license from the ONMVC, such that its advertising would be subject to that body's regulation, an OCPA claim arising from that same advertising would be precluded. *See*

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1111 (N.D. Cal. 2021)

("[T]he regulatory language [of Okla. Admin. Code §§ 465:15-3-1] indicates that

misrepresentations in the advertising of motor vehicles are governed by this provision and are

thus exempt from the Oklahoma Consumer Protection Act."); *Sweeny*, 2023 WL 2628697, at *14

(same).[30]

Based on the allegations of the complaint alone, it is unclear whether Ford is required to

obtain a license from the ONMVC such that its advertisements would be subject to ONMVC

regulation.  The statute, Okla. Stat. Ann. tit. 47, § 564, identifies who must be licensed:

> It shall be unlawful for any . . . firm . . . [or] corporation . . . to engage in business
> as, or serve in the capacity of, or act as a . . . manufacturer . . . of new motor
> vehicles . . . , or factory branch, . . . or factory representative, as defined
> in Section 562 of this title, in this state without first obtaining a license therefor as
> provided for by law.

Okla. Stat. Ann. tit. 47, § 564(A).  Section 562 defines "manufacturer" as "any person, firm,

association, corporation, or trust, resident or nonresident, that manufactures or assembles new

and unused motor vehicles or new and unused powersport vehicles or that engages in the

fabrication or assembly of motorized vehicles of a type required to be registered in this state."

Okla. Stat. Ann. tit. 47, § 562(5).  It defines "factory branch" as "any branch office maintained

by a [manufacturer] for the sale of motor vehicles . . . to distributors, or for the sale of motor

---

[30] Plaintiffs cite to *In re Gen. Motors Corp.*, 2005 WL 1924335 (W.D. Okla. Aug. 8, 2005), a case in which
the court found that ONMVC regulation did not preclude OCPA claims.  However, that case is distinguishable.  The
court in *In re Toyota RAV4* dismissed the OCPA claims after observing the following:

> [T]he court in [*In re Gen. Motors Corp.*] found only that the Oklahoma Motor Vehicle
> Commission's authority did not extend to the conduct at issue in that case, namely "the regulation
> of allegedly defective products"; such conduct was therefore not exempt from the Oklahoma
> Act. . . .  But, as Toyota points out, Plaintiffs' consumer protection claims here do not focus on
> "whether the [Vehicles] contained a design defect, but how TMS allegedly advertised and
> represented [their] fuel tank capacity."

*In re Toyota RAV4*, 534 F. Supp. 3d at 1111 (citations omitted).  The same reasoning applies here—the OCPA
claims are not based simply on the existence of the alleged defect, but instead on Ford's alleged misrepresentations
and omissions in its advertising.

vehicles to new motor vehicle dealers, . . . or for directing or supervising, in whole or in part, its representatives." *Id.* § 562(7). And it defines "factory representative" as "any officer or agent engaged as a representative of a manufacturer of motor vehicles . . . or by a factory branch, for the purpose of making or promoting the sale of its motor vehicles . . . , or for supervising or contacting its dealers or prospective dealers." *Id.* at § 562(9).

While it is certainly possible that defendant maintains some of those operations within Oklahoma, it conspicuously does not contend that it is, in fact, itself licensed by the ONMVC. Thus, while ONMVC regulation would preclude the OCPA claims in the event defendant is regulated by the ONMVC, the Court cannot determine that defendant is so regulated as a matter of law at this stage. Therefore, the OCPA claims will not be dismissed on that basis.[31]

### 8.    Pennsylvania (Count 16)

Defendant contends that Pennsylvania plaintiffs' misrepresentation-based UTPCPL claims must be dismissed for failure to sufficiently allege causation, and that their omission-based UTPCPL claims must be dismissed for failure to allege a duty to disclose.

The UTPCPL "creates a private cause of action for consumers injured by unfair or deceptive practices in trade or commerce." *Silverstein v. Percudani*, 2005 WL 1252199, at *7 (M.D. Pa. May 6, 2005); 73 Pa. Stat. Ann. §§ 201-3 & 201-9.2. To state a claim for deceptive practices under the UTPCPL "a plaintiff must establish that: 1) the alleged violations occurred in trade or commerce; 2) the UTCPL grants a private cause of action for the injuries sustained; and 3) the alleged actions fall within one of the seventeen identified categories of unfair or deceptive trade practices." *Silverstein*, 2005 WL 1252199, at *7 (citing *In re Smith*, 866 F.2d 576, 581 (3d

---

[31] Defendant also makes a generalized assertion in its reply memorandum that it is "indisputably . . . federally regulated." (Reply at 34). Without any additional specification or elaboration, the Court cannot rely on that stray assertion as a basis for dismissal.

Cir. 1989)).  Where, as here, UTPCPL claims sound in fraud, they are subject to the heightened

pleading requirements of Rule 9(b).  *See Coyle v. JSL Mech., Inc.*, 2023 WL 5985273, at *4

(E.D. Pa. Sept. 14, 2023).

To state a claim for misrepresentation-based violation of the UTPCPL, a complaint must

plead causation, or actual reliance, sufficient to satisfy the requirements of Rule 9(b).  *See Yocca*

*v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 501 (2004) ("To bring a private cause of action

under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful

conduct or representation and that he suffered harm as a result of that reliance."); *Gregg v.*

*Ameriprise Fin., Inc.*, 664 Pa. 567, 582 (2021) ("Section 201-9.2 creates a causation element,

which requires a private plaintiff to demonstrate justifiable reliance.").  As discussed, the ACC

does not allege that Pennsylvania plaintiffs were exposed to any specific representations made by

Ford, and therefore fails to allege facts sufficient to plead actual reliance under Rule 9(b), and

thus fails to state a claim for misrepresentation-based violation of the UTPCPL.

Defendant further contends that the omission-based UTPCPL claims fail because the

ACC fails to allege that it had a duty to disclose.  *See DeSimone v. U.S. Claims Servs., Inc.*, 2020

WL 1164794, at *3 (E.D. Pa. Mar. 11, 2020) ("When allegations underlying a UTPCPL claim

involve a defendant's nondisclosure rather than misrepresentation, the omission is actionable

only if there is a duty to disclose.").  The duty to disclose under Pennsylvania law has been

summarized as follows:

> In the absence of a fiduciary or confidential relationship, Pennsylvania recognizes
> "a duty to disclose a known latent defect to a purchaser when the purchaser is
> unsophisticated and does not have access to the same information as the
> manufacturer." *Zwiercan v. Gen. Motors Corp.*, 58 Pa. D. & C. 4th 251, 259 (Pa.
> Com. Pl. 2002).  However, such a duty to disclose has been limited to "known
> serious and life threatening latent defects." *Zwiercan v. Gen. Motors Corp.*, 2003
> WL 1848571, at *2 (Pa. Com. Pl. Mar. 18, 2003) ("*Zwiercan III*").  In other
> words, "a party has a duty to disclose known material and dangerous defects, i.e.

those defects which are likely to cause significant bodily harm." *Id.*

*Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *31 (D.N.J. Oct. 19, 2023). The ACC alleges that the defect "has often led to potentially life-threatening situations," (ACC ¶ 558), and it includes a variety of NHTSA complaints citing occurrences such as the transmission "disengag[ing] completely when accelerating in traffic," (*Id.* ¶ 630). Therefore, the Court finds that the ACC plausibly alleges a duty to disclose under Pennsylvania law. Thus, the omission-based UTPCPL claims will not be dismissed for failure to allege such a duty.

Finally, defendant contends that the warranty-based UTPCPL violations are barred by Pennsylvania's "gist of the action" doctrine. The UTPCPL provides that "[f]ailing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made" constitutes an "unfair or deceptive act[] or practice[]." 73 Pa. Stat. Ann. § 201-2(xiv). The Court need not assess whether a claim based on that provision is barred by the "gist of the action" doctrine, because it has already determined that the express warranty does not cover the alleged design defect at issue in this case.

Accordingly, the UTPCPL claims will be dismissed to the extent they are based upon alleged affirmative misrepresentations or breach of warranty, but will not be dismissed to the extent they are based upon alleged omissions.

### 9. Texas (Count 10)

Defendant contends that the misrepresentation-based TDTPA claims must be dismissed for failure to sufficiently allege causation, and that both the misrepresentation- and omission-based TDTPA claims must be dismissed because the statute does not apply to "upstream manufacturers."

"The [T]DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (citing Tex. Bus.

& Com. Code Ann. § 17.50).  "To maintain a lawsuit under the [T]DTPA, the plaintiff must

establish:  (1) she is a 'consumer' under the [T]DTPA with respect to her claim against the

defendant; (2) the defendant committed a 'false, misleading, or deceptive' act; breached 'an

express or implied warranty'; or otherwise engaged in 'unconscionable' conduct; and (3) the

defendant's actions were the 'producing cause' of the plaintiff's damages."  *Chavez v. Ford

Motor Co.*, 2018 WL 6190601, at *3 (W.D. Tex. Sept. 26, 2018) (quoting Tex. Bus. & Com.

Code Ann. § 17.50).  Here, plaintiffs assert claims under the "false, misleading or deceptive"

prong.  (ACC ¶ 977).  Where, as here, TDTPA claims sound in fraud, they are subject to the

heightened pleading requirement of Rule 9(b).  *See Chavez,* 2018 WL 6190601, at *2 ("Federal

courts in Texas consistently apply Rule 9(b)'s heightened pleading requirements to claims

brought under the [T]DTPA."); *Bige, Inc. v. Penn-Am. Ins. Co.*, 2015 WL 5227726, at *4 (W.D.

Tex. Sept. 8, 2015) (same); *Trejo v. Allstate Fire & Cas. Ins. Co.*, 2019 WL 4545614, at *7

(W.D. Tex. Sept. 19, 2019) ("Some of [plaintiff's] claims for violation of . . . the TDTPA sound

in fraud and are, therefore, subject to Rule 9(b)."); *cf. Stewart v. Nationwide Prop. & Cas. Ins.

Co.*, 2011 WL 4592256, at *3 (S.D. Tex. Sept. 29, 2011) ("Courts have found that claims

alleging violations under the Texas Insurance Code that are substantively identical to fraud are

subject to the Rule 9(b) pleading requirements." (citation and quotation omitted)).  The

misrepresentation-based TDTPA claims sound in fraud, are subject to the requirements of Rule

9(b), and contain a "producing cause" requirement akin to an actual-reliance requirement.  The

Court will therefore dismiss the misrepresentation-based TDTPA claims for the same reasons

articulated in its dismissal of the Texas plaintiffs' common-law fraudulent-misrepresentation

claims.

    Both misrepresentation- and omission-based TDTPA claims are subject to an "upstream

manufacturer" exception under Texas law.  The Texas Supreme Court has held that the Texas

legislature did not intend for the TDTPA "to reach upstream manufacturers and suppliers when

their misrepresentations are not communicated to the consumer."  *Amstadt*, 919 S.W.2d at 649.

The court went on to clarify that "the defendant's deceptive trade act or practice is not actionable

under the [T]DTPA unless it was committed *in connection with* the plaintiff's transaction in

goods or services."  *Id.* at 650 (emphasis in original).  That is an additional reason to dismiss the

TDTPA misrepresentation claims of plaintiffs Chaney, Hernandez, the Terrys, and the

Napiorkowskis, as the ACC contains no allegation that they were exposed to any particular

communication from Ford.[32]  Given the broad sweep of *Amstadt*'s holding—apparently applying

generally to a "defendant's deceptive trade act[s] or practice[s]"—the Court finds that the failure

of the complaint to allege that any of those plaintiffs actually saw or heard any specific

communication from Ford, renders Ford an exempt "upstream manufacturer" as to those

plaintiffs for the purposes of their omission-based TDTPA claims in addition to their

misrepresentation-based claims.

The question that remains is whether the representations allegedly viewed by plaintiff

Smith are appropriately considered to be "in connection with the plaintiff's transaction," such

that Ford might not be exempt from his omission-based TDTPA claim.  *See Cortez v. State Farm

Mut. Auto. Ins. Co.*, 2006 WL 8435999, at *4 (W.D. Tex. Oct. 25, 2006) ("*Amstadt* does not

stand for the proposition that a plaintiff is never a consumer as to an upstream supplier . . . .  The

question in *Amstadt* was whether the defendants' conduct was sufficiently connected to the

consumer transaction to subject any defendant to liability under the [T]DTPA." (quoting *Atrium*

---

[32] While plaintiffs again contend that dealership-employee representations should be attributed to Ford, the complaint does not allege that the dealerships are Ford's agents, and does not allege even basic facts suggesting any right or exercise of control by Ford over the dealerships.

*Cos. v. Bethke*, 2002 WL 31892204, at *2-3 (Tex. App. Dec. 31, 2002)). "Texas courts have reasoned that a defendant need not be "present at the . . . transaction" to be liable under the [T]DTPA for misrepresentations to a plaintiff when the plaintiff 'relied on the [defendant's] representations to make a business decision.'" *Id.* (quoting *Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560, 565-66 (Tex. App. 1997)). While the communications allegedly viewed by Smith are insufficient to sustain a fraudulent-misrepresentation claim, they *are* communications that allegedly factored into Smith's transaction. Thus, reading the complaint in the light most favorable to plaintiffs, the Court finds those communications suffice to plausibly negate the "upstream manufacturer" exemption as to Smith's omission-based TDTPA claim.

In sum, the TDTPA claims will be dismissed, except for that of plaintiff Smith to the extent that his claim is based upon allegedly deceptive omissions.

### G.    <u>Statute of Limitations</u>

Defendant further contends that certain claims are barred by relevant statutes of limitations. Specifically, defendant concluded that the following claims are time-barred: the fraud and ADPTA claims asserted by Alabama plaintiffs Boggan, Grier, and the Wolfes; the CLRA claims asserted by California plaintiffs Butler and Martinez; the implied-warranty claims (under both the California Commercial Code and SBCWA) asserted by plaintiff Butler; the New York GBL claims asserted by New York plaintiffs Bunger and Soehnlein; and the implied- and express-warranty claims asserted by plaintiff Bunger.

As a preliminary matter, several of those claims will be dismissed for other reasons, and therefore the Court will not reach the issue of whether they are also time-barred.[33]

---

[33] Specifically, the Alabama fraud claims, the implied-warranty claims under the California Commercial Code, the SBCWA implied-warranty claim asserted by Butler, the express-warranty claims, and the implied-warranty claims under New York law have already been deemed insufficient for other reasons. The claims asserted by Grier, the Wolfes, Martinez, and Bunger have been stayed pending arbitration.

The remaining claims are the ADTPA claim asserted by Boggan; the CLRA claim asserted by Butler; and the New York GBL claims asserted by Soehnlein.

"A claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when 'the running of the statute is apparent on the face of the complaint.' . . . '[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (citations omitted). "Dismissing a complaint as untimely at the pleading stage is an unusual step, since the complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

Here, the Court agrees with plaintiffs that "[w]here, as in this case, 'the dates pertinent to the running of the statute cannot be determined from the allegations of the complaint, [] the matter cannot be decided on a motion to dismiss, and defendants must raise the defense through a motion for summary judgment or at trial.'" (Opp. at 71) (quoting *Deirmenjian v. Deutsche Bank, A.G.*, 526 F. Supp. 2d 1068, 1074 (C.D. Cal. 2007)). Furthermore, even where relevant dates may appear in the complaint, in the context of a set of claims based upon alleged concealment, there are facts that could potentially provide an exception to or extension of the limitations period that have not yet been fully developed. Thus, none of the challenged claims will be dismissed as untimely at this stage.

## H.    **Injunctive Relief**

The ACC includes a request that the court "enjoin[] Ford from continuing the unlawful practices as set forth herein, and order[] Defendant to engage in a corrective recall campaign." (ACC ¶ 1115(e)).

A plaintiff in federal court "bears the burden of showing that he has standing for each

type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  "To have standing to pursue injunctive relief, a plaintiff must 'establish a real and immediate threat' resulting in 'a sufficient likelihood that [s]he will again be wronged in a similar way.'"  *Gray v. Cummings*, 917 F.3d 1, 19 (1st Cir. 2019) (quoting *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992)).  Plaintiffs do not allege that they will buy any other Ford vehicles in the future, or that they will rely on Ford's advertising representations going forward. They thus fail to allege circumstances in which they will likely be exposed to future harm arising from the allegedly "unlawful practices" as to which they have plausibly stated claims.

Plaintiffs nonetheless contend that they "are likely to face ongoing performance issues and related vehicle repair costs."  (Opp. at 73).  That may be future injury, but it is not future injury that could be remedied by an injunction against Ford to stop selling defective cars or to stop publishing misleading advertisements.

Furthermore, defendant contends that the request for injunctive relief in the form of a court-ordered recall is preempted by the National Traffic and Motor Safety Act ("Safety Act"), 49 U.S.C. 30101, *et seq.*  Plaintiffs do not contest that assertion, and the Court agrees that a court-ordered, nationwide recall based upon a set of state-law claims is impliedly preempted by the Safety Act's detailed regulation of motor-vehicle recalls.  *See Lilly v. Ford Motor Co.*, 2002 WL 84603, at *5 (N.D. Ill. Jan. 22, 2002) ("A nationwide court-ordered recall would conflict directly with and frustrate the Safety Act."); *Flynn v. FCA U.S., LLC*, 2016 WL 5341749, at *5 (S.D. Ill. Sept. 23, 2016) ("[A] state law can be preempted if it interferes with the actual goal of a federal statute or if it interferes with the methods by which the federal statute set to achieve the federal goal, and a court-supervised recall would run roughshod over the recall procedures put forth in the Motor Vehicle Safety Act for an agency-coordinated recall." (citations omitted));

*Schiesser v. Ford Motor Co.*, 2017 WL 1283499, at *5 (N.D. Ill. Apr. 6, 2017) ("While the

Safety Act does not expressly state that only the Secretary of Transportation may order a motor

vehicle recall, the comprehensive nature of the federal administrative scheme indicates

Congress'[s] intent that only the Secretary of Transportation do so." (citation and quotation

omitted)).

  Thus, plaintiffs' request for injunctive relief fails as a matter of law.

## IV. <u>Conclusion</u>

  For the foregoing reasons, the Motion of Defendant Ford Motor Company to Dismiss the

Amended Consolidated Class Action Complaint is GRANTED in part and DENIED in part, as

follows:

1. As set forth in the Memorandum and Order on Defendant's Motion to Compel Arbitration, filed March 28, 2025, the claims of certain identified plaintiffs are being stayed pending arbitration (the "Arbitration Plaintiffs"), and the claim of plaintiff Shannon Hartman is being severed from the present action and transferred to the United States District Court for the Central District of California for resolution of defendant's motion to compel arbitration (the "Severed and Transferred Plaintiff"). As to the claims of those plaintiffs, the motion to dismiss is DENIED without prejudice to its renewal should those claims be litigated, rather than arbitrated, at a future time.

2. The motion to dismiss is GRANTED as to the claims of all plaintiffs, other than the Arbitration Plaintiffs and the Severed and Transferred Plaintiff, asserted in Count 1 (Breach of Express Warranty).

3. The motion to dismiss is GRANTED as to the claims of all plaintiffs, other than the Arbitration Plaintiffs, the Severed and Transferred Plaintiff, and Massachusetts plaintiff Jeffrey Pollack, asserted in Count 5 (Fraud), to the extent the claims are based on an alleged affirmative misrepresentation.

4. The motion to dismiss is GRANTED as to the following claims:

  a. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of Alabama plaintiffs Larry Boggan and Bradford Houseal;

  b. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of California plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson;

c. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of Florida plaintiffs Joseph Vangel, Bryan Klontz, and Janet Paula;

d. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of Illinois plaintiffs Marc Chambers, David Diersen, Chris Meredith, and Terry Abate;

e. Count 2 (Breach of Implied Warranty of Merchantability) as to the claim of Massachusetts plaintiff Ron San Angelo;

f. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of New York plaintiffs Teressa Kohman, Mark Soehnlein, and Dean Ianazzi;

g. Count 2 (Breach of Implied Warranty of Merchantability) as to the claims of Oklahoma plaintiffs Kyle and Valerie Johnson;

h. Count 3 (Violation of the Song-Beverly Consumer Warranty Act for Breach of Express Warranty) as to the claims of California plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson;

i. Count 4 (Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranties) as to the claims of California plaintiffs Amanda Simmons and Caitlin Butler;

j. Count 5 (Fraudulent Concealment) as to the claims of Alabama plaintiffs Larry Boggan and Bradford Houseal, to the extent that those claims are based on an alleged concealment or omission;

k. Count 5 (Fraudulent Concealment) as to the claims of California plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson, to the extent that those claims are based on an alleged concealment or omission and arise out of alleged post-purchase injuries;

l. Count 5 (Fraudulent Concealment) as to the claims of Florida plaintiffs Joseph Vangel, Bryan Klontz, and Janet Paula, to the extent that those claims are based on an alleged concealment or omission;

m. Count 5 (Fraudulent Concealment) as to the claims of Illinois plaintiffs Marc Chambers, David Diersen, Chris Meredith, and Terry Abbate, to the extent that those claims are based on an alleged concealment or omission;

n. Count 5 (Fraudulent Concealment) as to the claim of Massachusetts plaintiff Ron San Angelo, to the extent that the claim is based on an alleged concealment or omission;

o.      Count 5 (Fraudulent Concealment) as to the claims of New York plaintiffs Teressa Kohman, Mark Soehnlein, and Dean Ianazzi to the extent that those claims are based on an alleged concealment or omission;

p.      Count 5 (Fraudulent Concealment) as to the claims of Oklahoma plaintiffs Kyle and Valerie Johnson, to the extent that those claims are based on an alleged concealment or omission;

q.      Count 5 (Fraudulent Concealment) as to the claim of Pennsylvania plaintiff Marvin Burdick, to the extent that the claim is based on an alleged concealment or omission;

r.      Count 5 (Fraudulent Concealment) as to the claims of Texas plaintiffs Shawn Chaney, Cathis Antonio Hernandez, Kevin Smith, Gwendolyn Terry and David Terry III, and Carrie and Witold Napiorkowski, to the extent that those claims are based on an alleged concealment or omission;

s.      Count 6 (Violation of Massachusetts Gen. Laws ch. 93A) as to the claim of Massachusetts plaintiff Ron San Angelo;

t.      Count 7 (Violation of Florida Deceptive and Unfair Trade Practices Act) as to the claim of Florida plaintiff Bryan Klontz;

u.      Count 9 (Violation of Illinois Consumer Fraud and Deceptive Practices Act) as to the claims of Illinois plaintiffs Marc Chambers, David Diersen, Chris Meredith, and Terry Abbate;

v.      Count 10 (Violation of Texas Deceptive Trade Practices and Consumer Protection Act) as to the claims of Texas plaintiffs Shawn Chaney, Cathis Antonio Hernandez, Kevin Smith, Gwendolyn Terry and David Terry III, and Carrie and Witold Napiorkowski, except to the extent that the claim of plaintiff Kevin Smith is based on an allegedly deceptive omission;

w.      Counts 11 and 12 (Violation of New York General Business Law §§ 349 and 350) as to the claims of New York plaintiffs Teressa Kohman, Mark Soehnlein, and Dean Ianazzi, to the extent that those claims are based on an affirmative misrepresentation;

x.      Count 13 (Violation of California Consumer Legal Remedies Act) as to the claims of California Plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson, to the extent that those claims are based on an affirmative misrepresentation;

y.     Count 14 (Violation of California Unfair Competition Law) as to the claims of California Plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson, without prejudice; and

z.     Count 16 (Violation of Pennsylvania Unfair Trade Practice and Consumer Protection Law) as to the claim of Pennsylvania plaintiff Marvin Burdick, to the extent that the claim is based on an affirmative misrepresentation or breach of warranty.

5.     The motion to dismiss is GRANTED as to the claims of Massachusetts plaintiffs Daniel McCabe, Daniel Wright, and Jeffrey Pollack for breach of express warranty (Count 1) and fraudulent concealment (Count 5) to the extent that those claims were dismissed by the Court in its memorandum and order dated March 8, 2024, and pleaded again after that dismissal in the Amended Consolidated Class Action Complaint.

6.     The motion to dismiss is GRANTED as to all claims seeking injunctive relief.

7.     The motion to dismiss is DENIED as to the following claims:

a.     Count 5 (Fraud) as to the claims of California plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson, to the extent that those claims are based on an alleged concealment or omission that induced plaintiffs to purchase or lease their vehicles;

b.     Count 7 (Violation of Florida Deceptive and Unfair Trade Practices Act) as to the claims of Florida plaintiffs Joseph Vangel and Janet Paula;

c.     Count 8 (Violation of Alabama Deceptive Trade Practices Act) as to the claims of Alabama plaintiffs Larry Boggan and Bradford Houseal;

d.     Counts 11 and 12 (Violation of New York General Business Law §§ 349 and 350) as to the claims of New York plaintiffs Teressa Kohman, Mark Soehnlein, and Dean Ianazzi, to the extent that those claims are based on an alleged concealment or omission;

e.     Count 13 (Violation of California Consumer Legal Remedies Act) as to the claims of California plaintiffs Caitlin Butler, Amanda Simmons, and Steve Joneson, to the extent that those claims are based on an alleged concealment or omission;

f.     Count 15 (Violation of Oklahoma Consumer Protection Act) as to the claims of Oklahoma plaintiffs Kyle and Valerie Johnson;

g.     Count 16 (Violation of Pennsylvania Unfair Trade Practice and Consumer Protection Law) as to the claim of Pennsylvania plaintiff Marvin Burdick,

to the extent that the claim is based on an alleged concealment or omission; and

h.      Count 10 (Violation of Texas Deceptive Trade Practices and Consumer Protection Act) as to the claim of Texas plaintiff Kevin Smith, to the extent that the claim is based on an alleged concealment or omission.

8.      The motion to dismiss is DENIED as to any asserted defense based on the statute of limitations.

9.      Defendant shall file any renewed motion to dismiss Counts 5 (fraud based on an affirmative misrepresentation) and 6 (violation of Massachusetts Gen. Laws ch. 93A) as to the claims of Massachusetts plaintiff Jeffrey Pollack within 21 days of the date of this order—that is, by April 18, 2025.

**So Ordered.**


/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 28, 2025               Chief Judge, United States District Court